**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
:
GOWANUS INDUSTRIAL PARK, INC.,                    :         Civil Action No. 10-05522 (JG) (JO)
:
Plaintiff,            :         **ECF CASE**
:
against                           :
:
HESS CORPORATION,                                 :
:
Defendant.            :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


**DEFENDANT'S OMNIBUS MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND**
<u>**IN OPPOSITION TO GIP'S MOTION FOR SUMMARY JUDGMENT**</u>


PROSKAUER ROSE LLP

Charles S. Sims
Eleven Times Square
New York, NY 10036
P:  (212) 969-3000
F:  (212) 969-2900
csims@proskauer.com

*Attorneys for Defendant*
*Hess Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ............................................................................1

FACTS ...................................................................................................................2

Hess's Use of the Henry Street Basin and the Brooklyn Terminal.....................3

The Bulkhead Protecting the Above Ground Storage Tanks at the Brooklyn Terminal ................3

GIP's Lack of Use of the Basin ...........................................................................7

The Complaint and GIP's Representations to this Court Regarding its "Plans" for the Basin .......7

ARGUMENT .........................................................................................................8

I.      STANDARD OF REVIEW ........................................................................8

II.     GIP IS NOT ENTITLED TO DECLARATORY RELIEF ...............................10

        A.      GIP Is Collaterally Estopped From Establishing Title to the Parcels in The
                Absence Of A Legislative Act or Authorization of the Thruway Authority. ........11

        B.      Even If Judge Glasser's Finding Is Not Binding As A Matter Of Collateral
                Estoppel, the Manifest Failure To Comply With Public Lands Law Section
                50 Renders GIP's "Title" Void As A Matter Of Law...........................11

        C.      Title To The Bulkhead and The Adjacent Filled-in Lands Vested In Hess
                By Virtue Of Adverse Possession.........................................................13

                1.      Because The Port Authority Held The Parcels In Its Proprietary
                        Capacity, The Doctrine of Adverse Possession Applies...........................14

                2.      Hess's Possession of The Bulkhead Was Hostile And Under A
                        Claim Of Right......................................................................15

                3.      Possession of the Bulkhead and the Adjacent Land by Hess and its
                        Predecessors Has Been Actual, Open and Notorious, Exclusive and
                        Continuous For Over 65 Years Before This Action Was
                        Commenced. ........................................................................18

                4.      GIP's Claim That It Is Entitled To Summary Judgment On The
                        Adverse Possession Counterclaim Is Without Merit Because Title
                        Had Vested In Hess and Bushey Even Before The Void 1997
                        Conveyance.........................................................................20

i

D.      Title To The Bulkhead And The Adjacent Filled-In Lands Vested In Hess By Virtue Of The Doctrine Of Practical Location...................................................21

E.      Hess Has Satisfied The Elements Of An Easement By Prescription....................23

III.    SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST GIP'S TRESPASS CLAIM ...................................................................................................24

A.      GIP's Trespass Claim Should Be Dismissed Due to GIP's Lack of Title and Possession. ....................................................................................................24

B.      In Any Event, Hess's Exercise Of Its Riparian Rights Was Reasonable As A Matter Of Law...............................................................................................25

        1.      Hess Is A Riparian Owner. ....................................................................25

        2.      The Bulkhead, Fence And Piping Constitute A Reasonable Exercise Of Hess's Riparian Rights As A Matter Of Law. ......................27

IV.     SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST GIP'S PRIVATE NUISANCE CLAIM..........................................................................33

V.      SUMMARY JUDGMENT SHOULD BE GRANTED ON HESS'S CLAIM FOR DECLARATORY RELIEF AND ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PROPER MEASURE OF DAMAGES AND THE UNAVAILABILITY OF INJUNCTIVE RELIEF ............................................35

A.      Hess Is Entitled To Summary Judgment On Its Claim For Declaratory Relief.................................................................................................................35

B.      Hess Is Entitled To Partial Summary Judgment On The Proper Measure Of Damages. ....................................................................................................35

C.      This Court Should Deny GIP's Claim For Injunctive Relief As A Matter Of Law. ............................................................................................................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................9

*Asher v. Borenstein*,
76 A.D.3d 984 (2d Dep't 2010)..............................................................14

*Bandike Assocs. v. B.B.M. Realty Corp.*,
44 A.D.2d 622 (3d Dep't 1974).........................................................34, 35

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................8

*Chase Manhattan Bank, N.A. v. T & N PLC*,
905 F. Supp. 107 (S.D.N.Y. 1995) ........................................................34

*Chavoustie v. Stone St. Baptist Church of Chaumont*,
171 A.D.2d 1055 (4th Dep't 1991).....................................................20, 21

*City of New York v. Third Ave. Ry. Co.*,
294 N.Y. 238 (1945)........................................................................27, 28, 29

*Copart Indus., Inc. v. Consolidated Edison Co.*,
41 N.Y.2d 564 (1977) ...............................................................................33

*Coverdale v. Zucker*,
261 A.D.2d 429 (2d Dep't 1999).............................................................24

*Cullen v. Vill. of Pelham Manor*,
2009 WL 1507686 (S.D.N.Y. May 28, 2009),
*aff'd*, 399 F. App'x 657 (2d Cir. 2010) ................................................33

*De Camp v. Bullard*,
159 N.Y. 450 (1899) ...........................................................................37, 38

*DMPM Prop. Mgmt., LLC v. Mastroianni*,
82 A.D.3d 1332 (3d Dep't 2011) .............................................................20

*Drouin v. Ridge Lumber, Inc.*,
209 A.D.2d 957 (4th Dep't 1994) ............................................................33

*Durham v. Ingrassia*,
105 Misc. 2d 191 (Sup. Ct. Nassau Co. 1980).......................................28

*Felton v. King of Salsa, LLC*,
  2010 WL 1789934 (S.D.N.Y. May 4, 2010) ...........................................................9

*First Constr. Co. v. State*,
  174 A.D. 560 (3d Dep't 1916),
  *aff'd*, 221 N.Y. 295 (1917)......................................................................1, 27, 28

*Generalow v. Steinberger*,
  131 A.D.2d 634 (2d Dep't 1987) ..............................................................34, 35, 38

*GIP I*,
  2003 WL 22076651 (E.D.N.Y. Sept. 5, 2003) ............................................ passim

*GIP II*,
  2008 WL 2572853 (N.Y. Sup. Ct. Kings Co. June 27, 2008),
  *aff'd*, 65 A.D.3d 1071 (2d Dep't 2009),
  *appeal denied*, 13 N.Y.3d 716 (2010)............................................................1, 25

*Glyn v. Title Guarantee & Trust Co.*,
  132 A.D. 859 (1st Dep't 1909) ...........................................................................36

*Granchelli v. Walter S. Johnson Bldg. Co., Inc.*,
  85 A.D.2d 891 (4th Dep't 1981) .........................................................................37

*Hammond v. Baker*,
  81 A.D.3d 1288 (4th Dep't 2011) .......................................................................17

*Hartshorn v. Chaddock*,
  135 N.Y. 116 (1892) ...........................................................................................36

*Harway Improvement Co. v. Partridge*,
  203 A.D. 174 (2d Dep't 1922),
  *aff'd*, 236 N.Y. 563 (1923)................................................................................27

*Hazen v. Hazen*,
  26 A.D.3d 696 (3d Dep't 2006) ..........................................................................21

*Hoffmann Invs. Corp. v. Yuval*,
  33 A.D.3d 511 (1st Dep't 2006) .........................................................................39

*Hogan v. Kelly*,
  2011 WL 2899586 (2d Dep't July 19, 2011)......................................................17

*Huguenot Yacht Club v. Lion*,
  43 Misc. 2d 141 (Sup Ct. Westchester Co. 1964)..........................................21, 22

*In re Coll. Point Indus. Park, Urban Renewal, Project II, New York City*,
  72 A.D.2d 745 (2d Dep't 1979) ..........................................................................15

*Isear v. Burstein*,
    24 N.Y.S. 918 (Super. Ct. City of New York 1893).......................................34, 36

*Katona v. Low*,
    226 A.D.2d 433 (2d Dep't 1996) ...............................................................17

*Lawrence v. Mullen*,
    40 A.D.2d 871 (2d Dep't 1972) ...............................................34, 35, 38

*Lewis v. Vill. of Lyons*,
    54 A.D.2d 488 (4th Dep't 1976) ...............................................................14

*Long Island Gynecological Servs., P.C. v. Murphy*,
    298 A.D.2d 504 (2d Dep't 2002) ...............................................................25

*Marsh v. Hogan*,
    81 A.D.3d 1241 (3d Dep't 2011) ...............................................................39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................9

*McDermott v. City of Albany*,
    309 A.D.2d 1004 (3d Dep't 2003) .........................................................36, 37

*McMahon v. Morse*,
    135 Misc. 233 (Sup Ct. Madison Co. 1929) ...............................................23

*Mesler v. Cozzolino*,
    208 Misc. 54 (Albany Co. Ct. 1955).........................................................36

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992).....................................................................11

*Montfort v. Benedict*,
    199 A.D.2d 923 (3d Dep't 1993) ...............................................................15

*Morrison v. Nat'l Broadcasting Co.*,
    19 N.Y.2d 453 (1967) .............................................................................35

*MSF Holding Ltd. v. Fiduciary Trust Co., Int'l*,
    435 F. Supp. 2d 285 (S.D.N.Y. 2006),
    *aff'd*, 235 F. App'x 827 (2d Cir. 2007)......................................................9

*Nazarian v. Pascale*,
    225 A.D.2d 381 (1st Dep't 1996) ...............................................................18

*Parker v. Hogan*,
    2011 WL 1988070 (E.D.N.Y. May 20, 2011) .............................................33

*Parmelee v. Oswego & Syracuse R.R. Co.*,
    7 Barb. 599 (Sup. Ct. N.Y. Co. 1850),
    *aff'd on different grounds*, 6 N.Y. 74 (1851) ........................................................12

*Parry v. Murphy*,
    79 A.D.3d 713 (2d Dep't 2010) ..................................................................34, 35, 38

*Rasmussen v. Sgritta*,
    33 A.D.2d 843 (3d Dep't 1969) ................................................................................24

*Reid v. City of New York*,
    274 N.Y. 178 (1937) ................................................................................................19

*Riggs v. Benning*,
    290 A.D.2d 716 (3d Dep't 2002) ..............................................................................22

*Riviera Ass'n, Inc. v. Town of N. Hempstead*,
    52 Misc. 2d 575 (Sup. Ct. Nassau Co. 1967) ..........................................................27

*Robarge v. Willett*,
    224 A.D.2d 746 (3d Dep't 1996) ..............................................................................17

*Robert v. Shaul*,
    62 A.D.3d 1127 (3d Dep't 2009) ..............................................................................21

*Rose v. Grumman Aerospace Corp.*,
    196 A.D.2d 861 (2d Dep't 1993) ..............................................................................33

*Searight v. Doherty Enters., Inc.*,
    2005 WL 2413590 (E.D.N.Y. Sept. 29, 2005) ..........................................................9

*Serafin v. Dickerson*,
    2009 WL 3234143 (Sup. Ct. Bronx Co. Oct. 8, 2009) ......................................34, 36

*Stickler v. Halevy*,
    2011 WL 2582102 (E.D.N.Y. June 24, 2011) ..............................................16, 17, 18

*Talmage v. Ronald Altman Trust*,
    871 F. Supp. 1577 (E.D.N.Y. 1994) .........................................................................13

*Tiffany v. Town of Oyster Bay*,
    234 N.Y. 15 (1922) ..................................................................................................26

