# EXHIBIT 1



Henry Street Basin, Brooklyn, NY

**EXHIBIT**

Quadrozzi-1
6/29/11 @ ID

©2011 Europa Technologies
©2011 Google

©2010 Google

Imagery Date: 6/17/2010   1978

40°40'13.24" N  74°00'27.25" W elev  6 ft

Eye alt  1785 ft

# EXHIBIT 2



THE PORT OF NEW YORK AUTHORITY
PORT AUTHORITY GRAIN TERMINAL
GOWANUS BAY, BROOKLYN, N.Y.
MAP OF HENRY STREET BASIN PROPERTY

# EXHIBIT 3



HESS0001234



HESS0001235

EXHIBIT 4

1

2              UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF NEW YORK

4    ---------------------------------------X

GOWANUS INDUSTRIAL PARK,

5                              Civil Action No. 10-5522

          Plaintiff,

6

          - against -

7

HESS CORPORATION,

8

          Defendant.

9    ---------------------------------------X

10

11              DEPOSITION OF JOHN QUADROZZI

12                 New York, New York

13              Wednesday, June 29, 2011

14

15

16

17

18

19

20

21

22

23

24   Reported by:

ANNETTE ARLEQUIN, CCR, RPR

25   JOB NO. 40083

Page 2

1

2

3

4

5                  June 29, 2011

6                  10:22 a.m.

7

8      Deposition of JOHN QUADROZZI, held at

9  the offices of Proskauer Rose, LLP, Eleven

10  Times Square, New York, New York, before

11  Annette Arlequin, a Certified Court

12  Reporter, a Registered Professional

13  Reporter and a Notary Public of the State

14  of New York.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4         HINMAN, HOWARD & KATTELL, LLP

5         Attorneys for Plaintiff

6             185 Madison Avenue - 7th Floor

7             New York, New York  10016

8         BY: JOSEPH N. PAYKIN, ESQ.

9             jpaykin@hhk.com

10

11        PROSKAUER ROSE LLP

12        Attorneys for Defendant

13            Eleven Times Square

14            New York, New York  10036

15        BY: CHARLES S. SIMS, ESQ.

16            csims@proskauer.com

17            EVAN B. CITRON, ESQ.

18            ecitron@proskauer.com

19            BRETT J. BLANK, ESQ.

20            bblank@proskauer.com

21

22

23    ALSO PRESENT:

24

25            DAWN MARIE MULVEY, Hess Corporation

1

2        IT IS HEREBY STIPULATED AND AGREED,

3    by and between the attorneys for the

4    respective parties herein, that filing

5    and sealing be and the same are hereby

6    waived

7        IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form

9    of the question, shall be reserved to the

10   time of the trial.

11       IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn to

13   and signed before any officer authorized to

14   administer an oath, with the same force and

15   effect as if signed and sworn to before the

16   Court.

17

18

19

20

21

22

23

24

25

1                    J. Quadrozzi

2    property being conveyed included the bulkhead on

3    the eastern shore of the basin?

4         A.    Sorry.   Repeat that question?

5              MR. SIMS:   Can you repeat the

6         question, please?

7              (Question was read back as follows:

8              "QUESTION:   Am I correct that the

9         Port Authority did not advise you or any of

10        your agents or colleagues prior to the

11        transaction that the property being

12        conveyed included the bulkhead on the

13        eastern shore of the basin?")

14        A.    That they didn't advise me?

15        Q.    Yes.

16        A.    What we were requiring was based upon

17    a survey.   I don't know that they identified any

18    particular piece other than land and underwater

19    lands, but the details of which were identified

20    on the survey.

21        Q.    And no one told you that you were

22    acquiring the eastern -- any land on the eastern

23    side of the basin, did they?

24        A.    We were acquiring everything that was

25    within the survey.

1                    J. Quadrozzi

2        you can do.

3        A.     There are so many names.

4        Q.     I believe I only have two leases from

5   yourself.

6               If there are more than that, we're

7   entitled to know.

8        A.     We do a lot of month-to-month -- we

9   do mostly month-to-month rental.

10       Q.     Meaning short-term rentals.

11       A.     We don't refer to it as short-term,

12   but we call them month-to-month.

13       Q.     Well, other than Hornbeck and

14   International Salt, are there any other tenants

15   that Gowanus Industrial Park has had since 2005?

16       A.     Yes.

17       Q.     Please identify them.

18              MR. PAYKIN:  You want to ask how

19       many, the scope before you ask?

20              MR. SIMS:  Yeah.

21   BY MR. SIMS:

22       Q.     How many?

23       A.     Probably 50.

24       Q.     Let me just focus on any of these

25   tenants that have actually used the Henry Street

1                    J. Quadrozzi

2  Basin or the land under the Henry Street Basin;

3  that is, I'm not asking about what's west of the

4  Henry Street pier, I'm only asking about

5  what's -- any tenants that have used the east

6  side of the Henry Street pier or the east side

7  of the grand terminal or the east side of the

8  north area.

9      A.    The basin I believe it's only

10  International Salt, but there could have been

11  another that I'm not recalling.

12      Q.    Only International Salt.

13      A.    (Witness nods).

14      Q.    And what is International Salt?  What

15  activities have they been engaged in?

16      A.    They and Gowanus Industrial Park,

17  handling of bulk salt.

18      Q.    Is any bulk salt visible on Exhibit 1

19  that we had marked previously?

20      A.    No.  There's nothing in this picture,

21  no.

22      Q.    And when the bulk salt is present at

23  your property, where is it located?