*Town of Oyster Bay v. Commander Oil Corp.*,
    96 N.Y.2d 566 (2001) ..............................................................................................27

*U.S. v. $421,090.00 in U.S. Currency*,
    2011 WL 3235632 (E.D.N.Y. July 27, 2011) .............................................................9

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,
  373 F.3d 241 (2d Cir. 2004)...........................................................32

*Walling v. Przybylo*,
  7 N.Y.3d 228 (2006) ....................................................................16

*Western World Ins. Co. v. Stack Oil, Inc.*,
  922 F.2d 118 (2d Cir. 1990)...........................................................9

*Wing Ming Props. (U.S.A.) v. Mott Operating Corp.*,
  79 N.Y.2d 1021 (1992) ................................................................39

*Woodrow v. Sisson*,
  154 A.D.2d 829 (3d Dep't 1989) ...................................................16

*Zhuang Li Cai v. Uddin*,
  58 A.D.3d 746 (2d Dep't 2009),
  *lv. denied,* 13 N.Y.3d 715 (2010),
  *cert. denied*, 131 S. Ct. 940 (2011) .........................................34, 36

*Ziegler v. Serrano*,
  74 A.D.3d 1610,
  *lv. denied*, 15 N.Y.3d 714 (2010)................................................20


**STATUTES**

CPLR § 211.....................................................................................16

CPLR § 212.....................................................................................16

N.Y. Public Lands Law § 33............................................................13

N.Y. Public Lands Law § 50.........................................1, 10, 11, 12, 13

N.Y. RPAPL § 501 ....................................................................14, 15

N.Y. RPAPL § 512(1)-(2)................................................................18

N.Y. RPAPL § 522(1)-(2)................................................................18

**OTHER AUTHORITIES**

33 C.F.R. § 330.5 ................................................................................................................5

33 CFR § 105.255 ..............................................................................................................31

33 CFR § 105.260 ..............................................................................................................31

33 CFR § 105.400 ..............................................................................................................30

33 CFR § 165.169 ..............................................................................................................31

1 N.Y. Jur. 2d, Adjoining Landowners, § 125 ..................................................................23

81 N.Y. Jur. 2d, Nuisances, §3 .........................................................................................34

Fed. R. Civ. P. 56 ................................................................................................................8

Defendant Hess Corporation ("Hess") respectfully submits this memorandum of law in opposition to the motion of plaintiff Gowanus Industrial Park, Inc. ("GIP") for summary judgment and in support of Hess's cross-motion for summary judgment.

## PRELIMINARY STATEMENT

GIP's claims are no stronger or better supported than were its claims in *GIP I*.[1]  As in *GIP I*, GIP still (1) claims title in the absence of a legislative act or authorization of the Thruway Authority, (2) claims title notwithstanding the failure of the putative conveyance to comply with Public Lands Law § 50, and (3) lacks *any* plans for use of the Henry Street Basin, despite its contrary representation that it had and would rely for this motion on such plans.

GIP's motion for summary judgment on its claim for declaratory relief ignores that title to the Bulkhead and adjacent filled in upland vested in Hess well before the failed 1997 conveyance by operation of the doctrines of adverse possession and practical location, and at a minimum Hess has a right to exclusive use by operation of prescriptive easement.[2]  (Point II.)

GIP's trespass claim fails as a matter of law not only for the foregoing reasons, but because that claim erroneously assumes – contrary to Judge Glasser's findings in *GIP I*, this Court's prior statements and, indeed, GIP's own concessions in this action – that Hess lacks any riparian rights.  As Judge Glasser recognized in *GIP I*, Hess has such rights; and the lack of any

---

[1] *GIP I* is reported at 2003 WL 22076651 (E.D.N.Y. Sept. 5, 2003).  *GIP II* is reported at 2008 WL 2572853 (N.Y. Sup. Ct. Kings Co. June 27, 2008), *aff'd*, 65 A.D.3d 1071 (2d Dep't 2009), *appeal denied*, 13 N.Y.3d 716 (2010).

[2] In this brief, "Bulkhead" refers to the steel-capped bulkhead, constructed in or about 1985, identified in *GIP I*.  The "adjacent filled in upland" is the sliver of filled in land between the Bulkhead and the U.S. Pierhead & Bulkhead Line (the "Bulkhead Line"), also identified in *GIP I*, which is a line, set out in 1875 by a New York statute, to mark the boundary between uplands and the navigable Gowanus Bay and subsequently approved by the federal government.  *See GIP I*, 2003 WL 22076651, at *6 and n.5 (factual finding re size of sliver of land); *see also, e.g.*, *First Constr. Co. v. State*, 221 N.Y. 295, 306 (1917) (*First Construction II*) (addressing the Bulkhead Line).  Because GIP's claims concern the Bulkhead together with the adjacent filled in upland, references to the Bulkhead, where context permits, generally refer to the Bulkhead together with the adjacent filled in upland west of the bulkhead line as identified in *GIP I*, 2003 WL 22076651, at *6 and n.5.

evidence of planned use by GIP impeded by Hess makes it impossible as a matter of law for GIP's interests to override Hess's interest (and the public's) in the commercial heating oil operations that Hess and its predecessors have been engaged in for decades on the east bank of the Henry Street Basin.[3]  Because Hess's exercise of its riparian rights is reasonable as a matter of law, and GIP has nothing to weigh on the other side of the balance, Hess is entitled to judgment as a matter of law dismissing the trespass claim.  (Point III.)

GIP's private nuisance claim is similarly futile (and in any event duplicative of its trespass claim, since the gravamen of GIP's complaint as to both is an alleged interference with its alleged right to exclusive possession).  Nor does a nuisance claim lie where a plaintiff alleges a nuisance operating from its own (alleged) property. (Point IV.)

To the extent that GIP's trespass claim survives, Hess seeks a declaration with respect to the proper measure of damages and the unavailability of injunctive relief on the undisputed facts.  New York courts have long held that damages for trespass caused by an encroachment are measured by the difference in the value of the property with and without the encroachment, and that injunctive relief is unavailable in cases such as this.  (Point V.)

## FACTS

Judge Glasser's opinion in *GIP I* thoroughly sets forth the history of the Henry Street Basin and the origins of the present dispute, *see GIP I*, 2003 WL 22076651, at *1-6, and Hess expressly relies on those findings for the necessary background.  Hess writes separately here to emphasize the material facts that bear on the present motions for summary judgment.

---

[3] An aerial image of the Henry Street Basin from Google Maps, which when enlarged shows the fence and piping on the west side of the above ground storage tanks, is annexed to the Declaration of Charles S. Sims executed on August 11, 2011 ("Sims Dec.") as Exhibit 1.

**Hess's Use of the Hery Street Basin and the Brooklyn Terminal**

Hess operates the oil terminal in Brooklyn, New York (the "Brooklyn Terminal"), the west side of which is the Henry Street Basin (the "Basin"), for use in its interstate transshipment of heating oil and other petroleum products from barge to delivery truck.  (Declaration of Scott Vitello executed on August 10, 2011 ("Vitello Dec.") ¶ 2.)  Heating oil and other petroleum products shipped to Hess are offloaded into a pipeline whose terminus is on the Hess Finger Pier. (Vitello Dec. ¶ 2.)  Barges moor on either side of the Hess Finger Pier to offload their petroleum, which is pumped via the pipeline into three above ground storage tanks (through intake valves on the west side of the tanks) maintained at the Brooklyn Terminal, just east of the Bulkhead in dispute here.  (Vitello Dec. ¶ 2.)  The western edge of the Brooklyn Terminal, just west of those three tanks, is the Bulkhead at issue here, which serves as the eastern edge of the Basin.  A fence (the "Fence") is maintained on top of the Bulkhead to protect the tanks (by keeping the public away from them) and to comply with regulations promulgated and enforced by the Department of Homeland Security ("DHS").[4]  (Vitello Dec. ¶ 10.)  From the above ground storage tanks, oil is pumped via pipes into tanker trucks filled at the Brooklyn Terminal, for delivery to businesses and homes throughout New York City and the surrounding metropolitan area.  (Vitello Dec. ¶ 2.) The Brooklyn Terminal accounts for more than 100 million gallons of the home heating oil and diesel fuel used by homes and businesses in New York City per year.  (Vitello Dec. ¶ 3.)

**The Bulkhead Protecting the Above Ground Storage Tanks at the Brooklyn Terminal**

An oil transshipment facility has been operating at what is now Hess's Brooklyn Terminal since at least the 1960's.  (Declaration of George S. Edge executed on August 5, 2011 ("Edge Dec.") ¶ 3.)

---

[4] Since acquiring the Brooklyn Terminal in 1977, Hess has maintained a fence atop either the Bulkhead or its predecessor wooden bulkhead for safety, security, and environmental reasons.  (Edge Dec. ¶ 14 & Exs. 6-8; Sims Dec. Ex. 1.)

Hess acquired the Brooklyn Terminal by virtue of its acquisition of shares of Bushey in 1977. At that time, the eastern bank of the Basin was supported and edged by a bulkhead consisting of wooden pilings sunk into the floor of the Basin and a crib wall (the "wooden bulkhead"). (*See* Edge Dec. ¶ 10.) A fence and piping were located just east of the wooden bulkhead, so that the tanks could be filled through their intake valves. (Edge Dec. ¶ 13 & Exs. 6-8.) There is no evidence that any western neighbor of Bushey or Hess owning the underwater land in the Basin (which neighbors were, according to the opinion of Judge Glasser, the State of New York from at least 1875 to 1945, and the Port Authority from 1945 to 2004)[5] ever complained of any encroachment of the wooden bulkhead onto their property; and as a practical matter, the wooden bulkhead was (and was treated as) part of the Brooklyn Terminal, and, as such, Hess's responsibility. (Edge Dec. ¶¶ 7-8, 10.) The first such complaint was GIP's 1998 demand that Hess compensate it for continuing to use its own bulkhead. (Edge Dec. ¶¶ 8-9.)

Nor was the Port Authority under any misimpression of the facts. From the Port Authority's assumption of ownership of the Henry Basin in 1945, it knew that the wooden bulkhead on the western edge of the Brooklyn Terminal extended west of the Bulkhead Line: a 1945 survey prepared for the Port Authority plainly indicates that the wooden bulkhead encroached beyond (*i.e.*, west of) the Bulkhead Line. *See GIP I*, 2003 WL 22076651, at *5 ("The earliest map showing the wooden bulkhead is a 1945 survey map created for the Port Authority"); Sims Dec. Ex. 2 (1945 survey map); see also Edge Dec. Ex. 6-8.

The City has also treated the Bulkhead, and its predecessor wooden bulkhead, as the Brooklyn Terminal's western boundary. The City's tax maps reflect that Bushey (and then Hess), but never GIP, have been assessed taxes on the Bulkhead and the strip of land adjacent

[5] *See GIP I*, 2003 WL 22076651, at *3-4.

4

thereto and west of the Bulkhead Line at issue here (the "Bulkhead and the adjacent filled-in lands") since the 1920's.  (Sims Dec. Ex. 3.)

In or about 1982, the United States Army Corps of Engineers ("COE") notified Hess that a portion of the property's waterside improvements were deteriorating and should be repaired.  (Edge Dec. ¶ 16.)  In its initial permit application, Hess notified the COE that its proposed work was necessary "to protect existing facilities … and to comply with requirements to protect the environment."  (Edge Dec. ¶ 23.)  Hess submitted a subsequent application—which concerned some modifications to its construction plans—in response to the COE's finding that Hess's waterfront facilities were "in imminent danger of falling into tidal waters, thereby creating a serious hazard to navigation and request that immediate action be taken to remedy this condition."  (Edge Dec. ¶ 24.)  The COE responded to Hess's applications by noting that Hess was allowed to execute its plans pursuant to a nationwide permit codified at 33 C.F.R. § 330. 5(a)(3) (Edge Dec. ¶ 25.)  As was required, Hess's plans received the approval of the New York State Department of Environmental Conservation, the New York City Department of Ports and Terminals, and the New York City Fire Department.  (Edge Dec. ¶ 26.)