24      A.    The activity occurred in a number of

25  locations.  The entire north area, a section

1               J. Quadrozzi

2          Another company called Bouchard,

3     B-o-u-c-h, something like that.

4          Q.    With respect to NYCEMCO, what is

5     NYCEMCO?  Do you know what it stands for?

6          A.    New York Cement Company.

7          Q.    Is it correct that there is one

8     vessel that NYCEMCO has moored for a long period

9     of time on the Henry Street pier?

10         A.    Yes.

11         Q.    And is that vessel --

12         MR. PAYKIN:  Can you clarify long

13    period of time?

14    BY MR. SIMS:

15         Q.    Well, how long has it been moored

16    there?

17         A.    I don't recall exactly.

18         Q.    More than a year?

19         A.    I think less.

20         Q.    More than six months?

21         A.    Probably.

22         Q.    Does that vessel, since it got there,

23    has it been simply sitting there or is it --

24    does it move in and out?

25         A.    It's been moored.

1                    J. Quadrozzi

2        Q.     It's been moored there for whatever

3   lengthy period of time it's been moored there,

4   more than six months.

5        A.     Yes.

6        Q.     And am I correct that that vessel was

7   previously moored on the other side of Gowanus

8   Bay?

9        A.     Yeah.

10        Q.     And at some point it lost that

11   privilege and made arrangements with Gowanus

12   Industrial Park to moor on the east side of the

13   Henry Street pier.

14        A.     I don't know what you mean by lost

15   privilege.

16        Q.     Am I correct that for some period of

17   time it was moored across the Gowanus Bay on

18   someone else's property and then at some point

19   within the last year changed its long-term

20   moorage and has been moored on your property?

21        A.     It's been moved to Gowanus Industrial

22   Park.

23        Q.     Are there any plans to terminate that

24   moorage?

25        A.     To terminate, no.  I don't really

1                     J. Quadrozzi

2          document whose numbers are GIP 54 to 69.

3                   (Defendant's Exhibit GIP 8, Rider to

4          Lease Agreement dated 8/1/05, Bates stamped

5          GIP 54 through 69, marked for

6          identification, as of this date.)

7     BY MR. SIMS:

8          Q.    What is this document, Mr. Quadrozzi?

9          A.    It's labeled as "Rider" to this

10    agreement dated August 1st between Gowanus and

11    International Salt.

12         Q.    And if you look at page 65, am I

13    correct that pages 65 to 69 are the August 1st

14    lease agreement that's referred to on the first

15    page of the rider?

16         A.    I believe so, yes.

17         Q.    The lease is on page 69, the last

18    paragraph is paragraph 39 and the lease rider on

19    page 54 begins paragraph 40, correct?

20         A.    Paragraph 39 and I'm sorry, what was

21    the --

22         Q.    The first page, the Rider commences

23    with paragraph 40.

24         A.    Yes.

25         Q.    What use, if any, does this tenant

1          J. Quadrozzi

2    make of the Henry Street Basin?

3        A.    On the north area they moor a crane

4    barge for unloading the salt onto the land and a

5    supply barge alongside the crane barge that

6    would feed the terminal with the salt.

7            The finger pier on the east side,

8    they would stage the barges or cue them up for

9    barge changes, so one would be standing by with

10   a loaded barge at the finger pier while one is

11   unloading alongside the crane barge, and then

12   they would -- when the barge would be emptied,

13   they would switch the barges, placing the empty

14   barge at the finger pier, putting the loaded

15   barge along the crane barge and then taking the

16   empty barge out thereafter to be loaded.

17       Q.    Once the salt is loaded onto the land

18   at Gowanus Industrial Park, how does it leave

19   Gowanus Industrial Park?

20       A.    Via a dump truck.

21       Q.    By truck.  Comes in by water, goes

22   out by land.

23       A.    Yes.

24           MR. PAYKIN:  I just want to clarify

25           and I'm not sure if it's there, I mean I

1          J. Quadrozzi

2     would ask him about the -- if this lease

3     was renewed.  I mean because...

4          MR. SIMS:  Thank you.

5   BY MR. SIMS:

6     Q.    The term of this lease in paragraph

7   40 indicates that it expired at the end of

8   August 2009.

9          Do you see that?

10         MR. PAYKIN:  It's right here

11    (indicating).

12    A.    Yes.

13    Q.    Is it presently -- was it extended at

14  all after that time?

15    A.    No.

16    Q.    Are there ongoing discussions in

17  connection with any extension or new lease?

18    A.    No.

19    Q.    Since the expiration of the

20  International Salt agreement, have any other

21  tenants used the Henry Street Basin moored

22  against the north area and offloaded anything

23  onto the north area?

24    A.    No.

25    Q.    Is Gowanus Industrial Park presently

J. Quadrozzi

1

2      A.     No.

3      Q.     How did you come to be aware of that

4  requirement, that set of requirements?

5      A.     The Homeland Security?

6      Q.     Yes.

7      A.     In our affiliated company, we have

8  such a -- we had such a plan in place, the

9  NYCEMCO terminal.

10      Q.     I'm sorry, the?

11      A.     The NYCEMCO terminal where you had

12  mentioned earlier was on the other side of

13  Gowanus Bay, we had such a plan in place at that

14  facility.

15      Q.     And was the NYCEMCO -- first of all,

16  do you personally have an ownership interest in

17  the NYCEMCO terminal?

18      A.     No.

19      Q.     Does the Estate of John Quadrozzi,

20  Sr. have an ownership interest in that terminal?

21      A.     Yes.

22      Q.     Does it own it?

23      A.     It owns the company NYCEMCO, yes.

24      Q.     Do you have a role?  Are you either a

25  director or an officer?