Hess's protective work at the Basin included replacing the old wooden bulkhead with the Bulkhead, a steel sheet bulkhead enclosed with a thirty inch concrete cap.  (Edge Dec. ¶ 21.) This large-scale construction project took over one year to complete and cost over $3.8 million. (Edge Dec. ¶ 20.)  The Bulkhead was constructed for the sole purpose of preventing the subsidence and erosion of the land upland of the eastern bank of the Basin on which the tanks are located.  (Edge Dec. ¶ 29.)  It was not designed, engineered, nor constructed, and is not fit, for docking or mooring commercial vessels for loading or offloading goods.  (*GIP I*, 2003 WL 22076651, at *6; Edge Dec. ¶ 29; *see also* Declaration of Robert P. Perla executed on August 10,

5

2011 ("Perla Dec.") ¶¶ 8-10.)[6]  The Bulkhead extends west of the Bulkhead Line to a generally

lesser extent than the wooden bulkhead did.  *See GIP I*, 2003 WL 22076651, *5-6.

Relocating the Bulkhead to the Bulkhead Line would be prohibitively expensive and time

consuming, and would depend on the grant of numerous permits which may or may not be

forthcoming, and whose grant cannot be predicted, particularly since under governing regula-

tions the tanks could not, at present, be constructed as of right in their present location.  (Perla

Dec. ¶¶ 11-13; Edge Dec. ¶¶ 12, 32.)  Such a project would cost at least $10-20 million, and

would require at least one year to plan and execute – a period that would necessarily take the

Hess tanks out of service for at least a full heating season, depriving the City and its residents of

a principal source of New York City's home heating oil needs.  (Perla Dec. ¶¶ 12-13.)

Hess's Brooklyn Terminal is subject to a series of maritime security regulations promul-

gated by the Department of Homeland Security.  (Vitello Dec. ¶¶ 5-6.)  In accordance with these

regulations, Hess has implemented a facility security plan ("FSP") – of which the Fence is an

integral part – that has been approved by the Captain of the Port (the "COTP").  (Vitello Dec.

¶¶ 7, 9-10.)  The Fence serves the regulations' vital interests of controlling access to the Brook-

lyn Terminal, deterring the unauthorized introduction of substances and devices to the facility,

securing the substances at the facility, and protecting the facility and those persons authorized to

be there.  (Vitello Dec. ¶ 10.)  DHS regulations further require Hess to post signs along the Fence

on the Bulkhead so as to alert the public of a 25 yard waterfront security zone surrounding the

Brooklyn Terminal, violation of which is punishable by fine, imprisonment, or both.  (Vitello

Dec. ¶¶ 11-12 & Ex. 1.)  The signage contains language required by the Coast Guard.  (Vitello

---

[6] In contrast, at the same time the Bulkhead was constructed, another bulkhead, located on the southeast corner and east side of the Brooklyn Terminal (the "Pier 2 Bulkhead"), was designed, constructed, and engineered for the purpose of mooring vessels.  *See* Perla Dec. ¶ 8; Edge Dec. ¶ 30.

Dec. ¶ 12.)  Only authorized and/or invited individuals bearing a Transportation Worker Identification Credential ("TWIC") may access the Brooklyn Terminal.  (Vitello Dec. ¶¶ 13-15.)

**GIP's Lack of Use of the Basin**

Since August 31, 2009, neither GIP, nor its customers, clients or tenants, have used the western piers and bulkheads of the Basin or the Basin itself for any maritime commerce.  (Sims Dec. Ex. 4 (Quadrozzi Dep.) at 61-62, 90-92) Indeed, during that time the only use GIP has made of its Basin frontage has been its tying on of a single vessel not used in commerce and owned by the owner of GIP (John Quadrozzi, Jr.'s father's estate and his family), which used to be stationarily lodged on the far side of the Gowanus Canal but has been moored at GIP since January 2011.  (Sims Dec. Ex. 4 at 65-66).

GIP's moving papers contain no discussion whatsoever of its present use or planned use of the Basin.  Not a single page (or byte) concerning any such uses was produced in response to document production requests.  GIP's production reflects no Hess interference with GIP's ability to navigate within the Basin or to exploit its upland property on the Basin's western bank; nor has GIP complained of any such interference (other than its property dispute presented here). Similarly, there is no evidence – nor any contention – that Hess has prohibited GIP from constructing any structures or mooring facilities along the western bank of the Basin.

**The Complaint and GIP's Representations to
this Court Regarding its "Plans" for the Basin**

GIP's initial complaint, filed on November 29, 2010, was a threadbare summary of the allegations in *GIP I* which made no allegations of any planned use of the Bulkhead and the adjacent filled-in lands.  At the March 29, 2011 hearing on Hess's motion to dismiss GIP's initial complaint, the Court stated that a hearing should be held to balance the riparian rights of Hess as against the asserted rights of GIP, and GIP represented that it would amend its complaint to

7

allege a competing use of the Bulkhead.  (Sims Dec. Ex. 5 at 20-25; *see also* Sims Dec. Ex. 5 at 24 ("I take it at this hearing you're going to present evidence as what the plan is and how the plan is frustrated by this bulkhead. . . ?")).  Indeed, this Court's order setting forth the scope of the hearing at which the Court planned on balancing GIP's rights, as the purported owner of lands under water, against Hess's rights as a riparian owner, noted that the balancing would necessarily focus on GIP's proposed use of the underwater land.  (Docket No. 22, at 4-5.)

GIP amended its complaint to make vague references to "plans," but none of them was produced or have the slightest reality *and none have been proffered to the Court on GIP's motion for summary judgment*, when it was GIP's obligation to do so.  GIP produced no documents whatever evidencing or relating to these "plans" in the course of document production.  In sum, for purposes of this motion – and in reality – GIP has no planned use of the Bulkhead and the adjacent filled-in lands, or even of the Basin, to weigh in the balance against Hess's continued petroleum transshipment operations at its Brooklyn Terminal.

## ARGUMENT

### I.   STANDARD OF REVIEW

Summary judgment should be granted where the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment provides a procedure whereby unfounded claims may be eliminated without a costly and unnecessary trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . .  A fact is material if it might affect the outcome of the suit under the governing law. . . .  The moving party bears the initial burden of demonstrating that no genuine factual dispute exists. . . .  If the movant successfully makes this showing, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for

trial." *U.S. v. $421,090.00 in U.S. Currency*, 2011 WL 3235632, at *5 (E.D.N.Y. July 27, 2011)

(Gleeson, J.)  (citations omitted) (internal quotation marks omitted).  To withstand the motion,

the nonmovant must do more than present evidence that is merely colorable, conclusory or

speculative; it must present "concrete evidence from which a reasonable [fact-finder] could

return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986);

*Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (nonmoving party

"cannot escape summary judgment merely by vaguely asserting the existence of some unspeci-

fied disputed material facts, or defeat the motion through mere speculation or conjecture")

(citations and internal quotation marks omitted).  In the end, the nonmovant must do more than

show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986).

Moreover, Local Civil Rule 56.1 requires a movant to submit a statement of undisputed

material facts in connection with its motion, and GIP has failed to comply with that rule.

"Failure to submit such a statement may constitute grounds for denial of the motion."  *See Felton

v. King of Salsa, LLC*, 2010 WL 1789934, at *2 (S.D.N.Y. May 4, 2010) (holding that movant's

failure "to comply with Local Rule 56.1(a) with respect to statements of material facts . . . results

in the denial of their motion for summary judgment"); *MSF Holding Ltd. v. Fiduciary Trust Co.,

Int'l*, 435 F. Supp. 2d 285, 304 (S.D.N.Y. 2006) (same), *aff'd*, 235 F. App'x 827 (2d Cir. 2007);

*Searight v. Doherty Enters., Inc.*, 2005 WL 2413590, at *1 (E.D.N.Y. Sept. 29, 2005) (denying

motion for summary judgment for failure to submit a Local Rule 56.1 statement and noting that

even if movant's affidavit, which accompanied its motion for summary judgment, was construed

to be movant's Local Rule 56.1 statement, the motion would still be denied because "it fail[ed] to

allege material facts that, if undisputed, entitle[d] [movant] to summary judgment").

## II.    GIP IS NOT ENTITLED TO DECLARATORY RELIEF

GIP's motion papers do not specify the declaratory relief it seeks, but its amended

complaint sought a judgment declaring that GIP is the "sole and exclusive owner" of the parcels

of land allegedly (but subsequently determined to have been invalidly) acquired by it in 1997

(the "Parcels"), including the Bulkhead and filled in land west of the Bulkhead Line; that GIP is

"entitled to sole, exclusive and unfettered use of and access to the Bulkhead, which includes, but

is not limited to, constructing a catwalk and related Pile Clusters"; that Hess "has no legal or

equitable claim to the ownership or use of the Bulkhead"; and also that the Bulkhead is within

the legal description of the underwater Parcel and therefore legally constitutes part of the "Parcel

Property."  Am. Compl. at 9.

As a matter of law, plaintiff is not entitled to that declaratory relief for several reasons.

First, Judge Glasser's 2003 opinion, subject to collateral estoppel, established that existing state

laws preclude the transfer of the Parcels outside of state control without authorizing legislation

(which has not been enacted) or, conceivably, the action of the New York State Thruway

Authority (which was not forthcoming), so that the alleged "corrective" 2004 conveyance to GIP

was invalid.  Second, even if collateral estoppel does not bar plaintiff's claim, the failure to

comply with Public Lands Law § 50 renders GIP's 2004 title void as a matter of law.  Third, title

to the Bulkhead and the adjacent filled-in lands vested in Hess even before the failed 1997

conveyance, as a result of the doctrines of adverse possession and practical location.  Finally,

because Hess is able to satisfy the elements of an easement by prescription, plaintiff is not

entitled to the requested declaratory relief.  Each of these reasons is sufficient to deny the relief

sought by plaintiff.

**A.      GIP Is Collaterally Estopped From Establishing Title to the Parcels in The Absence Of A Legislative Act or Authorization of the Thruway Authority.**

None of the various memoranda submitted by plaintiff in this matter have mentioned, let alone addressed, Judge Glasser's holding that a permissible transfer of the title to the Parcels to GIP *could only be accomplished* by an act of the Legislature, and in any event by the Thruway Authority, not the Commissioner of General Services. *GIP I*, 2003 WL 22076651, at *9-10. Although plaintiff has declined to address this holding, it is binding nonetheless between the parties as a matter of collateral estoppel as it was necessarily decided and central to the holding in *GIP I* and would be dispositive here. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir. 1992); *see also* May 13, 2011 Order at 6-7 and n.4. Plaintiff's inability to demonstrate that the conditions held required by Judge Glasser have been satisfied (the Legislature has not acted to permit the title transfer, and the Thruway Authority did not transfer title) preclude it from establishing that the 2004 conveyance was valid.[7]

**B.      Even If Judge Glasser's Finding Is Not Binding As A Matter Of Collateral Estoppel, the Manifest Failure To Comply With Public Lands Law Section 50 Renders GIP's "Title" Void As A Matter Of Law.**

GIP's title defense consists merely of a truncated and conclusory summary of the argument advanced by the New York Attorney General in its brief as amicus curiae – namely, "that GIP obtained title through a facially valid letters patent" and that "the only party that may challenge such title is the State of New York." (GIP Mem. at 7.) As explained more fully in Hess's memorandum in response to the Attorney General's brief, which Hess expressly incorporates by reference and relies on here, (1) Hess is not barred from challenging GIP's alleged ownership in

---

[7] Contrary to GIP's contention (GIP Mem. at 7), this Court did not deny, in its entirety, Hess's motion to dismiss on the basis of collateral estoppel. Instead, this Court held only that "[a]ssuming that GIP holds title to the property at issue, its trespass and nuisance claims are not barred by *res judicata* or collateral estoppel." (May 13 Order at 7.) As this Court made clear, it has not yet decided that GIP holds valid title. (*Id.* at 2 and n.1.) Accordingly, the effect of collateral estoppel on plaintiff's claim of title has not yet been resolved.