1               J. Quadrozzi

2       A.     Yes.

3       Q.     With respect to NYCEMCO?

4       A.     Yes.

5       Q.     What?

6       A.     President and director.

7              MR. SIMS:  Do we have a map -- that's

8       okay.

9    BY MR. SIMS:

10      Q.     So does NYCEMCO, does the NYCEMCO

11   terminal -- first of all, I take it that's

12   essentially across Gowanus Bay from the Henry

13   Street property?

14      A.     It's on the eastern side of Gowanus

15   Bay, yes.

16      Q.     And this is the western side of

17   Gowanus Bay.

18      A.     Yes.  For example, I would consider

19   it in the middle.

20      Q.     I understand.

21             At the NYCEMCO terminal, is there now

22   a fence or wall required by the Department of

23   Homeland Security?

24      A.     Well, we've moved out of there, but

25   there was a fence along the pier adjacent to the

1                    J. Quadrozzi

2    Trade Center, Freedom Tower, whatever is under

3    construction there.

4         A.    A little different environment.

5              It has storage of, how I would say,

6    returned concrete material that would be crushed

7    and sold on the property most often comes from

8    the World Trade Center.

9         Q.    Materials that are taken by somebody

10   else from someplace else to the World Trade

11   Center --

12        A.    No.  Something that Quadrozzi

13   Concrete would have shipped for the project and

14   not been consumed or utilized that would be

15   brought to the facility.

16        Q.    Is Quadrozzi Concrete an ongoing

17   supplier of the World Trade Center site?

18        A.    Yes.

19        Q.    But concrete is not getting mixed and

20   prepared at the site for delivery to -- at your

21   site for delivery in lower Manhattan?

22        A.    For delivery to?  No.

23        Q.    You indicated previously that there

24   is a vessel that previously was at NYCEMCO

25   that's now and has been for at least six months

Page 110

                        J. Quadrozzi

1

2   on the eastern side of the Henry Street pier,

3   correct?

4        A.     Correct.

5        Q.     What was the name of that vessel?

6        A.     The Loujaine, L-o-u-j-a-i-n-e.

7        Q.     Okay.  Since that's been there, have

8   other vessels in connection with any commerce of

9   your tenants been going past it north of it for

10  delivery -- for piering in the basin and

11  delivery of something onto GIP's property?

12       A.     No, not since the vessel is there.

13            MR. SIMS:  Let me mark as an exhibit,

14        a document marked as GIP 37 to 40.

15            (Defendant's Exhibit GIP 9, Letter

16        dated 4/19/01 from NYS Department of

17        Environmental Conservation to Miele

18        Associates, Bates stamped GIP 37 through

19        40, marked for identification, as of this

20        date.)

21  BY MR. SIMS:

22       Q.     Do you recognize this document,

23  Mr. Quadrozzi?

24            MR. PAYKIN:  Don't guess if you don't

25        know.

EXHIBIT 5

1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


   - - - - - - - - - - - - - - X
                              :      10cv5522
GOWANUS INDUSTRIAL PARK, INC,

                              :

                    Plaintiff, :

                              :

        V.                           U.S. Courthouse
                                     Brooklyn, New York

HESS CORPORATION,              :


                    Defendant  :

                                     March 29, 2011
                                     10:30 a.m.
                              :

   - - - - - - - - - - - - - - X
                TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JOHN GLEESON
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:       JOSEPH N. PAYKIN, ESQ.


For the Defendant:       CHARLES S. SIMS, ESQ.


Court Reporter:          Burton H. Sulzer
                         (718) 260-4526