11

defense of GIP's claims, and (2) even if Hess could only challenge the facial validity of the letters patent, they are not facially valid because even a cursory examination of Public Lands Law Section 50 and the Findings of the First Deputy Commissioner of General Services— expressly stated in the letters patent as the authorizing source—shows failure to comply with the material requirements of Section 50, including a failure of the required consideration.

First, the authority cited by plaintiff and the Attorney General in support of the claim that Hess lacks standing to challenge plaintiff's ownership was ancient lower court dicta, not even addressed by the Court of Appeals, which affirmed on a different ground. *See Parmelee v. Oswego & Syracuse R.R. Co.*, 7 Barb. 599 (Sup. Ct. N.Y. Co. 1850), *aff'd on different grounds*, 6 N.Y. 74 (1851). Indeed, as Hess established, modern courts entertain challenges to ownership regardless of the method of conveyance, including letters patent. (Hess Mem. in Response to AG at 4.)

In any event, as Hess established in its response to the amicus brief, *Parmelee* is distinguishable because (1) that court merely held that title could not be challenged by plaintiffs who had no colorable claim whatsoever to any property interest in dispute and (2) the plaintiffs in that case sought to challenge the validity of the letters patent in order to evict the defendant. Here, by contrast, (1) Hess has a recognized property interest in dispute – including its riparian rights and its construction of the Bulkhead – and (2) Hess is defending itself against GIP's claims. (Hess Mem. in Response to AG at 4-6.) Accordingly, for the reasons underlying Judge Glasser's 2003 decision, and based on collateral estoppel as well, Hess has standing to challenge the validity of GIP's alleged title.

Second, even if plaintiff and the Attorney General were correct that Hess may challenge only the facial validity of the letters patent, the defects identified by Hess's May 27, 2011

12

Memorandum of Law demonstrate that the letters patent are, indeed, facially invalid, because (1) the Parcels are not abandoned canal land, (2) GIP was not an "occupant" of the Parcels and (3) GIP failed to pay to the State the consideration required by Public Lands Law §§ 50 and 33. (Hess Mem. in Response to AG at 10-18.)  Accordingly, the letters patent are facially invalid and GIP is not entitled to a declaratory judgment that it owns the Parcels.

Finally, to the extent that GIP seeks a declaration that Hess has no "legal or equitable claim to the . . . use of the Bulkhead", its claim is barred by res judicata and collateral estoppel, since Judge Glasser in *GIP I* expressly held that

> Hess's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is granted in part as to those parts of [GIP's] claims I and IV seeking declaratory relief that GIP is the sole legal and equitable owner of the property and that Hess has no legal or equitable claim to make use of either the bulkhead or the waters to the west of the Finger Pier . . . .

*GIP I*, 2003 WL 22076651, at *18.

### C.      Title To The Bulkhead and The Adjacent Filled-in Lands Vested In Hess By Virtue Of Adverse Possession.

Adverse possession was not raised in the prior proceeding.  Undisputed evidence now establishes, however, that since at least 1945, Hess, and Ira S. Bushey & Sons, Inc.  ("Bushey"),[8] its wholly-owned subsidiary since 1977, have maintained a bulkhead on the western side of the Brooklyn Terminal, which according to a 1945 survey prepared for the Port Authority clearly shows extended generally even further west of the Bulkhead Line than the present steel bulkhead Hess completed in or about 1985.

---

[8] Bushey, Hess's wholly owned subsidiary, has continuously owned the two parcels adjacent to the east side of the Basin pursuant to two deeds dated January 10, 1940 and April 15, 1942.  (Edge Dec. ¶ 5.) Under New York law, "a claimant in possession for less than the prescriptive period may tack his possession to a predecessor's possession to satisfy the applicable period." *Talmage v. Ronald Altman Trust*, 871 F. Supp. 1577, 1586, (E.D.N.Y. 1994), citing *Brand v. Prince*, 35 N.Y.2d 634, 637 (1974). Accordingly, in satisfying the elements of adverse possession, Bushey and Hess may also rely on the possession of even earlier predecessors-in-interest if such be necessary.

Under Article Five of the New York Real Property Actions and Proceedings Law, an "adverse possessor" is defined as a person or entity who occupies "real property of another person or entity with or without knowledge of the other's superior ownership rights, in a manner that would give the owner a cause of action for ejectment." N.Y. RPAPL § 501.1. Where the party claiming adverse possession demonstrates that its possession was "adverse, under claim of right, open and notorious, continuous, exclusive and actual," for the statutory period title vests in that party by operation of law. *Id.* § 501.2; *see also Asher v. Borenstein,* 76 A.D.3d 984, 986 (2d Dep't 2010) (to establish adverse possession, possession must be "(1) hostile and under claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for the required period"). In light of the indisputable evidence establishing that Hess and/or Bushey have possessed the Bulkhead and the adjacent filled-in lands and the predecessor wooden bulkhead openly and notoriously since at least 1945, title to the bulkheads and adjacent filled-in lands vested in Hess and/or Bushey via adverse possession long before plaintiff sought to enforce its rights by commencing this action and long before even before the failed 1997 conveyance.

1.  Because The Port Authority Held The Parcels In Its Proprietary Capacity, The Doctrine of Adverse Possession Applies.

Although adverse possession does not apply to property owned by the government and held by it in its governmental capacity, it is well-established that where such property is owned by the government in its proprietary capacity – as distinguished from its governmental capacity – the government is not immune from adverse possession. *Lewis v. Vill. of Lyons*, 54 A.D.2d 488, 490 (4th Dep't 1976). Thus, where the property held by the State has not been appropriated to public use, nor considered by it as property being held in trust, title can be acquired through adverse possession. *See id.* at 490-91 ("There is a well-recognized distinction between lands held by the State as sovereign in trust for the public and lands held as proprietor only, 'for the

14

purpose of sale or other disposition' . . . such lands only as the State holds as a proprietor may be lost to the State; it cannot lose such lands as it holds for the public, in trust for a public purpose, as highways, public streams, canals, public fair grounds."  (internal quotation marks omitted)); *see also In re Coll. Point Indus. Park, Urban Renewal, Project II, New York City*, 72 A.D.2d 745, 746 (2d Dep't 1979) (filled in land held by government in proprietary capacity with no statutory prohibition on alienability may be adversely possessed).  New York law clearly prescribes that abandoned canal lands are held by the government in its proprietary capacity.  *See Montfort v. Benedict*, 199 A.D.2d 923, 925 (3d Dep't 1993) (noting that lands no longer held for canal purposes are held in a proprietary capacity in the absence of "any other sovereign or public purpose").  The Attorney General's position that the Parcels became abandoned canal land pursuant to the 1944 Statute (Amicus Brief at 6), whatever its validity for other purposes,[9] reflects the Attorney General's agreement that the Parcels have been held by the government in its proprietary capacity since then, and therefore adverse possession properly lies.

> 2.   Hess's Possession of The Bulkhead Was Hostile And Under A Claim Of Right.

Hess's operations (and those of its predecessors) at and occupation of the Terminal, including the successive bulkheads and the adjacent filled in land west of the Bulkhead Line, have been under an obvious claim of right (and "hostile" for purposes of adverse possession law), and actual, open and notorious, exclusive and continuous for many decades (since not later than 1945).[10]  Accordingly, title to the Bulkhead and the adjacent filled-in lands vested in Hess

---

[9] As discussed *supra* and in its prior briefs, Hess disagrees with this claim, but assumes its validity for purposes of this point.  Of course, if the Court agrees with Hess that the Parcels were never abandoned canal land, then this court need not address this adverse possession claim as Hess will have demonstrated that GIP lacks title.

[10] N.Y. RPAPL § 501 provides that "An adverse possessor gains title to the occupied real property upon the expiration of the statute of limitations for an action to recover real property pursuant to subdivision (a) of section two hundred twelve" of the CPLR; and CPLR § 212, entitled "Possession necessary to recover

before the failed 1997 conveyance. Bushey's reliance on the Robinson Deed (addressed, albeit found wanting, by Judge Glasser), and its actions while in possession, establish that its possession was hostile and under a claim of right. "By definition, a claim of right is adverse to the title owner and also in opposition to the rights of the true owner." *Walling v. Przybylo*, 7 N.Y.3d 228, 232 (2006); *Woodrow v. Sisson*, 154 A.D.2d 829, 830-31 (3d Dep't 1989) ("There is also sufficient evidence to demonstrate that plaintiffs occupied the Schoolhouse Lot under a claim of right. Plaintiffs believed they owned the parcel in question and claimed and maintained it as their own even though it was not included in the description in their deed. Moreover, in view of defendants' failure to present any credible evidence that plaintiffs did not claim the parcel as their own, plaintiffs' claim of right was not required to be a valid or rightful claim under plaintiffs' deed."); *see also Stickler v. Halevy*, 2011 WL 2582102, at *8 (E.D.N.Y. June 24, 2011) ("a possessor's subjective belief or motive is irrelevant to" a claim of right; "the manifest acts of the possessor are what put the owner on notice of the hostile claim"). Similarly, with regard to the element of hostility, the occupant's

> possession does not require a showing of enmity or specific acts of hostility . . . .
> All that is required is a showing that the possession constitutes an actual invasion
> of or infringement upon the owner's rights . . . . Consequently, hostility may be
> found even though the possession occurred inadvertently or by mistake, as is the
> likely situation here . . . . In any event, if the use is open, notorious, and
> continuous for the full [] statutory period, a presumption of hostility arises.

---

real property," in turn, provides in subdivision (a) a 10-year limitations period. Thus, title vested in Hess's predecessors by 1955. Even if GIP argued that the longer limitations period for actions "by" New York State in § 211(c) should apply (and this is not such an action), GIP would not be helped, since the undisputed facts show the necessary adverse possession for any arguably applicable lengthier period - indeed, even if a 40 year limitation period applied, title still vested in Hess by 1985.

For those same reasons, GIP's action is time-barred by CPLR § 211(d), which provides that "An action shall not be commenced for or with respect to real property by a person claiming by virtue of letters patent or a grant from the state, unless it might have been maintained by the state, as prescribed in this section, if the patent or grant had not been issued or made." Had the alleged grant to GIP not been made, the state (and even the Port Authority, assuming contrary to law that it were deemed "the state") could not have sued Hess, because that claim "by the state" would not have accrued within the prescribed period before GIP's commencement of this action in 2010 as required by CPLR § 211(c).