Proceedings recorded by mechanical stenography, transcript
produced by CAT.
```

2

1          (Open court-case called-appearances noted.)

2          THE COURT:  Good morning.  Do you want to be heard

3     in support of your motion to dismiss?

4          MR. SIMS:  Briefly, your Honor.  I did send one

5     photograph in, that I think the court has, from Google Maps, I

6     have another six, I've already shown them to my adversary, and

7     I think they might be helpful just for the court to be able to

8     follow along.

9          THE COURT:  All right.

10         MR. SIMS:  The first photograph -- I don't want to

11    spend any time on them other than -- the first photograph is

12    before the reconstruction of the bulkhead that is talked about

13    in Judge Glasser's opinion that was done sometime in the

14    eighties.

15         THE COURT:  Meaning A?

16         Mr. Sims:  Yes.  So, A, which was produced as the

17    production number in the prior litigation, shows what it was

18    like before the bulkhead was rebuilt in the mid-eighties and

19    the other photographs, B through F, simply show it in its

20    current form.

21         THE COURT:  How much discovery was there in the

22    prior litigation?

23         Mr. Sims:  Not a lot.  Let me say, my memory after

24    ten years is not a lot.

25         The one other thing I want to just mention before I

3

1    start is there are two errors in our reply brief, both really

2    the same error.  The heading of .1 C should have said "did not

3    remove" rather than "remove."

4         Again, the title of that argument, it should have

5    been:  "Plaintiff is bound by Judge Glasser's 2003 holding

6    that the 1944 statute did not remove the parcels from the

7    scope..."  I'm sorry for any misunderstanding.

8         So we're here ten years after, in our view, this

9    case was first brought and Judge Glasser decided it in a very

10   scholarly opinion.  The claims for declaratory relief are

11   literally identical word for word and the trust best claim is

12   virtually identical and we think that collateral estoppel and

13   res judicata ought to dispose of the entire case.

14        To the extent that title is an element, collateral

15   estoppel should apply because Judge Glasser found, after a

16   full and fair opportunity to address the issue, that Gowanus

17   Industrial Park did not in fact have title to the land under

18   the water or its terminal that it claimed to own, and the

19   reason is that the Legislature in 1944 said that the title to

20   the lands under water, which had always been in statehold

21   possession since before The Revolution, could not be alienated

22   other than to New York State.  That determination is binding

23   here as a matter of collateral estoppel.

24        Its principal argument for not applying collateral

25   estoppel is that the state court action brought by the city

4

1   against GIP a few years ago changes things somehow and in

2   their view there was some sort of determination there that the

3   corrections they tried to make subsequently did get them quick

4   title and we say that is not so because Judge Glasser's

5   decision was that the Legislature act, the act of the

6   Legislature was necessary in order to get quick good and there

7   is no allegation that there was any such legislation.

8           THE COURT: Right, that was for good title to go from

9   Port Authority to GIP.

10          MR. SIMS:  In the first place, Judge Glasser's

11  decision states the point in a passive voice without

12  limitation to the Port Authority; and, second of all, what

13  happened in 2004 with these papers is clearly one transaction,

14  that is the Port Authority issues a quick claim deed on Bay 1

15  and on Bay 3, it's turned around and turned into a letters

16  patent by the state.

17          I think under any sensible view of what happened

18  there it was a transaction designed to do what the 44 Act says

19  can't be done, namely to give property to part of New York

20  Waterway.  I mean, it's an important part of the

21  infrastructure of the whole community to a private party.

22          The reason, as he pointed out, one of the things you

23  understand from the proposition that this land can't be taxed

24  is that the Legislature thought it would stay in public hands

25  and the 44 Act I think means what it says, and in Judge

5

1   Glasser's decision, in the WestLaw version Star One and Star

2   Nine:  GIP does not own the property, which by state law

3   cannot be conveyed and, in any event, cannot be conveyed

4   simply by obtaining a lease from the State Department, and

5   there is similar language.

6        I think, notwithstanding the language in the 44 Act,

7   the court ought to hold that this was exactly the kind of

8   transfer that the legislation prohibits.

9        THE COURT:  Just assume for present purposes I don't

10  agree with that, where does the case go -- assuming I don't

11  agree about the preclusive effect here by virtue of issue

12  preclusion or claim preclusion flowing from Judge Glasser's

13  decision, where do we go from here?

14       It looks like a couple of things are not in dispute.

15  One is the bulkhead was built on what we call the parcels in

16  this case; it extends out a short distance into the land that

17  GIP claims to own.  Correct?

18       Mr. Sims:  Yes.

19       THE COURT:  It also looks like everybody --

20       MR. SIMS:  Between five inches and five feet or so.

21       THE COURT:  -- that that part of what Judge Glasser

22  held is separate and apart from the preclusive effect, if any,

23  of his decision.  Everyone agrees the bulkhead's within the

24  property -- whoever owns that property, the bulkhead is within

25  it.

6

1          It looks like the state, the Port Authority of the

2    State -- whatever entity -- it looks like the state's

3    determined to get the property in the hands, whether it's

4    allowed to or not, of GIP.  At least that's how it responds to

5    Judge Glasser's decision.

6          I think there are some interesting questions there.

7    Who knows, maybe even if district courts had the authority to

8    certify questions to the New York Court of Appeals, maybe this

9    would be a case where that might be appropriate.  Assuming all

10   that away, assuming the property is in the hands of, is owned

11   by GIP, what is the next step?

12         I think the next step is a balancing -- at least

13   your adversary seems to think that and it looks like that is

14   in part of what Judge Glasser had to say as well, a balancing

15   of the riparian rights, which seem possibly even strong,

16   against the interests of the adjacent land owner's rights.

17         It seems to me that would entail things like the

18   extent to which the bulkhead is necessary for Hess's right of

19   access to navigable waters adjacent to its land.  Is a

20   continued use of the bulkhead necessary to preserve Hess's

21   reasonable right to access?

22         To what extent the bulkhead, if any, impairs the