16

*Katona v. Low*, 226 A.D.2d 433, 434 (2d Dep't 1996) (internal citations omitted) (hostility requirement satisfied where "the plaintiff, as an adverse user, entered upon real property under the misapprehension that the parcel was part of his land, and cultivated the parcel by planting a hedgerow, rose bushes, and a rock garden, a use consistent with the nature and character of the parcel"); *see also Robarge v. Willett*, 224 A.D.2d 746, 747 (3d Dep't 1996) ("to prove hostility, all that is required is a showing that the possession infringed on the owner's rights, even if inadvertent or by mistake").[11]

The unilateral maintenance (by Bushey and Hess and their predecessors) of the Bulkhead, Fence and Piping, and their longstanding payment of property taxes on the Bulkhead and filled in lands west of the Bulkhead Line, makes plain their good faith belief that prior deeds had given them rights in and to the Basin. *See GIP I*, 2003 WL 22076651, at *5 ("the Robinson deed purported to convey title to the lands under water extending from the eastern side of the Henry Street Basin to the center of the basin"). Consistent with that belief, Bushey maintained the wooden bulkhead, fence and piping on the land that it believed it owned. Bushey and Hess continued this pattern of possession and, indeed, replaced the wooden bulkhead in 1985 with the Bulkhead as part of a large-scale, time-consuming, and expensive construction project, which required numerous governmental permits. Clearly, all concerned were under the good faith belief that Bushey and Hess owned the Bulkhead and the adjacent filled-in lands. Of particular significance is the fact that Hess or its predecessors-in-title have paid property taxes on the

---

[11] While legislation was passed in 2008 to codify this area of law, it changed none of the relevant legal principles and rules that require judgment in Hess's favor (and in any event could not be retroactively applied to an adverse possession claim that began to run more than 60 years ago). *See Stickler*, 2011 WL 2582102, at *6 ("New York courts have not applied these 2008 amendments retroactively."); *Hogan v. Kelly*, 2011 WL 2899586, at *2 (2d Dep't July 19, 2011) ("the amendments cannot be retroactively applied to deprive a claimant of a property right which vested prior to their enactment"); *Hammond v. Baker*, 81 A.D.3d 1288, 1290 (4th Dep't 2011) ("where title has vested by adverse possession it may not be disturbed retroactively by newly-enacted or amended legislation").

Bulkhead for at least the past 80 years.  (*See* Sims Dec. Ex. 3.)  Further support that Hess and

Bushey had been conducting themselves as, and were believed to be, the owners of the Bulkhead

is evidenced by the fact that, in 1982, the Army Corps of Engineers advised Hess, not the Port

Authority, that the deteriorating wooden bulkhead needed to be replaced.  (Edge Dec. ¶ 16.)

Accordingly, Hess's possession was hostile and under a claim of right, as required by New York

law.  *See Nazarian v. Pascale*, 225 A.D.2d 381, 383 (1st Dep't 1996) (hostile possession did not

arise upon sending of letter by owner's attorney to adverse possessor to cease and desist use of

encroaching portion of property and to build a wall to demarcate the correct limits of the

property, where owner's predecessor knew of encroachment six years earlier (predecessor had

built the encroachment) – "our courts have historically applied an objective test of focusing

simply on the adverse possessor's use of the property as his own, notwithstanding the true

owner's negligent forbearance in bringing action to assert his rights").

Similarly, at the very moment that it obtained ownership of the Basin in 1945, a Port

Authority survey showed unmistakably to it that Bushey's then-wooden bulkhead extended up to

15 feet 4 inches west of the Bulkhead Line.  (Sims Dec. Ex. 2.)  It was at that moment that the

adverse possession period (whether 10 or 20 or even 40 years) began to run.

> 3.     Possession of the Bulkhead and the Adjacent Land by Hess and its
>        Predecessors Has Been Actual, Open and Notorious, Exclusive and
>        Continuous For Over 65 Years Before This Action Was Commenced.

The Bulkhead and filled-in uplands adjacent to it have been "improved" and "protected

by a substantial enclosure."  N.Y. RPAPL §§ 512(1)-(2), 522(1)-(2), as in effect prior to the 2008

amendments; *see also Stickler*, 2011 WL 2582102, at *9 ("Possession and adverse use must be

open and notorious in order to provide a reasonably attentive owner notice of a possible adverse

claim.").  At the time it first took ownership in 1945, survey maps *created for the Port Authority*

reflect the existence of the old, wooden bulkhead *up to 15 feet 4 inches west of the Bulkhead*

Line.  *GIP I,* 2003 WL 22076651, at *5 n.4; *see also* Sims Dec. Ex. 2 [1945 survey]; Edge Dec.

Ex. 3.  That wooden bulkhead existed continuously until the early 1980s, when it was replaced

by Hess with a "steel sheet bulkhead enclosed with a thirty inch concrete cap, constructed for the

sole purpose of shoring up the upland east of the Henry Street Basin owned by Hess."  *Id.* at *5-

6.  Indeed, as discussed *supra*, it was Hess, not the Port Authority, that was notified by the COE

that the wooden bulkhead needed substantial repairs.  *Id.* at *5.  In turn, Hess applied for and

received permission from the COE (and others) to renovate the wooden bulkhead.  *Id.*

Indisputably, Hess and Bushey possessed the Bulkhead, the predecessor wooden bulkhead, and

the adjacent filled-in lands for in excess of 50 years prior to the failed 1997 conveyance.

      The placement of the Fence and Piping on top of or just east of the Bulkhead further rein-

forces the actual, open and notorious, and exclusive nature of Hess's and Bushey's possession.

The Fence openly and notoriously bars access to the uplands adjacent to the Bulkhead from the

Parcels.  It has for decades been assuring Hess and Bushey of exclusive possession, as the

relevant sliver of fenced-in land could only be accessed from the terminal property.  Similarly,

placement of the colorful piping at the foot of the Fence demonstrates that the Bulkhead and the

adjacent filled-in lands had been adapted for a single purpose – offloading oil into Hess's above

ground storage tanks.  Notably, neither the Port Authority nor any other state or federal agency

ever raised any objections or complaints with respect to Hess's replacement of the deteriorating

wooden bulkhead with the Bulkhead.  (Edge Dec. ¶ 27.)  It was apparent to any reasonably atten-

tive neighbor to the west that Hess was possessing the Bulkhead and the adjacent filled-in lands

with the intent to (1) exclude all others and (2) use the property in connection with its marine oil

transshipment operations. *See Reid v. City of New York,* 274 N.Y. 178, 181-82 (1937) (adverse

possession established where part of possessed land under water "was filled in, was bulkheaded,

and two piers were erected," "[t]he owners of the upland manufactured brick from the sand of

Gravesend Bay and pumped it from Allotment No. 8 in pipes laid along the bed of Allotment No.

8" and "[t]his property has been assessed against plaintiff and his predecessors since 1894 and

prior thereto"); *DMPM Prop. Mgmt., LLC v. Mastroianni*, 82 A.D.3d 1332, 1332-33 (3d Dep't

2011) (adverse possession established where recreation center exclusively occupied disputed

property for 17 years, undertook acts consistent with ownership, including payment of taxes,

landscaping and maintenance, and openly used property as place of ingress, egress and parking);

*Ziegler v. Serrano*, 74 A.D.3d 1610, 1612 (3d Dep't) ("Throughout this time, plaintiffs

undertook numerous acts that were consistent with those of a property owner and sufficient to

put defendant on notice, including the payment of all taxes, extensive landscaping, installing a

shed and fence, replacing all the windows, the deck, front door, sidewalk and driveway, and

prominently displaying their surname on the home's mailbox."), *lv. denied*, 15 N.Y.3d 714

(2010); *Chavoustie v. Stone St. Baptist Church of Chaumont*, 171 A.D.2d 1055, 1055-56 (4th

Dep't 1991) (adverse possession established where "plaintiffs cultivated and maintained the

subject parcel, mowed it, planted a garden and trees on it, and erected a garage, swimming pool,

storage shed and clothes line on it," facts which "established that plaintiffs have possessed the

parcel hostilely and under claim of right, actually, openly and notoriously, exclusively and

continuously for the statutory period").

> 4. GIP's Claim That It Is Entitled To Summary Judgment On The Adverse Possession Counterclaim Is Without Merit Because Title Had Vested In Hess and Bushey Even Before The Void 1997 Conveyance.

GIP says that its opposition to Hess's claim commenced in January 1998 – 11 months

after the failed 1997 conveyance.  (GIP Motion, at 9.)  But the period from 1945 through 1965

(or indeed through 1997) established that title had vested in Hess, through Bushey, by operation

of the doctrine of adverse possession.  Well before the failed conveyance and the 1998 letters,

Hess was the owner of the Bulkhead and the uplands.[12]

### D.     Title To The Bulkhead And The Adjacent Filled-in Lands Vested In Hess By Virtue Of The Doctrine Of Practical Location.

Under the doctrine of practical location, "[a] practical location of a boundary line and an

acquiescence therein for more than the statutory period is conclusive of the location of such

boundary . . . although such line may not in fact be the true line according to the calls of the

deeds of the adjoining owners."  *Hazen v. Hazen*, 26 A.D.3d 696, 697-98 (3d Dep't 2006). "[T]o

be effectual, the acquiescence must be an act of the parties, either express or implied; and it must

be mutual, so that both parties are equally affected by it [and i]t must be definitely and equally

known, understood and settled."  *Robert v. Shaul*, 62 A.D.3d 1127, 1128 (3d Dep't 2009).

New York courts have not hesitated to apply this doctrine.  *See Hazen*, 26 A.D.3d at 698

(despite knowledge of property lines as called for in deeds, fence represented boundary between

two farms by practical location); *Chavoustie*, 171 A.D.2d 1055, 1055-56 (4th Dep't 1991) ("The

uncontradicted testimony established that, at least between 1974 and 1985, the owners of the

respective properties considered their boundary line to be a line parallel to and three feet from

the west side of [the] church and perpendicular to Washington Street.  That testimony shows the

practical location of the boundary and acquiescence thereto by the respective property owners for

at least 11 years.  Practical location and acquiescence for the statutory period is conclusive as to

the location of the boundary line."); *Huguenot Yacht Club v. Lion*, 43 Misc. 2d 141, 145 (Sup Ct.

Westchester Co. 1964) ("It has also been firmly established that where adjoining property

---

[12] Interestingly, GIP's President, John Quadrozzi, Jr., claims that although he believed during the 1997 transaction that GIP would be acquiring the Bulkhead and adjacent filled in land west of the Bulkhead Line, he said or did nothing to raise the issue with Hess (or for that matter with the Port Authority) prior to the closing on that transaction in 1997.  (Sims Dec. Ex. 4 at 34.)

owners have long acquiesced in establishing the boundary line as to their land under water as being their upland property line extended to the bulkhead line, the proper boundary line is the line established by the parties."); *cf. Riggs v. Benning*, 290 A.D.2d 716, 717-18 (3d Dep't 2002) ("faintly painted line" that "was not straight and was 'hard to follow'" and "occasional postings" (on fewer than12 trees along a 2,500 foot border) bearing name of defendant's predecessor failed "to establish that the border was sufficiently known, understood and settled among the parties and their predecessors-in-interest to have been established by practical location").