23   adjacent land owner's rights, assuming for present purposes

24   that is GIP, is that where the case is headed if you don't win

25   on these threshold issues?

7

1          MR. SIMS:  I think not, your Honor, because there is

2     one other issue that Judge Glasser did decide that I think is

3     dispositive, which is -- although he did hold, as Justice

4     Miller did in the city's case later on, that at some point

5     there is that kind of balancing, if you get to that point.

6          What he did was, what Judge Glasser did is he

7     dismissed these claims on the ground that there was no

8     allegation, no pleading and in the end, no evidence, that

9     there was any kind of possession or use to be balanced.

10          In other words, if this case had come to your Honor

11     on a very different pleading, which is we are doing this, we

12     are presently engaged in this kind of commerce, it's been

13     interfered with, then there is that kind of balance to weigh.

14          But I think what Judge Glasser held, among other

15     things, is that there is no occasion for that balancing on the

16     sort of bare bones complaint there was in ten years, and the

17     complaint in this case is half the length of the other one.

18          There is no allegation of possession, there is no

19     allegation of use, there is in fact no economic activity going

20     on over there.  So while eventually one day maybe there would

21     be an occasion for that kind of balancing I don't think there

22     is now.

23          THE COURT:  What so limited by that argument?  By

24     that I mean it's premised on the fact that GIP is not using

25     the basin, correct?

8

1          MR. SIMS:  Yes.

2          THE COURT:  Does that mean that I would dismiss this

3     claim if the bulkhead were built 80 feet out into the middle

4     of the basin?

5          MR. SIMS:  Well, there is one other finding of Judge

6     Glasser that I do want to pay attention to, which is at Star

7     15 in the WestLaw thing.  There were actually findings on the

8     importance of the bulkhead.  I think that is not a matter that

9     is just ready for decision anew.

10         The decision said that a failure to maintain the

11     bulkhead would lead to soil erosion and collapse of the oil

12     tanks.

13         A collapse of such tanks would not only

14     significantly impair Hess's facilities, it would also impair

15     the public's right of access to the basin and other use of the

16     waters surrounding the basin.

17         Absent the existence of an alternative proposal, the

18     maintenance of some sort of bulkhead seems necessary to

19     prevent such a collapse.

20         One of the reasons I handed up the photographs, your

21     Honor, is that they show just how close to the edge of the

22     basin the oil tanks now are and the really frightening

23     situation they were in before the strengthening of the

24     bulkhead, all of which was done with the close cooperation of

25     the Corps of Engineers.

9

1          I think that in light of the judge's findings, both

2    with respect to title and with respect to the lack of

3    possession or use and therefore the inappropriateness of

4    balancing at this stage, the case ought to be dismissed and

5    the parties left to try to live together and if and when the

6    other side, Mr. Quadrozzi, is ready to undertake something

7    that requires cooperation and negotiation, the parties should

8    be left to it and to come to court if they can't.

9          THE COURT:  All right.  I'm interested in the limits

10   of your argument.  If the bulkhead had been built 80 feet out

11   into the basin, I would, under your argument, be required to

12   dismiss the law suit?

13         MR. SIMS:  No.  I think that the fact that there are

14   oil tanks that supply heating oil for a good part of New York

15   City right there, that the bulkhead was intended to shore them

16   up but there's a court findings that there was, all of that

17   makes it a very different case than if it was a much further

18   distance in.

19         Hess's goal was not to eat up the waterfront, it was

20   to secure these tanks that have been there since clearly

21   before the mid-sixties.

22         THE COURT:  The difference is a matter of degree?

23         MR. SIMS:  I think the difference is a matter of

24   degree.

25         THE COURT:  Why would that warrant not having a

1  hearing at all?  That would just suggest to me that the

2  interests that would be advanced on the part of GIP, assuming

3  GIP is the land owner, would be less weighty than the

4  interests advanced if you had built the bulkhead 80 feet out?

5  　　　　MR. SIMS:  Except there is a holding here, which I

6  think is subject to collateral estoppel, that given the

7  particular allegations of possession and use in that complaint

8  there was no occasion to undertake that balancing, but the

9  other side, in a case like this, needs to have something to

10  weigh in the balance and on this complaint there is nothing

11  else to weigh against the obvious and judicially found

12  interests of the residents of New York City, who don't, after

13  all, want the oil to be spilling into the water.

14  　　　　THE COURT:  You think the proper resolution is to

15  dismiss it and then if and when -- assuming GIP's claim to

16  title to the property sticks, if and when they decide to

17  actually use it then we come back and balance it then?

18  　　　　MR. SIMS:  Yes.  I think one of the things the judge

19  said is the balance can't be abstract, it's got to be

20  concrete.  And there is nothing concrete to balance now.

21  　　　　THE COURT:  All right.  Thank you.

22  　　　　Why isn't he right?

23  　　　　MR. PAYKIN:  Let's start on the possession argument

24  he just made.  The judge went into possession because he said

25  even if you don't have ownership, if you have actual use then

1    you might be able to establish a trespass claim.

2         In this case our argument is we have actual

3    ownership so therefore we don't need possession.  That

4    possession was used as a way to get around actual ownership

5    and we can't have possession because we're blocked off it by

6    their fence.  So it's a Catch 22.

7         THE COURT:  You're blocked off on the other side of

8    the fence?

9         MR. PAYKIN:  Right.

10        THE COURT:  What are you blocked off from doing;

11   what is GIP interested in doing with this property?

12        MR. PAYKIN:  GIP is -- we call it Gowanus, Gowanus

13   is --

14        THE COURT:  I'll call it Gowanus if you want.

15        MR. PAYKIN:  I can call it GIP.

16        In any event, GIP basically operates a bulk storage

17   facility and it brings in materials through the water.  It

18   could bring in salt or sand or stone or cement, and so barges

19   come into that area --

20        THE COURT:  Into this basin?

21        MR. PAYKIN:  Yes, and they unload on the other side

22   to the above water property.  The thing is, there could be

23   more barges than --

24        THE COURT:  On the west side of the basin?