The undisputed record, including the Port Authority's acquiescence to Bushey's and Hess's maintenance of the Bulkhead for decades, establishes that all parties treated the Bulkhead topped by a fence and piping as the western boundary of the Brooklyn Terminal.  The open, notorious maintenance of a bulkhead, a fence and a system of piping without complaint by the Port Authority reflects its acquiescence to the Bulkhead as the western boundary of the Brooklyn Terminal, notwithstanding its 1945 survey (or any other surveys or deeds).  *Cf. GIP I*, 2003 WL 22076651, at *9 ("the existence of a structure *under the waters of the Gowanus Bay* (even if known) does not lend itself to the type of confidence in assuming acquiescence *that fences, walls or other marks on solid ground would inspire*") (emphasis added).  Furthermore, the evidence clearly establishes that Hess, or its predecessors in interest, have been paying taxes on the Bulkhead and the adjacent filled-in lands since the 1920's.  Indeed, New York City tax maps dating back until the early part of the twentieth century include the Bulkhead and the adjacent filled-in lands within the lot owned by Hess and its predecessors in interest.  (*See* Sims Dec. Ex. 3.)  Under such circumstances, acquiescence to the Bulkhead as the boundary line clearly existed for 59 years before the alleged 2004 conveyance and, thus, such practical location is conclusive as to the actual location of the boundary line.  *See Huguenot*, 43 Misc. 2d at 145-46 (practical

location established where (1) plaintiff had submitted an application to the Army Corps of Engineers for a dredging permit "show[ing] the boundary line of its land under water to be the projection of its upland property line," (2) a similar application by defendant's father showed the same boundary line, (3) "[i]t also appears from other maps and applications of both parties that from 1930 until service of the complaint in this action, both the plaintiff and the defendant always treated the proper boundary line between their respective lands under water to be the extension of their upland boundary line" and (4) state land grants reflected that "the proper boundary line between their respective lands under water is their upland property line extended"); *McMahon v. Morse*, 135 Misc. 233, 236 (Sup Ct. Madison Co. 1929) ("The long-continued acquiescence of the plaintiff's predecessors in title to the maintenance of the fence on the now disputed line amounts in law to a practical location of the fence, and estops the plaintiff from now disputing defendants' title to the land so fenced off to them."); 1 N.Y. Jur. 2d Adjoining Landowners § 125 ("Where premises have been bounded by a fence for upward of 20 years the law presumes that the fence is the true boundary, and will not disturb such a line.  Acquiescence in a fence as a boundary line for a period of more than 20 years estops the owner of the adjoining land from setting up, as against a purchaser of the adjacent land from the original owner, that the fence was not the true boundary line.  Acquiescence for 40 years in a fence as marking the true boundary line establishes the boundary conclusively, notwithstanding the fence was originally put up under an agreement that it was to be altered at some future time in case it should be found on actual survey that it was not on the true line.").

### E.    Hess Has Satisfied The Elements Of An Easement By Prescription.

For the same reasons discussed in part II.C, *supra*, in which Hess demonstrated that it has title to the Bulkhead and the adjacent filled-in lands by virtue of the doctrine of adverse possession, Hess also is entitled to continue its exclusive use of that area by virtue of the doctrine

of easement by prescription.[13]  This doctrine is almost identical to adverse possession except that it is premised on adverse use of property, rather than possession, and results in an easement, not a transfer of title.  *See Rasmussen v. Sgritta*, 33 A.D.2d 843, 843 (3d Dep't 1969).  Here, Hess and Bushey have had both possession and use of the Bulkhead and the adjacent filled-in lands since 1945, so both doctrines apply.  Under the prescriptive easement doctrine, "[o]nce the claimant has shown, by clear and convincing evidence, that the subject property was used openly, notoriously, and continuously for the statutory period, the presumption arises that the use was adverse under claim of right and the burden shifts to the owner of the property to rebut the presumption by showing that the use was permissive."  *Coverdale v. Zucker*, 261 A.D.2d 429, 430 (2d Dep't 1999).  For the same reasons discussed *supra* in connection with adverse possession, Hess's use of the Bulkhead and the adjacent filled-in lands is sufficient, as a matter of law, to satisfy the elements of a prescriptive easement.  *See id.* (elements of prescriptive easement satisfied by showing that "since 1971, [defendant's] family had openly and notoriously used a portion of the plaintiff's estate as a driveway to gain access to their residence").  Thus, Hess has the right to continue its exclusive use of the Bulkhead and the adjacent filled-in lands.

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST GIP'S TRESPASS CLAIM

### A.    GIP's Trespass Claim Should Be Dismissed Due to GIP's Lack of Title and Possession.

As discussed in point II *supra*, both collateral estoppel and New York statutory law foreclose GIP's claim of title to the Bulkhead and the adjacent filled-in lands.  Nor is there any evidence whatever that GIP has ever been in possession of those areas at any point in time, and undisputed evidenced establishes the opposite.  Lacking any property and possessory interest in

---

[13] To the extent that the court agrees with any of points II.A through D, *supra*, it need not address this claim, as Hess will have demonstrated either that GIP does not own the Parcels or that Hess owns the Bulkhead and the adjacent filled-in lands.

those areas, GIP's trespass claim fails as a matter of law.  That was the reason for the dismissal of GIP's trespass claim in *GIP I*.  *GIP I*, 2003 WL 22076651, at *12.  *See Long Island Gyneco-logical Servs., P.C. v. Murphy*, 298 A.D.2d 504, 504 (2d Dep't 2002) ("Liability for civil tres-pass requires the fact-finder to consider whether the person, without justification or permission, either intentionally entered *upon another's property*, or, if entry was permitted, that the person refused 'to leave after permission to remain ha[d] been withdrawn.'") (quoting *Rager v. McCloskey*, 305 N.Y. 75, 79 (1953)) (emphasis added).

**B.    In Any Event, Hess's Exercise Of Its Riparian Rights Was Reasonable As A Matter Of Law.**

Moreover, as this court has observed and as Judge Glasser recognized in *GIP I*, plaintiff's trespass claim fails as a matter of law if Hess's maintenance of the Bulkhead was a reasonable exercise of its riparian rights.  *See GIP I*, 2003 WL 22076651, at *15; *see also GIP II*, 2008 WL 2572853, at *5 (June 27, 2008) (riparian owners have "the right to reasonable access" to under-water landowner's property).  For the reasons that follow, and because GIP has broken its promise to the Court that this time around it would present evidence of its plans and the manner in which that plan is frustrated by the Bulkhead (Sims Dec. Ex. 5 at 24), the only possible finding is that Hess's exercise of its riparian rights is reasonable as a matter of law, and plaintiff's trespass claims therefore cannot survive.

    1.    Hess Is A Riparian Owner.

Plaintiff's contention that "Hess is not a riparian owner and thus, it has no riparian rights to the Basin" (GIP Mem. at 5-6) is contrary to several express findings by Judge Glasser, and in any event unsustainable.  Judge Glasser expressly found, and relied on the finding, that Hess is a "riparian owner" with "riparian rights":

- "[T]his Court must examine the scope of Hess's riparian rights."  *GIP I*, 2003 WL 22076651, at *13.

25

- "Under New York law, as a riparian owner Hess has the right. . . ." *Id.* at *14.

- "[T]he issue here therefore is whether the bulkhead's existence is necessary in order to assure Hess's reasonable access to navigable waters and, if so, whether its continued existence would seriously impair or destroy GIP's rights as the purported possessor of the submerged land." *Id.* at *15.

Indeed, notwithstanding its position now, plaintiff previously *conceded* the existence of Hess's riparian rights in its opposition to Hess's motion to dismiss, noting that Judge Glasser found "that Hess, as the owner of the upland parcel *had riparian rights to access the Henry Street Basin*" and that "*Hess had riparian rights* which needed to be balanced against the property owner's rights." (GIP Opp. to Motion to Dismiss, at 8) (emphasis added).

In any event, Judge Glasser's conclusion that Hess is a riparian owner is correct. The argument advanced by GIP now – namely, that because Hess does not own the five foot strip of land between the Brooklyn Terminal and the Basin, Hess lacks any riparian rights – was considered and rejected by Judge Glasser in *GIP I*, and for good reason:

> As noted above, however, the 1884 Act clearly vested title in Beard in all the lands then filled in, and there is little reason to doubt that an owner of land next to water can exercise riparian rights. As even the case on which GIP relies notes, "land under water may lose its 'character of foreshore' at least for some purposes, with consequent changes in rights and legal relations, where the filling in is pursuant to permission or grant. . . ." Accordingly, before GIP can pursue this argument, it would need to supply evidence that the uplands adjoining the Bulkhead had not been filled in prior to the vesting of title in 1884. However, no such evidence exists in the record before the Court, and therefore this argument is not persuasive.

*GIP I*, 2003 WL 22076651, at *14 (citation omitted). Plaintiff has not even attempted to demonstrate how this analysis is incorrect, or that the uplands adjoining the Bulkhead had not been filled in prior to the vesting of title in 1884. Accordingly, this Court must conduct the balancing that Judge Glasser was unable to perform in *GIP I*. *See Tiffany v. Town of Oyster Bay*, 234 N.Y. 15 (1922) (when a riparian proprietor having no title below high watermark unlawfully but honestly, pursuant to court decision, fills in the foreshore, the owner of the foreshore holds the

made land subject to the riparian rights of the owner of the upland, as though the fill had not

been made); *see also Harway Improvement Co. v. Partridge*, 236 N.Y. 563 (1923) (by filling in

the land under water in front of its upland, plaintiff did not lose its riparian rights), *aff'g*, 203

A.D. 174, 197-202 (2d Dep't 1922); *Riviera Ass'n, Inc. v. Town of N. Hempstead*, 52 Misc. 2d

575, 577-80 (Sup. Ct. Nassau Co. 1967) (upland owner fronting on Manhasset Bay did not lose

riparian rights by filling area on both sides of boat slip it had created—"plaintiff's riparian rights

continue notwithstanding the placing of the fill, and this would be true whether the fill was or

was not authorized by the town").

> 2. The Bulkhead, Fence And Piping Constitute A Reasonable Exercise Of
> Hess's Riparian Rights As A Matter Of Law.

The question presented here is the question that went unresolved in *GIP I*:  "whether the

bulkhead's existence is necessary in order to assure Hess's reasonable access to navigable waters

and, if so, whether its continued existence would seriously impair or destroy GIP's rights as the

purported possessor of the submerged land."  *GIP I*, 2003 WL 22076651, at *15 (quoted by

Judge Gleeson at page 4 of Memorandum dated April 19, 2011 (*see* Docket No. 22)).  The

answer is clear:  Hess's maintenance of the Bulkhead is reasonable as a matter of law.

It is beyond dispute, as found by Judge Glasser, that "Under New York law, as a riparian

owner Hess has the right of access to navigable water, and the right to make this access a practi-

cal reality by building a pier, or 'wharfing out.'" *GIP I*, 2003 WL 22076651, at *14, quoting

*Town of Oyster Bay v. Commander Oil Corp.*, 96 N.Y.2d 566, 571 (2001).  As the Bulkhead is

used in connection with Hess's shipment of and commerce in oil and petroleum based products,

it clearly falls within the riparian owner's right to build a pier or bulkhead or to "wharf out."

*See, e.g.*, *Commander Oil*, 96 N.Y.2d at 571; *City of New York v. Third Ave. Ry. Co.*, 294 N.Y.

238, 243 (1945); *see also First Constr. Co. v. State*, 174 A.D. 560, 563-64 (3d Dep't 1916)

(referring to the lands formerly owned by William Beard near the Basin, concluding that "upland owners may . . . erect wharves, piers and *bulkheads* and fill in the lowlands, *so as to afford ways and means for the shipping and landing of articles of commerce, and thus facilitate navigation*" (emphasis added)), *aff'd and rev'd in other part by*, 221 N.Y. 295 (1917); *Durham v. Ingrassia*, 105 Misc. 2d 191 (Sup. Ct. Nassau Co. 1980) (grant of riparian rights extended to use of a waterfront, improved with a bulkhead partially paid for and maintained, by the grantees of the riparian rights).