25        MR. PAYKIN:  Right.  And the idea would be that we

12

1    could in theory tie some up against that bulkhead or put

2    something in front of the bulkhead and tie them up so that we

3    have more use so we can bring more materials through.

4    Recognize, the reason that --

5                THE COURT:  Is that alleged here?

6                MR. PAYKIN:  It's not in the complaint, no.

7                THE COURT:  Why not?  Aren't I stuck with what is on

8    the face of your complaint in terms of whether or not you

9    plead -- your adversary argues there is no injury here, it is

10   not even pled, I should dismiss the case until such time, if

11   there is such a time, that there is actually a competing use

12   of the property at issue?

13               MR. PAYKIN:  I mean, to the extent of balancing the

14   rights between the parties, he may be right on that, but to

15   the extent of getting a trespass claim he's not right because

16   the fence -- I mean, they are actually blocking us, the fence

17   actually is using our property.  They are wrongly on my

18   client's property.

19               THE COURT:  What relief is being sought by Gowanus

20   in this case?

21               MR. PAYKIN:  The objective of this case was to have

22   Hess move its fence and piping back.  That is really the

23   relief.

24               THE COURT:  Why will more barges fit into this basin

25   if the fencing and the piping are moved back?  I don't

13

1   understand.

2          MR. PAYKIN:  We might be able to put cleats on top

3   of the bulkhead that we can't get there to put the barges on.

4          THE COURT:  You might?

5          MR. PAYKIN:  We might, that is the goal.  We have

6   not been able to go over there to scope it out.

7          The idea is to be able to dock barges along that

8   bulkhead and right now we're prohibited -- we can't get on it.

9   We have no way to get there.  We can't get on to it to even

10  scope it out and make plans or design plans because we are

11  blocked.

12         Assuming we get past the title issue, then I'd ask

13  for leave to replead, to amend my complaint to put these facts

14  in.

15         THE COURT:  Is that why we're here, because you want

16  to tie up barges to the west side of this bulkhead and Hess

17  won't let you, is that why we're here today?

18         MR. PAYKIN:  That's the primary reason, yes.

19         THE COURT:  From your perspective, is that right?

20         MR. SIMS:  No.  First of all there is a holding, a

21  factual finding by Judge Glasser in the opinion that the

22  bulkhead was simply not built strong enough for anything to be

23  tied up against it.

24         There is a paragraph in the opinion that says

25  that -- I don't have it right here, but I could identify it if

14

1  the court doesn't see it -- so nobody is tying up along the

2  bulkhead and this lawsuit doesn't involve the finger pier,

3  they only made claims with respect to the bulkhead and not the

4  finger pier so what he's just said makes no sense.

5           They're not using their pier.  I've talked to

6  people --

7           THE COURT:  Get back to my question.  From Hess's

8  point of view the bulkhead won't sustain the stress?

9           MR. SIMS:  It can't sustain it, that's correct.

10 There is a finding to that extent.

11          THE COURT:  For present purposes I'm not going to

12 give preclusive effect to Judge Glasser's opinion.  So let's

13 focus on going forward.

14          MR. SIMS:  The other point that I do want to make

15 is --

16          MR. PAYKIN:  The pier is --

17          THE COURT:  Don't interrupt.

18          MR. SIMS:  Their claim of ownership depends on

19 Section 50 of the Public Law Lands and I don't think they can

20 rely on that --

21          THE COURT:  I understand that.

22          MR. SIMS:  There are three elements that aren't met,

23 including the appraisal piece.

24          THE COURT:  I understand that.  We interrupted your

25 argument, sir.  Go ahead.

1          MR. PAYKIN:  Obviously if we were going to dock

2    barges against that bulkhead we would modify it so that it

3    would be structural sound, but that is neither here nor there.

4    I mean  --

5          THE COURT:  Why is that neither here nor there?

6          MR. PAYKIN:  We're not at that point yet.  If we got

7    there, obviously if we were going to dock or try to tie up

8    barges there we would do it in a way that would protect

9    everybody, the environment, Hess.  We clearly don't want to

10   pull gas tanks down into the water.

11         THE COURT:  I take it from your perspective -- and

12   this is what I gleaned from your brief -- that the next step,

13   should this case not be dismissed on these threshold issues

14   and ownership issues that your adversary advances -- is a

15   hearing at which the rights of Hess, riparian rights, are

16   balanced against your rights as an owner, correct?

17         MR. PAYKIN:  Correct.

18         THE COURT:  So you actually want me to supervise

19   this business about you shoring up this bulkhead so that it

20   can be used on your side of it, you want me to do that rather

21   than this be done between Hess and Gowanus?

22         MR. PAYKIN:  I would very much appreciate the

23   opportunity to work it out directly with Hess if we could

24   potentially adjourn this and have a discussions between us.

25         THE COURT:  But if it's not worked out -- I'm just

1    trying to envision what the parties think is the appropriate

2    province of the court.

3              I take it you believe that what we ought to have is

4    a hearing at which we roll up our sleeves and get down into

5    the nitty-gritty of it.  Maybe it's undisputed that the

6    bulkhead wouldn't support the use to which Gowanus wants to

7    put it, that is undisputed, but the next step would be to find

8    facts so that I could make a determination as a court sitting

9    in equity as to what Gowanus can do on its side of the wall

10   that's consistent with both its ownership rights and the

11   riparian rights of Hess?

12             MR. PAYKIN:  Correct.

13             THE COURT:  And what would that consist of, some

14   experts coming in about the -- about what?  You tell me, it's

15   your case.

16             MR. PAYKIN:  Well, the first thing would be -- and

17   it's a simple thing -- does Hess have a right to put a fence

18   right where it is in the piping?  Should the fence be moved

19   back or should they be paying us rent to have the fence and

20   the piping running down there on our property?  That is the

21   simple part of it.  Then the next part would be --

22             THE COURT:  You want rent for the fence?

23             MR. PAYKIN:  There is piping that runs down there as

24   well.  That would be simpler part of it.

25             The next part would be, what are the rights of the

1    upland land owner to access the water and to get there and

2    what are our rights to use the water?

3           We're actively looking for, in theory I guess, a