GIP's argument that the Bulkhead, Fence or Piping are not an exercise of Hess's riparian rights because Hess does not use those structures as a means of accessing the Basin is incorrect. A riparian owner is entitled to reasonable, safe and convenient access to the water for navigation and the right to build piers, wharves, and bulkheads to aid in his access to navigable waters or unload freight, and that right includes "whatever is needed for the [riparian owner's] complete and innocent enjoyment . . . ." *Third Ave. Ry. Co.*, 294 N.Y. at 244.  The Bulkhead, Fence and Piping fall squarely within these principles.  The Bulkhead prevents the land it supports from collapsing, and provides indispensable support and protection for the tanks which are the recaptacles for the refined petroleum that is offloaded from the Finger Pier, which is anchored to the Bulkhead and its adjacent upland.  The Hess Finger Pier is used by vessels which dock alongside it and offload oil and other petroleum products into a pipeline which travels from that pier onto the adjacent filled in land and into the Brooklyn Terminal's three above ground storage tanks protected by the Bulkhead.  Oil is transmitted to delivery trucks via the Piping, and the Fence – whose presence is required by Hess's Coast Guard Mandated and Approved FSP – serves the vital purpose of ensuring the security and safety of the Brooklyn Terminal and the safety of the surrounding environment and community.  The Bulkhead, Fence and Piping are thus essential to

Hess's exercise of its riparian rights and water-borne commerce, as *GIP I* previously found: "the maintenance of some sort of bulkhead seems necessary to prevent [a collapse of the tanks]" and that "[a]lthough the bulkhead itself (or the oil tanks it supports) does not provide access [to the Basin] per se, without the bulkhead access to the waters (and from the waters to the land) will diminish as the soil subsides and the oil tanks fall into the waters around it." *GIP I*, 2003 WL 22076651, at *15. *See Third Ave. Ry.*, 294 N.Y. at 242-43 (maintenance of structures used to load and unload coal and gain access to electric power, including a small power house, trolley tracks, coal hoppers, conveyors, and a small office, was a proper exercise of its riparian rights because they all were "'incidents of the loading and unloading of water-borne freight' . . . . incidental only to their reasonable enjoyment of their right to transport merchandise to and fro between the navigable water and their lands" (citation omitted)).

Moreover, not only does the Bulkhead constitute a reasonable exercise of Hess's riparian rights, but there is nothing on the other side of the balance: GIP's motion papers identify no use it seeks to engage in (much less no use that it is presently hampered from undertaking), and in any event the Bulkhead was not designed, constructed, or engineered, and is not fit, for any non-passive uses. Judge Glasser explicitly made that finding in *GIP I*, where he concluded that "[t]he new bulkhead was not designed for and is not fit for docking or mooring commercial vessels for loading or offloading goods." *GIP I*, 2003 WL 22076651, at *6. Judge Glasser's finding is reinforced by undisputed evidence that the engineering drawings of the Bulkhead evidence no intention to engineer it to support the mooring of vessels. (*See* Perla Dec. ¶¶ 8-9; *see also* Edge Dec. ¶ 29 ("As I recall from my direct involvement [in the construction of the Bulkhead] (my initials are on many of the construction drawings), the Bulkhead was designed, constructed, and engineered for the sole purpose of preventing the subsidence and erosion of the land upland of

the eastern bank of the Basin on which the tanks are located, so as to facilitate and preserve the waterborne commerce of the Brooklyn Terminal.  It was not designed, constructed, nor engineered, and is not fit, for docking or mooring vessels.").  The same engineer's contemporaneous drawings of the bulkhead on the southeast corner of Hess's Brooklyn Terminal, known as Pier 2, *do* reflect the evident intention to engineer that bulkhead for the purpose of mooring vessels, rendering the omission of such indications on the drawings for the Bulkhead all the more telling.  (*See* Perla Dec. ¶ 8; *see also* Edge Dec. ¶ 30.)  Nor did Hess construct cleats or other indications of intended mooring use on the Bulkhead itself.[14]

Even if the Bulkhead were structurally capable of mooring vessels – and the undisputed evidence shows that it is not[15] – regulations promulgated by the Department of Homeland Security (the "DHS") further support the reasonableness of Hess's use and the impossibility of the trespass relief that GIP seeks.  The Hess Brooklyn Terminal has been designated as a facility subject to a series of maritime security regulations enacted by the DHS in 33 CFR Part 105. (Vitello Dec. ¶ 6.)  One such regulation, 33 CFR § 105.400, requires Hess to develop and implement a facility security plan ("FSP"), and to submit the FSP to the Captain of the Port (the "COTP") for approval.  (Vitello Dec. ¶ 7.)  An integral part of Hess's FSP—which was approved by the COTP—is the Fence, which serves the regulations' vital interests of controlling access to the Brooklyn Terminal, deterring the unauthorized introduction of dangerous substances and devices to the facility, securing the dangerous substances at the facility, and protecting the

---

[14] For example, cleats were not constructed on it, although they would have been had it been intended for the use of tying on barges or other vessels.  (Perla Dec. ¶ 9.)

[15] GIP initially identified a proposed expert – an unlicensed environmental engineer – whose report asserted the contrary.  After a deposition in which he retracted that assertion, GIP's summary judgment papers contained no deposition extracts of declaration from that individual.

facility and those persons authorized to be there.  (Vitello Dec. ¶¶ 9-10); *see also, e.g.*, 33 CFR §§ 105.255, 105.260.[16]

Additionally, 33 CFR § 165.169 establishes a 25 yard waterfront security zone surrounding the Brooklyn Terminal (which expands, during petroleum transfer, to 25 yards measured not from the fence surrounding the waterside of the facility but from the outer perimeter of any barge, ferry or other commercial vessel engaged in transfer operations).  DHS regulations *require* Hess to maintain the Fence and post signs along the Fence on the Bulkhead so as to provide public notice of the waterfront security zone.[17]  Even if GIP had supported its summary judgment motion with some evidence showing particular proposed uses at or on the Bulkhead, the above-cited regulations, and the security plan they required be adopted and approved by the COTP would prohibit any such uses as parking barges on the Bulkhead, or landing barge personnel onto the Bulkhead of its uplands west of the tanks, all of which would be well within the 25 yard waterfront security zone set by the DHS.  Further, although this affirmative defense was raised in Hess's Amended Answer and Counterclaims, GIP elected not to address it in its motion papers, a tactic that betrays the weakness of GIP's position.

Hess's use, which leaves the Basin available for competing uses, is particularly reasonable in view of GIP's failure to support its motion with any plans for commerce in or at the Basin that would require possession of the Bulkhead and the sliver of adjacent filled in land (or explanation of what more revenue it could reap if the western edge of the Brooklyn Terminal were restored to the Bulkhead Line).  Judge Gleeson's April 19, 2011 Memorandum (Docket No. 22)

---

[16] Any changes to Hess's FSP, including the removal or relocation of the Fence, must be submitted to the COTP for approval.  As such, Hess's ability to implement any changes to its FSP is completely dependent upon receiving approval from the COTP to enact such changes.

[17] 33 CFR § 165.169(a)(3)(i).   The Coast Guard-required language that appears on each such sign reads: "WARNING – U.S. Coast Guard Restricted Area – 25 Yd. Security Zone – Trespassing or Loitering Prohibited – Violators can be fined, imprisoned, or both."

advised that "if those [title] issues were resolved in GIP's favor, resolution of the action would *require* a balancing" of the respective existing or planned uses – but GIP's discovery and submission here presented no evidence of "the particular uses to which GIP plans to put the underwater land and the ways in which the bulkhead would interfere with those uses." *Id.* at 2 n.3.

Neither GIP's production nor its motion for summary judgment contain any evidentiary support whatsoever for any planned use by GIP at all, notwithstanding its prior statements to this Court at an early date that it had and would rely on such plans – notwithstanding that this Court declined to dismiss GIP's complaint on the basis of its representations that it would amend its complaint to allege such plans. (*See* Sims Dec. Ex. 5 at 25.)  This Court's plan was to conduct a hearing at which GIP must present concrete evidence as to its plans and the manner in which Hess's Bulkhead interfered with those plans. (*See id.* at 24.)  GIP's failure of proof simply confirms that its only real plan has been extortion-by-litigation – an attempt to obtain a payoff from Hess in exchange for allowing Hess to continue using the Bulkhead it built so as to continue the safe operation of tanks (in use since the 1970s) that supply more than 100 million gallons of the home heating oil and diesel fuel used by residents of New York City each year. GIP's own piers and bulkheads along the Basin are not presently in use at all, and Hess's maintenance of its Bulkhead for its intended (and longstanding use) presents no impediment or interference with GIP's presently non-existent (and undocumented future) operations from and on the Basin.  GIP's total failure to carry its burden of providing admissible evidence of facts entitling it to summary judgment necessitates the denial of its motion here.  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is*

*presented*." (emphasis in original) (internal quotation marks omitted)); *Parker v. Hogan*, 2011 WL 1988070, at *3 (E.D.N.Y. May 20, 2011) (Gleeson, J.) (where plaintiff could not establish element of claim, plaintiff's motion for summary judgment must be denied and defendant's motion for summary judgment must be granted); *Cullen v. Vill. of Pelham Manor*, 2009 WL 1507686, at *9 (S.D.N.Y. May 28, 2009) ("[b]ecause Plaintiffs cannot establish title, by adverse possession or otherwise, to the disputed property, their claim that the DeLucas trespassed cannot be sustained" and thus the DeLucas' motion for summary judgment must be granted), *aff'd*, 399 F. App'x 657 (2d Cir. 2010).

## IV.  SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST GIP'S PRIVATE NUISANCE CLAIM

Plaintiff's motion for summary judgment also fails to establish a claim for private nuisance, which under the circumstances – if it exists at all – is merely duplicative of its claim for trespass.  GIP's complaint is not that some activity of Hess on its side of the Basin is interfering with GIP's use or enjoyment of other land GIP possesses, but that Hess is interfering with GIP's asserted right to exclusive possession of the Bulkhead, which is precisely the function of a trespass claim.  *Copart Indus., Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 570 (1977) (nuisance "is distinguished from trespass which involves the invasion of a person's interest in the exclusive possession of land").

Moreover, in the circumstances here, GIP's allegations of ownership preclude its nuisance claim.  *See Rose v. Grumman Aerospace Corp.*, 196 A.D.2d 861, 862 (2d Dep't 1993) ("Because the injury complained of was to the same property as that on which the nuisance was alleged to exist, the plaintiff's nuisance cause of action should have been dismissed."); *Drouin v. Ridge Lumber, Inc.*, 209 A.D.2d 957, 959 (4th Dep't 1994) ("We agree that plaintiffs cannot recover on a theory of public or private nuisance for defendant's alleged interference with plain-

tiffs' rights as remaindermen of the property leased to defendant"); *see also Chase Manhattan Bank, N.A. v. T & N PLC*, 905 F. Supp. 107, 125 (S.D.N.Y. 1995) ("With respect to a claim for private nuisance, New York cases hold that where the source of the nuisance exists on the plaintiff's own property the requisite invasion is absent and no action for nuisance may be maintained"); 81 N.Y. Jur. 2d, Nuisances, §3 ("The distinction is that a nuisance consists of the use of one's own property in such a manner as to cause injury to the property or other right or interest of another, and generally results from the commission of an act beyond the limits of the property affected; while a trespass is a direct infringement of another's right of property"). Here, GIP's allegation that it owns the property both from which the alleged nuisance emanates and which is affected by the alleged nuisance defeats its private nuisance claim as a matter of law.