4    dish besides our business, but we would like to be able to

5    sink mooring dolphins into the basin and rent that out to

6    people who dock boats or barges.

7           THE COURT:  Into the basin?

8           MR. PAYKIN:  Into the basin.

9           THE COURT:  I don't understand what impediment Hess

10   would be to doing that, it's your basin.

11          MR. PAYKIN:  It is our basin, but they have

12   rights of access -- that's the thing, they have rights as the

13   upland land owner -- and the prior decision talks about a

14   balancing between the two of us as to their rights to get

15   access to the water and they do bring in, I believe, barges

16   into that area occasionally.

17          THE COURT:  Is the west side of that retaining wall

18   used for barges by Hess?

19          MR. PAYKIN:  I believe occasionally it is.

20          THE COURT:  That's not my understandings.

21          MR. SIMS:  The finger pier is.  The bulkhead is not,

22   it would pull everything out and the oil would fall into the

23   water.

24          MR. PAYKIN:  So from your perspective you have no

25   issue with us?

BHS     OCR     CM     CRR     CSR

18

1          MR. SIMS:  It is true that Hess's position that

2   Gowanus Industrial Park does not own the land underwear.  If

3   somebody did own the land under water they're entitled to use

4   of it.

5          Look, the city is a riparian owner on the north

6   side, they have riparian rights and we're getting along fine

7   with the city.  There is nothing that Gowanus Industrial Park

8   has now been doing on its pier, it has no cleats on its pier,

9   it's not tying up boats on its pier, so to the extent that

10  this is about anything, your Honor, I think it's about the

11  potential to extract some sort of value from Hess by virtue of

12  the fact that it's a riparian adjacent owner and I don't think

13  that's what the law provides for and I think the parties,

14  whoever owns that land, would be obligated, we'd have to live

15  together and conduct our operations in a reasonable way and

16  I'm sure that would happen.

17         MR. PAYKIN:  I believe there is actually a 600-foot

18  ship moored at that pier as we speak right now.

19         MR. SIMS:  I've talked to the superintendent a few

20  days ago and for years there has been nothing over there.

21         THE COURT:  Okay.  To recap where we are so far.  It

22  sounds like what we're looking at -- again not to derogate

23  your arguments about ownership and the like, but it sounds

24  like what we're looking at is a claim for rent for the piping

25  and the fence and a possible dispute -- and I haven't heard

19

1   from your adversary yet on this -- but a possible dispute that

2   might arise out of your modifying the bulkhead so that the

3   west side of it can be put to use by Gowanus; right?

4         MR. PAYKIN:  Correct.

5         THE COURT:  Anything else?  Am I missing something?

6         MR. PAYKIN:  No.  The other issue that he raised,

7   talking about collateral estoppel, again, our claims were

8   essentially denied because of standing in the other case.  We

9   didn't own the property and that isn't grounds for res

10  judicata or collateral estoppel.

11        THE COURT:  Thank you, sir.

12        MR. SIMS:  Judge Glasser not only resolved their

13  motion for summary judgment, he resolved ours as well and the

14  conclusion lays it out, and he granted most of our motion for

15  summary judgment and I think it precludes most of what their

16  present complaint for all of it is.

17        THE COURT:  As I say, I don't mean to derogate your

18  arguments, but I don't need to send this case packing to the

19  Court of Appeals.

20        I think it's a close call.  I'm going to resolve at

21  this point the ownership claims against Hess, recognizing that

22  there is room for disagreement on it, but I don't really feel

23  like sending it packing out making these findings.

24        I don't want to impose litigation on you, you don't

25  otherwise want to engage in.  If you want to resolve these

1   claims somehow, reserving your right to appeal, that's fine

2   with me, but absent a resolution it seems to me that there is

3   some work yet to be done here in terms of balancing the

4   riparian rights of Hess as against the assertive rights of

5   Gowanus, and it seems to me I ought to have a hearing on it.

6               MR. SIMS:  Your Honor, I mean obviously you're the

7   judge, but I don't understand how that could happen because I

8   don't understand what can be weighed when they have no

9   concrete operations or plans.

10              That is, I think the essence of that weighing that

11  the cases talk about is a particularized -- you know, your

12  boats are in here 80 percent of the time and we need

13  40 percent of the time because there is not room for

14  everybody's intended operations to coexist so we've got to

15  work something out.

16              THE COURT:  Suppose I grant your motion on the

17  ground that there is no competing use that has been pled, wait

18  until they come back, and then I'm asked under Rule 15 for

19  leave to replead, which I don't liberally grant, and then they

20  replead it and say, We want to be able to dock barges on the

21  west side of the bulkhead, we want to do that.

22              That is a competing use.  Now we're back to a

23  different situation than we're in right now, and we are in a

24  situation where, if I am hearing your argument right, you can

25  see we got something to resolve because if they put a cleat,

1    or whatever they call it there, it's going to pull down the

2    bulkhead and these things are going to tip into the basin,

3    that would be a bad thing.  Right?

4              MR. SIMS:  Yes.

5              THE COURT:  That's the sort of balancing I have in

6    mind and I don't really see the point in postponing it until I

7    dismiss and then they replead and then we're back here.

8              So why shouldn't I, unless you resolve this between

9    yourselves, subject possibly to reserving the right to appeal

10   the ownership issues -- God bless you, I don't have a problem

11   with that -- unless you resolve it between yourselves, why

12   shouldn't I resolve that issue now?

13             Do you understand my question.

14             MR. SIMS:  I do.  But I think it's too abstract to

15   be decided.  That is --

16             THE COURT:  That's what hearings do, they turn the

17   abstract into the concrete.

18             MR. SIMS:  Well, if there are operations there's a

19   concrete issue, and if there are real plans then there is

20   something to be weighed.  But at present, where they have no

21   operation on their side of the basin, they don't need to go

22   over to the eastern shore of the basin because the western

23   shore is totally lacking in activity, it just seems to me --

24             THE COURT:  What do you want me to wait for them to

25   do, attach a cleat to their side of this bulkhead and then do

22

1  it on an emergency basis?

2      MR. SIMS:  Your Honor, to my way of thinking, they