Cases concerning encroachments, addressed in more detail below in connection with damages, are invariably addressed not as nuisance claims but under the law of trespass. *See Parry v. Murphy*, 79 A.D.3d 713, 716 (2d Dep't 2010); *Zhuang Li Cai v. Uddin*, 58 A.D.3d 746, 746-47 (2d Dep't 2009), *lv. denied,* 13 N.Y.3d 715 (2010), *cert. denied*, 131 S. Ct. 940 (2011); *Generalow v. Steinberger*, 131 A.D.2d 634, 635 (2d Dep't 1987); *Bandike Assocs. v. B.B.M. Realty Corp.*, 44 A.D.2d 622, 623-24 (3d Dep't 1974); *Lawrence v. Mullen*, 40 A.D.2d 871, 871-72 (2d Dep't 1972); *Serafin v. Dickerson,* 2009 WL 3234143, at *6 (Sup. Ct. Bronx Co. Oct. 8, 2009); *Isear v. Burstein*, 24 N.Y.S. 918, 919 (Super. Ct. City of New York 1893). Because GIP asserts that Hess's Bulkhead encroaches on its property by at most a few feet, its claim is a classic "encroachment" claim – indeed, GIP's president referred to the filled-in lands adjacent to the Bulkhead as "the 'Encroached Property'"[18] – and, as such, can proceed, if at all, only as a

---

[18] Quadrozzi Aff. ¶ 3 (Docket No. 37).

claim for trespass.  *Cf. Morrison v. Nat'l Broadcasting Co.*, 19 N.Y.2d 453, 459 (1967) ("We look for the reality and the essence of the action, and not its mere name." (citation omitted)).

**V.     SUMMARY JUDGMENT SHOULD BE GRANTED ON HESS'S CLAIM FOR DECLARATORY RELIEF AND ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PROPER MEASURE OF DAMAGES AND THE UNAVAILABILITY OF INJUNCTIVE RELIEF**

      **A.     Hess Is Entitled To Summary Judgment On Its Claim For Declaratory Relief.**

For the reasons started in part II *supra*, this Court should declare that Hess owns the Bulkhead and the adjacent filled-in lands, or at a minimum possesses the exclusive right to use and maintain the Bulkhead and adjacent filed in lands west of the Bulkhead Line.

      **B.     Hess Is Entitled To Partial Summary Judgment On The Proper Measure Of Damages.**

If GIP's trespass claim is not entirely dismissed, a speedy conclusion of this litigation would be immeasurably facilitated if the Court would rule on the proper measure of damages.

Under New York law, the issue is long-settled: damages for trespass caused by an encroachment are measured by the difference in the value of the property with and without the encroachment.  *See Parry*, 79 A.D.3d at 716 (damages for continuing trespass caused by underground pipeline measured by "difference between the value of the Parry property with and without the encroachment"); *Generalow*, 131 A.D.2d at 634-35 (damages caused by encroachment of driveway and retaining wall measured by "the value of the plaintiff's property with and without the encroachment");[19] *Lawrence*, 40 A.D.2d at 871-72 (damages caused by garage that encroached onto plaintiffs' property measured by "the difference between the value of their property with and without the encroachment"); *Bandike Assocs.*, 44 A.D.2d at 623-24 (where

---

[19] In *Generalow*, the Second Department also affirmed the trial court's determination that plaintiff was not entitled to an injunction compelling the defendants to remove the retaining wall, a point addressed at Point V.C, *infra*.

retaining wall encroached onto plaintiff's land, damages measured by "the difference between

the value of plaintiff's property with and without the encroachment"); *Isear*, 24 N.Y.S. at 919 (in

assessing damages for encroachment of defendant's wall onto plaintiff's land, the measure "is

the amount by which the selling price of the premises trespassed upon is reduced by the wrongful

act"); *see also Zhuang Li Cai*, 58 A.D.3d at 746-47 (upholding judgment denying plaintiff

damages "based on the de minimis character of the alleged encroachment and the complete

absence of any evidence to support the appellant's claim for damages"); *Glyn v. Title Guarantee

& Trust Co.*, 132 A.D. 859, 863 (1st Dep't 1909) (plaintiff "is entitled to recover the difference

between the value of the property when purchased, as it was with the encroachments, and its

value as it would have been if there had been no such encroachments"); *Serafin*, 2009 WL

3234143, at *6 ("a claiming party must show that the benefit of removing the encroachment

would outweigh the harm caused to the opposing party or that the encroachment resulted in a

diminution in property value.").[20]  In light of the foregoing authority, GIP's damages, if any, are

measured by the difference in the value of the Parcels with and without the Bulkhead.[21]

---

[20] *See also Mesler v. Cozzolino*, 208 Misc. 54, 55-56 (Albany Co. Ct. 1955) (noting that while the proper
measure of damages for an encroachment generally is the difference in property value with and without
encroachment, "it is also true that one of the methods of determining the difference in value between
property that is violative of contracts or zoning ordinances and property that is in conformity therewith is
the cost of correcting the discrepancy," but acknowledging that where there are competing measures, the
measure "which involves the least amount of damages must prevail").

[21] As is obvious, this measure is rooted in "[t]he traditional measure of damage to real property due to
trespass" – namely, "the lesser of the diminution in value of the property or the cost to repair, with
plaintiff bearing the burden to prove one or the other."  *McDermott v. City of Albany*, 309 A.D.2d 1004,
1006 (3d Dep't 2003), citing *Jenkins v. Etlinger*, 55 N.Y.2d 35, 39 (1982); *see also Hartshorn v. Chad-
dock*, 135 N.Y. 116, 122 (1892) ("The rule seems to be that, when the reasonable cost of repairing the
injury, or, in this case, the cost of restoring the land to its former condition, is less than what is shown to
be the diminution in the market value of the whole property by reason of the injury, such cost of restora-
tion is the proper measure of damages.  On the other hand, when the cost of restoring is more than such
diminution, the latter is generally the true measure of damages, the rule of avoidable consequences
requiring that in such a case the plaintiff shall diminish the loss as far as possible.").  In encroachment
cases, the cost of restoration – here, for example, the cost of restoring the bulkhead line as the eastern
edge of the Basin –will usually if not invariably exceed the difference in the property's value with and
without the encroachment.  Indeed, even where a trial court improperly precludes expert testimony

This issue was not briefed in *GIP I, a*nd *Granchelli v. Walter S. Johnson Building Co.,*

*Inc.*, 85 A.D.2d 891 (4th Dep't 1981), cited in dictum by Judge Glasser (2003 WL 22076551, at

\*16), does not compel a different result.  In *Granchelli*, the defendant wrongfully used plaintiff's

property to store building materials, equipment and supplies in connection with a construction

contract.  *Id.* at 891.  The court concluded that defendant benefitted from the use of plaintiff's

property without having to pay for this use, and thus that plaintiff adequately stated "a cause of

action for the value of this use."  *Id.  Granchelli* is distinguishable on multiple grounds.  First, it

was not an encroachment case.  Second, Hess never realized any benefit from its use of GIP's

alleged property:  had its predecessor retained the bulkhead line as the eastern edge of the Basin,

with the tanks supported on the land east of the bulkhead line, Hess would have made no more

(and no less) than it has having acquired the tanks where they were at the time of purchase.

Expressed differently, it made no difference to Hess's bottom line (or GIP's) that the Bulkhead

extended a few feet west of the Bulkhead Line.  Third, implicit in the court's analysis in

*Granchelli* was the fact that such damages were necessary because plaintiff sustained no actual

harm to his realty for which he could be compensated, and courts struggle to impose some

amount of damages, however small.  Here, by contrast, to the extent that GIP sustained any

injury, it would be fully compensated by an award of damages measured by the difference in the

value of the Parcels with and without the Bulkhead.

This result is further required in light of the fact that Hess could not be deemed a willful

trespasser.  "In cases of involuntary trespass the damages are restricted as much as possible, but

when the trespass is deliberate, intentional and continuous, they include, at least, the value of the

use of the premises for the period that the owner is kept out of possession."  *De Camp v. Bullard*,

---

regarding the cost to repair, such preclusion is harmless where the cost to repair will exceed the changed value of the property. *McDermott*, 309 A.D.2d at 1006.

159 N.Y. 450, 454 (1899).  Here, not only was Hess *not responsible* for the initial construction of the Bulkhead, Fencing, and Piping, but, after Hess's replacement of the Bulkhead in the 1980s – performed with the permission of the COE and the N.Y. Department of Environmental Conservation – the encroachment *shrank* considerably.  *See GIP I*, 2003 WL 22076651, at *5-6, nn.4 and 5.  Similarly, Hess was obligated by the DHS maritime security regulations to place the fence directly atop the Bulkhead (as in fact it had previously been).  There is no evidence whatever that Hess had any idea that its terminal might extend onto lands of the Port Authority (or of GIP) before GIP so contended in 1998, when the prior bulkhead had extended even further west and Hess and its predecessors had been paying taxes on the entire Brooklyn Terminal for decades.  As a matter of law, Hess is at worst no more than an involuntary trespasser, and any award of damages must be as restricted as much as possible.  *DeCamp,* 159 N.Y. at 454.

### C.   This Court Should Deny GIP's Claim For Injunctive Relief As A Matter Of Law.

New York law strongly disfavors awards of injunctive relief in encroachment or similar cases, particularly if even minimal damages can be awarded.  *See Parry*, 79 A.D.3d at 715-16 (reversing order to the extent that it granted injunctive relief for a stream diversion, since "[a] permanent injunction is a drastic remedy which may be granted only where the plaintiff demonstrates that it will suffer irreparable harm absent the injunction" and, that the trial court "should have determined that an award of damages would adequately compensate the Parrys"); *Generalow*, 131 A.D.2d at 635 ("In light of the minor encroachment and the evidence that the wall was necessary to the defendants' property, the harm to the defendants in removing the wall would outweigh any corresponding benefit to the plaintiff."); *Lawrence*, 40 A.D.2d at 871 (because encroachment was not result of willful trespass, "[t]he mandatory injunction directing defendant to set back or remove the encroaching portion of her garage bears heavily on her

without benefiting plaintiffs and it therefore should not have been granted").[22]   As in the cases

discussed *supra*, the issuance of an injunction requiring the relocation of the Bulkhead would

cause overwhelming harm to Hess outweighing any corresponding benefit to plaintiff.   *Marsh v.*

*Hogan*, 81 A.D.3d 1241, 1242 (3d Dep't 2011) ("In order to obtain the injunctive relief [he or

she] seeks, however, the [plaintiff is] required to demonstrate not only the existence of the

encroachment, but that the benefit to be gained by compelling its removal would outweigh the

harm that would result to the defendants from granting such relief.").   To the extent that GIP has

sustained any compensable injury – and, as demonstrated in parts II through IV, it has not – it

would be adequately compensated by an award of damages measured by the value of GIP's

property with and without the Bulkhead.  (*See* part V.B, *supra*.)

---

[22] *See also, e.g., Wing Ming Props. (U.S.A.) v. Mott Operating Corp.*, 79 N.Y.2d 1021, 1023 (1992)
(encroachment on plaintiff's airspace caused by defendant's parapets and equipment insufficient to justify
either monetary or injunctive relief); *Marsh v. Hogan*, 81 A.D.3d 1241, 1241-43 (3d Dep't 2011) (where
plaintiff held a 50 foot wide easement to access his property, and defendant's house encroached on the
easement by approximately 10 feet, "there is no need for the extraordinary remedy of an injunction
requiring defendants to move their residence"); *Hoffmann Invs. Corp. v. Yuval*, 33 A.D.3d 511, 512 (1st
Dep't 2006) (trial court properly denied request for injunction to remove de minimis encroachment).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant Hess's cross-motion for summary

judgment and deny plaintiff's motion for summary judgment.

Respectfully submitted,

PROSKAUER ROSE LLP

By: ____ s/ Charles S. Sims _____
                Charles S. Sims
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
*Attorneys for Defendant Hess Corporation*

New York, New York
August 12, 2011