3  have to have real economic operations to be weighed against

4  the operations on the other side.

5      I think that is one of the holdings of Judge

6  Glasser, but if the court disagrees we can have the hearing

7  you think would be useful.

8      THE COURT:  Do you want to be heard?

9      MR. PAYKIN:  I would appreciate -- if you want to

10  sit down to talk -- to have the opportunity to discuss it

11  before the hearing --

12      THE COURT:  You have, because we're not going to

13  have a hearing this afternoon.

14      MR. PAYKIN:  If we put it off for 30 days?

15      THE COURT:  What discovery would be needed?  I

16  assume you're going to present evidence as to -- you'll figure

17  out what is disputed and what is not, but if everything is in

18  dispute, I assume that there will be some evidence about how

19  integral this wall is to the riparian rights of Hess, not to

20  mention the environmental rights of the entire city.

21      I don't know if it's in dispute about the use

22  activity of this wall in the manner asserted by counsel that

23  Gowanus wants to use it.

24      If there is a dispute then there will be some

25  testimony, some evidence presented about the structural

1   limitations of the bulkhead.

2            If there's a dispute about the engineering viability

3   of this proposed use by Gowanus then I'll have evidence on

4   that, I take it.

5            What are you going to do, put evidence on about what

6   the rent ought to be for a pipe and a fence?  That seems

7   ridiculous to me.  Is that what you intend to do?

8            MR. PAYKIN:  It would be one piece of it.  Other

9   part would be how we think we should be able to use that

10  bulkhead.

11           THE COURT:  That's what we were talking about before

12  that.

13           MR. PAYKIN:  Those two issues, yes.

14           THE COURT:  What two issues?

15           MR. PAYKIN:  About rent for the pipe or just have

16  the pipe off --

17           THE COURT:  What are you going to do, call a real

18  estate agent?

19           MR. PAYKIN:  It's possible that -- I don't know the

20  answer to this, but it's possible if that fence was moved back

21  there's enough space that if somebody -- and even if you put

22  dolphins down in the water so it's not pulling against the

23  bulkhead, that people could actually get off the barge there

24  for whatever -- people can get off the barge and I believe

25  they can get to land.  So it might be another ingress/egress

1   thing to land running down the side.

2          THE COURT:  Might be, but I take it at this hearing

3   you're going to present evidence as what the plan is and how

4   the plan is frustrated by this bulkhead being anywhere from

5   six inches -- what is it, six inches to six feet?

6          MR. SIMS:  Yes.

7          THE COURT:  -- on your property, is that what you

8   claim?

9          MR. PAYKIN:  It is frustrated by, I believe, the

10  fence on top of the bulkhead, our plan.

11         MR. SIMS:  I've read all the cases about wharfing

12  out and bulkheads in New York, and I've not seen one which

13  talked about the right being subject to rent.

14         The lawsuit is a form of extortion, in our view.

15  It's seeking rents for what has been a right since colonial

16  times, the right to wharf out, the right to do the stuff.  If

17  anyone looks just at the photographs, B and C, you'll see the

18  distance between the fence and the pipes and the tanks and --

19         THE COURT:  Hang on.  B and C?

20         MR. SIMS:  Yes.  B and C give a very clear view of

21  how little space we're talking about here.  D as well.

22         It's not as if this land is being used profitably or

23  for purposes other than what the purpose is.  But if the court

24  thinks that a hearing would be useful we can do it.

25         What we would need, I guess, would be discovery with

25

1    respect to the operations they have and what their plans are

2    because we really can't do this laying in the abstract.

3                THE COURT:  I take it you have no problem with that?

4                MR. PAYKIN:  No, your Honor.

5                THE COURT:  Why don't we come up with a little game

6    plan.  Why don't you amend the complaint to set forth what

7    you've expressed here, that you have made here factual

8    allegations that essentially aren't in the complaint, about

9    the intended use of the basin -- what is it called, the

10   Gowanus Basin?

11               MR. SIMS: The Henry Street Basin.

12               THE COURT:  -- Henry Street Basin -- by Gowanus.

13   Why don't you do that -- make it by a week from today you'll

14   amend your complaint.  Fair enough?

15               MR. PAYKIN:  Yes, your Honor.

16               THE COURT:  All right.

17               Then, I think what I'll do is an order that

18   identifies what I think, absent an agreement by the parties,

19   would be the proper subject of a hearing.

20               My goal is, I said it and I'll say it again, my goal

21   is if the case gets sent packing up to the Court of Appeals,

22   we may as well resolve while we're here as much as we can

23   resolve.

24               I will identify the issues that I think an

25   evidentiary hearing ought to address, without prejudice to

1   your suggesting maybe some other issues that ought to be

2   addressed at the hearing, and give you a little time for

3   discovery.

4           Who is the magistrate judge assigned to the case?

5           THE CLERK:  Judge Orenstein, Judge.

6           THE COURT:  Judge Orenstein will preside over that.

7   Let's do it quickly.

8           MR. SIMS:  Your Honor, after they have get their

9   complaint in, if we could maybe spend 30 days seeing if we can

10  work things out --

11          THE COURT:  Of course.

12          MR. SIMS:  I think that would be useful.  Just in

13  terms of scheduling, I don't know what -- I'm going to be out

14  of the country from April 12th to 26th.  I hope I wouldn't

15  have an answer or a motion within that period.

16          THE COURT:  Certainly not a motion, I don't

17  anticipate another round of motions.

18          You can answer it if you like, and obviously you're

19  preserving all of the issues that were asserted in connection

20  with the initial complaint.

21          What I would envision is, to the extent we need an

22  evidentiary hearing, that is to the extent these issues that I

23  have concerns about are not agreed, there is not some

24  consensual resolution of them, I will look for a hearing

25  sometime in the summer, late June, early July, in that ball

27

1    park.  Maybe early June.

2            That will give you enough time to try to work it

3    out, get a little discovery and then we'll do the hearing, if

4    it's necessary.

5            Fair enough?

6            MR. PAYKIN:  Thank you, your Honor.

7            THE COURT:  All right.

8            MR. SIMS: Thank you, your Honor.

9            THE COURT:  Thank you.  Have a good day.

10                 * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BHS      OCR      CM      CRR      CSR