UNITED STATES DISTRICT COURT                    <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
                                             :
GOWANUS INDUSTRIAL PARK, INC.,  :
                                             :
                        Plaintiff,    :        <u>MEMORANDUM AND ORDER</u>
                                             :        10-CV-5522 (JG) (JO)
          -against-                     :
                                             :
HESS CORP.,                             :
                                             :
                        Defendant.   :
---------------------------------------------------x

A P P E A R A N C E S:

      HINMAN, HOWARD & KATTELL, LLP
          185 Madison Avenue, 7th Floor
          New York, New York 10016
      By:   Joseph Noah Paykin
          *Attorney for Plaintiff*

      PROSKAUER ROSE, LLP
          11 Times Square
          New York , New York 10036
      By:   Charles S. Sims
          *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

Gowanus Industrial Park, Inc. ("GIP") claims title to certain parcels of land (the "parcels"), including a strip of property approximately 200 feet wide beneath a body of water known as the Henry Street Basin. The Henry Street Basin lies at the end of Henry Street in South Brooklyn; beyond it is Gowanus Bay, and beyond that is Upper New York Harbor.

In this action, GIP complains of a bulkhead (and of a fence and piping on top of the bulkhead) maintained by Hess Corporation ("Hess"). Hess owns real property adjacent to the Henry Street Basin and uses that property as an oil terminal. GIP contends that Hess's bulkhead rests partially on the parcels. It therefore asserts nuisance and trespass claims against Hess,

seeking damages and preliminary and permanent injunctive relief.  GIP also asks for a declaration that it is the owner of the parcels, including the bulkhead, and that it is entitled to exclusive use and ownership of the bulkhead.  Hess, in turn, challenging GIP's claim of ownership to the parcels, seeks a declaration that it owns the bulkhead as well as those portions of the parcels lying beneath and to the east of the bulkhead and seeks an injunction prohibiting GIP from interfering with Hess's use of the bulkhead or attempting to use the bulkhead without Hess's permission.  Both parties have moved for summary judgment, each asking the court to grant its claims and deny the other party's claims as a matter of law.[1]  For the reasons stated below, each party's motion is denied in part and granted in part.  Specifically, GIP's claims for trespass and private nuisance are dismissed, as are its claims for declarations that (a) the bulkhead lies within the parcels; (b) GIP is entitled to "sole, exclusive and unfettered use of and access to the Bulkhead"; (c) GIP is entitled to construct a catwalk and related pile clusters on the bulkhead; and (d)Hess has no claim to the ownership or use of the bulkhead.  GIP's claim for a declaration that it owns the parcels is granted.  Hess's counterclaims are dismissed, except to the extent that it seeks a declaration that it owns the structures that it built and maintains on the property at issue; that declaration is granted as a matter of law.

## BACKGROUND

This action is the second iteration of a dispute that was previously before my colleague Judge I. Leo Glasser in *Gowanus Industrial Park, Inc. v. Amerada Hess Corp.*, No. 01-CV-0902 (ILG).  Its background – including a thorough history of the creation and title of the Henry Street Basin – is set out in detail in Judge Glasser's decision on the parties' cross-motions for summary judgment in that case, 2003 WL 22076651 (E.D.N.Y. Sept. 5, 2003) ("*GIP I*"), as

---

[1]  Hess also moves for partial summary judgment on the proper measure of damages.  That portion of Hess's motion is denied as moot because, as discussed below, I dismiss the trespass and nuisance claims on which GIP's request for damages is premised.

2

well as in several orders issued in this case, *see* Order Addressing Scope of Hearing, April 18, 2011, ECF No. 22; *Gowanus Indus. Park, Inc. v. Hess Corp.*, No. 10-CV-5522 (JG) (JO), 2011 WL 1841132 (E.D.N.Y. May 13, 2011) (order denying Hess's motion to dismiss in part); *Gowanus Indus. Park, Inc. v. Hess Corp.*, No. 10-CV-05521 (JG) (JO), 2011 WL 1431621 (E.D.N.Y. April 8, 2011) (order inviting *amicus* submission).  I recite here only those facts necessary to resolve the motions before me.  All facts are undisputed unless otherwise noted.[2]

A.    *GIP's Interest in the Parcels*

       The parcels at issue in this case are described in letters patent recorded with the New York Department of State on December 21, 2004.  Aff. John Quadrozzi, Jr. Ex. 6, July 14, 2011, ECF No. 37-2 ("Letters Patent").  They include all lands under water at the Henry Street Basin and are bounded on the east by a bulkhead line established in 1875 that runs along the eastern edge of the Henry Street Basin.  *GIP I*, 2003 WL 22076651, at *4; *see also* 1945 N.Y. Laws Ch. 899; 1875 N.Y. Laws Ch. 398.  That bulkhead line also serves as the western boundary of Hess's property, which is known as the Brooklyn Terminal.  The parcels were appropriated by New York State in 1912 pursuant to statute, *see* 1911 N.Y. Laws Ch. 746, and became part of the New York barge canal system.  *GIP I*, 2003 WL 22076651, at *3.  The state was prohibited by statute from alienating the appropriated lands, 1911 N.Y. Laws Ch. 746, § 14, but in 1944 the legislature deemed the Gowanus Bay Terminal "no longer necessary or useful as a part of the barge canal system, or as an aid to navigation thereon or for barge canal terminal purposes," 1944 N.Y. Laws Ch. 410, § 2, and transferred to the Port Authority of New York "all the right, title and interest of the state" in the lands that had been appropriated for the Gowanus Bay

---

[2]        Unless otherwise noted, the facts are stated as found by Judge Glasser in *GIP I*, as set forth in Hess's Rule 56.1 statement, or as explicitly agreed to by the parties in their motion papers and at oral argument.  The facts in Hess's Rule 56.1 statement are deemed admitted by GIP, which failed to file a response to the statement. *See* E.D.N.Y. Local Civ. R. 56.1 (factual statements set forth in the movant's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted" in the opposing Rule 56.1 statement).

Terminal, *id.* § 3.  In 1945, the 1944 Act was amended to include the underwater lands at the

Henry Street Basin.  1945 N.Y. Laws Ch. 899, § 2 (inserting a new § 18 into the 1944 Act).[3]

Together, the 1944 and 1945 Acts conveyed to the Port Authority title to the parcels at issue in

this litigation.

        Under the 1944 Act, the Port Authority held title to the parcels subject to certain

restrictions.  Although the act was entitled, in part, "An Act providing for the abandonment of a

barge canal terminal and barge canal terminal lands," the Port Authority was required to

"rehabilitate" the pier properties, and it could not use the lands "for any purpose which will

materially and substantially interfere with their use for pier and terminal purposes."  *Id.* § 2(a),

(b).  The act specified that the Port Authority, in maintaining the pier properties, would be

"performing an essential governmental function" by providing "needed transportation and

terminal facilities" to the people of New York and New Jersey.  *Id.* § 12.  The land was to remain

non-taxable.  In addition, the Port Authority was prohibited from granting or conveying title to

the lands "to any person or legal entity other than the state."  *Id*. § 2(c).

        Despite this restriction on alienation, the Port Authority purported to sell the

parcels to GIP in 1997 for $3.5 million and to transfer title by quitclaim deed.  GIP subsequently

initiated the 2001 action before Judge Glasser.  It alleged that it held title to the parcels and that

the bulkhead constructed by Hess encroached on the parcels and constituted a trespass.  On

cross-motions for summary judgment, Judge Glasser determined that the bulkhead was partially

located within the boundaries of the parcels, *GIP I*, 2003 WL 22076651, at *7-*9, but he also

held that GIP did not own the parcels.  He found the attempted 1997 transfer void because the

Port Authority was prohibited by the 1944 Act from transferring title to any entity other than the

---

[3]    As used henceforth in this memorandum and order, "1944 Act" refers to the act as it was amended in 1945.

state.  *Id*. at \*9.  Because Judge Glasser also found that GIP was not in possession of the disputed property, he granted summary judgment in Hess's favor on GIP's trespass claim.  *Id*. at \*2. Judge Glasser also considered a claim of ownership by Hess to a portion of the parcels.  He held that Hess did not hold title to any portion of the parcels, and that decades-long acquiescence by the Port Authority to the presence of the bulkhead had not shifted the property line to the location of the bulkhead because the Port Authority had taken no action indicating its adoption of a new boundary line.  *Id*. at \*7-9.

On November 29, 2004, in response to Judge Glasser's decision, the Port Authority assigned its interest in the parcels to the state by quitclaim deed.  On December 21, 2004, the state deeded the property to GIP by letters patent.  The letters patent state that the transfer from the state to GIP was made "pursuant to Section 50 of the Public Lands Law and Findings of the First Deputy Commissioner of General Services dated December 15, 2004 and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by [GIP]."  Letters Patent at A-91.  The letters patent are signed by Robert J. Fleury, First Deputy Commissioner of General Services, and approved by an assistant attorney general on behalf of Attorney General Eliot Spitzer.  Both the quitclaim deed and the letters patent refer to Judge Glasser's 2003 opinion and state an intent to cure the defect he identified.  Aff. John Quadrozzi, Jr. Ex. 5 at 1-2, July 14, 2011, ECF No. 37-2; Letters Patent at A-95.  The December 15, 2004 findings also cite Judge Glasser's opinion and state that GIP applied to the State Office of General Services "requesting that the State of New York ratify or confirm title in GIP." Charles S. Sims Letter Ex. A, March 30, 2011, ECF No. 12  ("Dec. 15 Findings").

B.      *Hess's Interest in the Brooklyn Terminal*

By deeds executed in 1940 and 1942, Ira S. Bushy & Sons, Inc. ("Bushy") acquired from the estate and heirs of Jeremiah P. Robison title to the land referred to here as the Brooklyn Terminal, the western boundary of which is the eastern bank of the Henry Street Basin. Bushy became a wholly-owned subsidiary of Hess in 1977, and Hess now holds title to the Brooklyn Terminal. Hess's title includes lands and structures along the eastern side of the Henry Street Basin, including a pier known as the finger pier, extending 500 feet southward into the Gowanus Bay. Since acquiring Bushy in 1977, Hess has operated an oil depot on the Brooklyn Terminal property. Oil is offloaded from vessels docked at the finger pier into pipelines for transport to three above-ground storage tanks, which are located on Hess's property within thirty feet or less of the Henry Street Basin. From there, the oil is piped into trucks for delivery to homes and businesses throughout the New York City metropolitan area. The oil tanks were constructed by Bushy or its tenant, Patchogue Oil Co., and were in place by the 1960s.

C.      *The Bulkhead, Fence and Piping*

At some point prior to 1945 – and likely before 1920 – a wooden bulkhead was sunk into the tidebed roughly following the eastern edge of the Henry Street Basin. According to surveys conducted in 1966 and 1972, the wooden bulkhead lay west of the 1875 bulkhead line by distances ranging from five inches to nearly fifteen-and-a-half feet. In the early 1980s, the United States Army Corps of Engineers notified Hess that a portion of the Brooklyn Terminal waterside improvements, including portions of the wooden bulkhead, were deteriorating and should be repaired, as they were "in imminent danger." Hess therefore made modifications to the waterfront in 1984 or 1985. Its repairs included installation of a new bulkhead – the bulkhead at issue in this litigation – for the purpose of shoring up the eastern shoreline of the Henry Street Basin (and the western boundary of the Brooklyn Terminal). The bulkhead is made

of steel and enclosed with a thirty-inch concrete cap.  It is not fit for docking or mooring commercial vessels for loading or offloading goods.  This new bulkhead, like its wooden predecessor, lies west of the 1875 bulkhead line.  Its encroachment onto the property west of that line ranges from one inch at some parts of the bulkhead to just over six feet at others.  Hess estimates that modifying the Brooklyn Terminal to accommodate a bulkhead situated fully to the east of the 1875 bulkhead line would require the approval of various governmental agencies, cost more than $10 million, and place the depot out of service for at least one year.[4]

D.    *The Present Action*

        In March of 1998, after the Port Authority attempted to transfer title to GIP but before that transfer was declared void in *GIP I*, GIP sent Hess a letter complaining that Hess was trespassing on its property.  Hess refused to vacate the property, and in 2001 GIP commenced the action before Judge Glasser.  After the Port Authority and the state attempted for a second time to transfer title to GIP in the wake of *GIP I*, GIP sent a letter dated June 24, 2008 to Hess, again complaining of trespass and demanding that Hess vacate the parcels.  Hess once again refused, and GIP initiated this action on November 20, 2010, seeking monetary, injunctive and declaratory relief for Hess's alleged trespass.

---

[4]        Hess designed the bulkhead to comply with maritime security regulations promulgated by the Department of Homeland Security in 33 C.F.R. Part 105.  The regulations apply to all facilities located adjacent to any water subject to the jurisdiction of the United States and used or maintained by a private entity.  33 C.F.R. §§ 105.400, 101.105 (defining "facility" as used in Part 105).  Pursuant to 33 C.F.R. §§ 101.105 and 2.36(a)(2), "[w]aters subject to the jurisdiction of the U.S." includes all "[i]nternal waters of the United States that are subject to tidal influence."  As the Henry Street Basin is tidal, *City of New York v. Gowanus Industrial Park*, 886 N.Y.S.2d 427, 428 (2d Dep't 2009), it satisfies this definition.  The regulations require that for each facility, a "facility security plan" ("FSP") outlining the security measures taken to protect the facility be submitted to and approved by a local federal officer known as the Captain of the Port ("COTP").  33 C.F.R. §§ 105.400, 101.105.  Hess has submitted an FSP for the Brooklyn Terminal and has received the approval of the relevant COTP.  The fence on top of the bulkhead is a component of the FSP and is intended to control access to the Brooklyn Terminal.  In addition, 33 C.F.R. § 165.169(a)(3) designates all facilities regulated by 33 C.F.R. Part 105 "safety and security zones," and requires that they have signs posted along the shoreline, facing the water, indicating that there is a 25-yard waterfront security zone surrounding the facilities.  Hess has placed signs along the fence on the bulkhead advertising the security zone.

On February 18, 2011, Hess filed a motion to dismiss GIP's initial complaint on the grounds that GIP does not hold title to the parcels and that GIP's claims are barred by res judicata. Oral argument on the motion was held on March 29, 2011. At oral argument, GIP indicated that its initial complaint did not set out the uses to which GIP intended to put the disputed sliver of underwater land, and acknowledged that consideration of those intended uses might be significant in determining whether Hess's continuing use and maintenance of the bulkhead exceeded its riparian rights. I therefore granted GIP leave to amend its complaint, which it did on April 5, 2011. In an order dated April 7, 2011, I deemed Hess's arguments in its motion to dismiss to have been made against the amended complaint, and I reserved judgment on the motion. On May 13, 2011, I issued a partial denial of Hess's motion to dismiss, holding that GIP's trespass and nuisance claims were not barred by res judicata or collateral estoppel.

I reserved judgment on Hess's other argument, *i.e.*, that GIP's claims should be dismissed because it does not hold title to the property. I noted that the state, which sought to convey the parcels to GIP, might have an interest in the court's resolution of GIP's claim of title. I therefore invited the Attorney General of New York State to file an *amicus curiae* brief on behalf of New York, addressing the question of whether the 2004 letters patent successfully vested title to the parcels in GIP. On May 13, 2011, the Attorney General filed an *amicus* brief, to which Hess responded by memorandum on May 27, 2011. Meanwhile, the portion of Hess's motion to dismiss based on GIP's alleged lack of title has been subsumed within the instant motion for summary judgment.

In its amended complaint, GIP asserts claims for trespass and nuisance and seeks damages and preliminary and permanent injunctive relief. GIP also seeks a declaration that (a) the offending bulkhead lies within the parcels; (b) GIP holds title to the parcels, including the

8

bulkhead; (c) GIP "is entitled to sole, exclusive and unfettered use of and access to the Bulkhead"; (d) GIP may construct a series of pile clusters alongside the bulkhead and construct catwalks attaching the pile clusters to the bulkhead; and (e) Hess has no claims to ownership or use of the bulkhead.  In its answer filed on May 23, 2011, Hess asserted a counterclaim, seeking a declaration that (a) GIP lacks title to the parcels; (b) GIP is not entitled to use of or access to the bulkhead; (c) Hess owns title to those portions of the parcels lying beneath and to the east of the bulkhead; and (d) Hess is entitled to exclusive use and maintenance of the bulkhead and those portions of the parcels lying beneath and to the east of the bulkhead.  Hess also seeks a permanent injunction enjoining GIP from (a) attempting to eject Hess from the bulkhead; (b) interfering or attempting to interfere with Hess's possession and occupancy of the bulkhead; or (c) using the bulkhead for any purpose whatsoever without Hess's prior permission.  The parties have cross-moved for summary judgment pursuant to Fed. R. Civ. P. 56.  Each seeks judgment in its favor on each of its own claims and dismissal of all claims raised by its opponent.

DISCUSSION

A.      *The Legal Standard for a Rule 56 Motion for Summary Judgment*

A motion for summary judgment pursuant to Fed. R. Civ. P. 56 should be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" within the meaning of Rule 56 if its resolution "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

9

Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994). When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks omitted). The court may not make credibility determinations or weigh the evidence, and "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

B.      *GIP's Claims for Trespass and Nuisance*

GIP claims that Hess's bulkhead, fence and piping constitute a trespass and a private nuisance. A trespass is an unauthorized entry upon the land of another. *Burger v. Singh*, 816 N.Y.S. 478, 480 (2d Dep't 2006). A private nuisance is an interference with another's right to use and enjoy his land. *Kaplan v. Inc. Village of Lynbrook*, 784 N.Y.S.2d 586, 588 (2d Dep't 2004). In order to maintain an action for trespass or nuisance, a plaintiff must demonstrate an interest in the invaded property. To prevail on a claim of trespass, the plaintiff must demonstrate a right to exclusive possession of the invaded property, *see Curwin v. Verizon Commc'ns (LEC)*, 827 N.Y.S.2d 256, 257 (2d Dep't 2006) ("The essence of trespass is the invasion of a person's interest in the exclusive possession of land[.]" (internal quotation marks omitted)), and to prevail on a claim of nuisance, the plaintiff must show a right to use and enjoy the property, *see Copart Indus., Inc. v. Consolidated Edison Co. of New York*, 41 N.Y.2d 564, 568 (an "essential feature" of private nuisance is "the interference with the use of enjoyment of land . . . actionable by the individual person or persons whose rights have been disturbed"). The nature of the defendant's

incursion is also relevant to a claim for trespass or nuisance.  A defendant can defeat a trespass

action by showing that its entry onto the property was authorized.  *See Golonka v. Plaza at*

*Latham*, 704 N.Y.S. 703, 706 (3d Dep't 2000) ("[A] person entering upon the land of another

*without permission*, whether innocently or by mistake, is a trespasser." (emphasis added)

(internal quotation marks omitted)); *cf. Curwin*, 827 N.Y.S.2d at 257-58 ("[A]n action alleging

trespass may not be maintained where the alleged trespasser has an easement over the land in

question."); *O'Brien v. Ginter*, 744 N.Y.S.2d 511, 512 (2d Dep't 2002) ("A license to remove

items such as minerals, crops, or timber from property is a complete defense to an action to

recover damages for trespass.")  Similarly, the plaintiff in a nuisance action must show that the

defendant's interference with its enjoyment of its property was unreasonable.  *See Kaplan*, 784

N.Y.S.2d at 588 (claim for nuisance could not succeed where plaintiffs "failed to show that their

use and enjoyment of their land was substantially and unreasonably interfered with"); *Weinberg*

*v. Lombardi*, 629 N.Y.S.2d 280, 280 (2d Dep't 1995) (the elements of private nuisance include

an interference with plaintiff's right to use and enjoy land that is "unreasonable in character"

(citing *Copart Indus.*, 41 N.Y.2d at 570)).

        GIP premises its claims of trespass and nuisance on its alleged ownership of the

parcels.  Hess argues that GIP's claims fail because it does not hold title to the parcels.  Hess

further argues that it has obtained title to the portion of the parcels on which the bulkhead sits by

adverse possession.  Finally, Hess contends that its incursion onto the parcels is an authorized

and reasonable exercise of its riparian rights, and accordingly cannot give rise to a claim for

trespass or nuisance.  For the reasons stated below, I find as a matter of law that GIP holds title

to the entirety of the parcels, but that it does so subject to Hess's rights as an uplands owner.  I

further find that Hess's construction and maintenance of the bulkhead constitute a valid exercise

of its riparian rights.  GIP's claims for damages and injunctive relief for trespass and nuisance are therefore dismissed.

        1.     *The Parties' Competing Claims of Ownership*

        GIP seeks a declaration that it holds valid title to the parcels, including the bulkhead.  Hess, in turn, sees a declaration that GIP lacks title to the parcels.  Hess also seeks a declaration that it owns title to the portion of the parcels that extends from the 1875 bulkhead line to the western edge of the bulkhead.  For the reasons stated below, I find as a matter of law that GIP holds title to the entirety of the parcels, and Hess does not own the small sliver it claims.  Accordingly, GIP's motion for summary judgment is granted and Hess's motion for summary judgment is denied with respect to the parties' competing claims of ownership of the underwater lands.

        a.     *GIP's Claim of Title*

        GIP claims that it holds title to the parcels by virtue of the December 2004 letters patent.  Hess challenges the efficacy of the letters patent on two grounds.  First, it advances a collateral estoppel argument.  Hess claims that in *GIP I*, Judge Glasser held that "a permissible transfer of title to the Parcels to GIP *could only be accomplished* by an act of the Legislature, and in any event by the Thruway Authority, not the Commissioner of General Services."  Def.'s Mem. Supp. Mot. Summ. J. at 11, Aug. 12, 2011, ECF No. 39-1 (emphasis in original).  That was not Judge Glasser's holding.  Rather, *GIP I* held that a transfer of the parcels *from the Port Authority* to GIP was void absent an act of the legislature, as the 1944 Act prohibited a transfer of the parcels from the Port Authority to any entity other than the state.  *GIP I*, 2003 WL 22076651, at *9; *see also* 1944 N.Y. Laws Ch. 410, § 2(c).  This case does not involve a transfer of the parcels from the Port Authority to GIP.  The Port Authority assigned its interest in the

parcels to the state by quitclaim deed, and the state in turn deeded the property to GIP by letters

patent.  Hess does not challenge the transfer of the parcels from the Port Authority to the state,

which was not prohibited by the 1944 Act, *see* 1944 N.Y. Laws Ch. 410 § 2(c).  It challenges the

subsequent conveyance of the parcels from the state to GIP, which was not and could not have

been considered by Judge Glasser in *GIP I*.[5]  Accordingly, GIP is not barred by collateral

estoppel from establishing that the 2004 conveyance was valid.  *See Jenkins v. City of New York*,

478 F.3d 76, 85 (2d Cir. 2007) (for collateral estoppel to apply, "the identical issue necessarily

must have been decided in the prior action and be decisive of the present action" (quoting *Juan

C. v. Cortines*, 89 N.Y.2d 659, 667 (1997))).

In its second challenge to GIP's claim of ownership, Hess contends that the letters

patent were facially invalid and therefore failed to vest title in GIP.  Hess argues, first, that § 50

of the New York Public Lands Law, the source of authority cited by the letters patent, authorizes

the Commissioner of General Services (the "Commissioner") to convey only abandoned canal

lands, and the parcels do not constitute abandoned canal lands.[6]  Second, according to Hess, § 50

authorizes the sale of abandoned canal lands only to "occupants of such abandoned canal lands

---

[5]      At oral argument, counsel for Hess argued that the 1944 Act barred the state from transferring the parcels to GIP, even if that was not Judge Glasser's holding.  Hess's argument finds no support in the text of the statute, which states that "the port authority shall not grant or convey title to said pier properties to any person or legal entity other than the state," 1944 N.Y. Laws Ch. 410 § 2(c), but is silent on the state's authority to sell the parcels in the event that the state regained title from the port authority.

[6]      Section 50 of the Public Lands Law reads:

> The commissioner of general services may sell and convey at public or private sale the right, title and interest of the state in and to any real property, acquired for canal purposes, which the commissioner of transportation may determine to have been abandoned for such purposes, or as to which a determination of abandonment shall have been heretofore made pursuant to law.  The commissioner of general services may sell and convey such abandoned lands in the same manner and with the same discretion as he may sell and convey unappropriated state land pursuant to [Public Lands Law § 33].  The commissioner may sell such abandoned canal lands for not less than the appraised value thereof to occupants of such abandoned canal lands or owners of adjacent land who have used or improved such abandoned canal lands either under a permit issued pursuant to section one hundred of the canal law or in good faith without knowledge that such canal lands were owned by the state; provided that such appraised value shall be exclusive of the value of the improvements made on the property by the purchaser.

or owners of adjacent land who have used or improved such abandoned canal lands either under

a permit . . . or in good faith without knowledge that such canal lands were owned by the state."

N.Y. Pub. Lands Law § 50.  Hess argues that GIP does not meet these qualifications.  Finally,

Hess argues that the consideration paid by GIP was insufficient to satisfy § 50's requirement that

abandoned canal lands be sold "for not less than the appraised value thereof."  *Id.*

    Under New York law, when a state has conveyed land by letters patent, the

validity of the conveyance must be presumed unless challenged by a party who can show that it

holds prior title to the property or in a direct proceeding by the state. In all other cases, the patent

may not be questioned "where evidence *de hors* the patent is requisite to establish its invalidity."

*E.G. Blakslee Mfg. Co. v. E.G. Blakslee's Sons Iron Works*, 129 N.Y. 155, 160 (1891); *see also*

*De Lancey v. Piepgras*, 138 N.Y. 26 (1893); *Lally v. New York Cent. & Hudson River R.R.*, 107

N.Y.S. 868, 869 (2d Dep't 1907) (private complainant "must possess a title superior to that of his

adversary" to rely on extrinsic evidence to collaterally attack patent (internal quotation marks

omitted)); *see also Boggs v. Merced Mining Co.*, 14 Cal. 279, 362 (1859) ("[A patent] cannot be

attacked collaterally, even for fraud . . . .  For these matters the right of interference rests only

with the government.  Individuals can resist the conclusiveness of the patent only by showing

that it conflicts with prior rights vested in them.") (cited approvingly in *Dooley v. Proctor &*

*Gamble Mfg. Co.*, 143 N.Y.S. 650 (2d Dep't 1913); *Lally*, 107 N.Y.S. at 869)).[7]  As discussed

---

[7]   Hess argues that this principle does not apply when a plaintiff "uses letters patent as a sword," and
that Hess must be permitted to raise any objection to the letters patent in order to defend against GIP's claims of
trespass and nuisance. Def.'s Mem. Resp. *Amicus* Mem. at 4-6, May 27, 2011, ECF No. 34.  Hess's argument is
contradicted by the case law.  For example, in *E.G. Blakslee Manufacturing Co.*, the plaintiff relied on a state-issued
patent in bringing an ejectment action against the defendant.  129 N.Y. at 156-57.  The New York Court of Appeals
held that the defendant's claimed interest in the underwater properties it occupied was facially inferior to the
plaintiff's, and that the defendant could collaterally challenge the patent relied on by the plaintiff only for facial
invalidity.  *Id.* at 160 ("It is a conclusive answer to both of these contentions that a patent from the state is not
assailable collaterally, unless void on its face."); *see also Jackson ex dem. Mancius v. Lawton*, 10 Johns. 23 (N.Y.
Sup. Ct. 1813) (holding in an ejectment action that the validity of plaintiff's letters patent, which pre-dated

below, Hess does not hold title to any portion of the parcels.  Accordingly, because it cannot rest

upon the strength of its own title, it may not collaterally attack GIP's title unless the letters patent

are void on their face.[8]  *Saunders v. New York Cent. & Hudson River R.R.*, 144 N.Y. 75 (1894);

*Dooley*, 143 N.Y.S. at 653-54.  This principle has been considered long "established," *E.G.*

*Blakslee Mfg. Co.*, 129 N.Y. at 160, and "well settled," *Lally*, 107 N.YS. at 869, for over a

century, and has been clearly and consistently applied by the New York courts.[9]  Less clear is

whether the defects Hess alleges would, if established, render the letters patent void on their face.

 The alleged defects in the state's conveyance of land by letters patent are not

facial if they can be proven only with resort to parol evidence.  *Jackson*, 10 Johns. at 26 ("It

would be against precedent, and of dangerous consequences to titles, to permit letters patent

(which are solemn grants of record) to be impeached collaterally by parol proof . . . ."); *Lally*,

107 N.YS. at 869 (challenge is not facial "where evidence dehors the patent is required to show

---

defendant's claim, could not be impeached by parol evidence, but could only be collaterally attacked if the patent's invalidity appeared on its face).

 [8] Hess attempts to avoid this principle of New York law by means of a collateral estoppel argument. According to Hess, "Judge Glasser necessarily held that Hess may assert GIP's lack of good title in defense against GIP's claims, and that determination of an issue of law is binding as a matter of collateral estoppel." Def.'s Mem. Resp. *Amicus* Mem. at 2-3.  In *GIP I*, GIP claimed to have obtained title from the Port Authority by means of a quitclaim deed.  Accordingly, Judge Glasser was not asked to determine whether and to what extent Hess could challenge the validity of letters patent issued by the state.  Even if he had, I would not necessarily be bound by his ruling on a purely legal matter.  *See Envtl. Defense v. EPA* 369 F.3d 193 (2d Cir. 2004) ("Where pure questions of law – unmixed with any particular set of facts – are presented to a court, the 'interests of finality and judicial economy may be outweighed by other substantive policies.'" (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993) (brackets omitted)).  In any event, I do not hold that Hess may not challenge the validity of GIP's title in its effort to defeat GIP's trespass and nuisance claims, but only that it must do so within the constraints set forth in New York law.

 [9] *Marba Sea Bay Corp. v. Clinton Street Realty Corp.*, 272 N.Y. 292 (1936) is not to the contrary, despite the heavy reliance Hess placed on it at oral argument and in its written submissions.  *See* Def.'s Mem. Resp. *Amicus* Mem. at 4; Def.'s Reply Supp. Mot. Summ. J. at 2 n.2, Sept. 23, 2011, ECF No. 43.  In *Marba*, the Court of Appeals found void an attempted conveyance by the state to a private party of eleven miles of foreshore, which constituted the entire ocean front of Queens.  The court held that the purported grant was *ultra vires*, as the state was without power to grant underwater lands to private parties except for a public purpose, and such a large grant of underwater lands was per se contrary to the public interest.  The mere fact that so much of the foreshore was conveyed, which was apparent on the face of the letters patent, rendered the transfer void.  *Marba*, 272 N.Y. at 296.  The dissenting judge in *Marba* argued that the grant at issue "was not so extensive as to be invalid," and was therefore not void on its face.  *Id.* at 300 (O'Brien, J., dissenting).  However, he did not contest that a state's attempt "to divest itself of all jurisdiction over vast areas of the foreshore" constitutes facial invalidity.  *Id*. at 299.  There is no indication that the majority in *Marba* would have entertained a challenge to the letters patent if it had agreed with the dissenting judge that they were facially valid.

the invalidity thereof" (citing *E.G. Blakslee Mfg. Co.*, 129 N.Y. at 160)).  To establish facial

invalidity, Hess must show that the officer who executed the patent did not have the authority to

make the grant "upon any state of facts." *Saunders*, 144 N.Y. at 85.  This is also the standard

applied by federal courts in assessing the validity of federal land grants.  *See, e.g.*, *Moffat v.

United States*, 112 U.S. 24, 30 (1884); *St. Louis Smelting & Refining Co. v. Kemp*, 104 U.S. 636,

640-41 (1881).  Construing this standard, courts have distinguished between executive officers'

jurisdiction to act and the regularity or validity of their actions.  The former may be inquired into

in a proceeding such as this, while the latter may not.  *See St. Louis Smelting*, 104 U.S. at 646-

47; *Whitehill v. Victorio Land & Cattle Co.*, 139 P. 184, 185 (N.M. 1914).  If all three of the

determinations that Hess challenges – concerning the nature of the land, the nature of the

grantee, and the amount of consideration – are within the Commissioner's jurisdiction, then they

may not serve as a basis for invalidating the letters patent in this action.  If, however, they are

prerequisites to the Commissioner's exercise of jurisdiction, they may.  "The test of jurisdiction is

whether or not the tribunal has power to enter upon the inquiry, not whether its conclusion in the

course of it is right or wrong."  *Whitehill*, 139 P. at 186 (internal quotation marks omitted).

Hess may not question any factual finding the Commissioner was authorized to

make, or maintain that procedures were not faithfully complied with.  If that is all Hess's

allegations amount to, any recitals to the contrary in the letters patent "are *prima facie* evidence

of its regularity and of compliance with the preliminary requisites of the statute."  *Saunders*, 144

N.Y. at 84.  As the New York Court of Appeals has explained, "[t]he rule is firmly established

that the issuing of a patent by the officers of a state, who have authority to issue it, upon

compliance with certain conditions, is always presumptive evidence of itself that the previous

proceedings have been regular, and that all the prescribed preliminary steps have been taken."

16

*De Lancey*, 138 N.Y. at 42.  On the other hand, the defect is jurisdictional if lands purportedly

conveyed "never were public property, or had previously been disposed of, or if [the legislature]

had made no provision for their sale, or had reserved them."  *St. Louis Smelting*, 104 U.S. at 641;

*see also Jackson*, 10 Johns. at 26 (no collateral challenge can be made "unless letters patent are

absolutely void on the face of them, or the issuing of them was without authority, or was

prohibited by statute"); *Mix v. Tice*, 298 N.Y.S. 441 (N.Y. Sup. 1937) (grant may be impeached

collaterally where state had no title to convey).  It is therefore necessary to determine whether

Hess's challenges to the 2004 letters patent implicate the jurisdiction of the Office of General

Services, in which case they may be considered by the court, or constitute mere challenges to the

procedures or findings of that agency, in which case they cannot.

      i.      *Hess's Claim that the Parcels Are Not Abandoned Canal Lands*

The letters patent cite New York Public Lands Law § 50 as the statutory authority

under which they were executed.  That provision authorizes the Commissioner of General

Services to sell abandoned canal lands.  Hess argues that the parcels are not abandoned canal

lands and that the Commissioner therefore issued the letters patent "without authority," *Jackson*,

10 Johns. at 26.[10]  I agree with Hess that neither the legislature nor the canal corporation[11]

abandoned the parcels prior to their conveyance to GIP.  However, I also conclude that the

---

[10]     As I noted in my April 8, 2011 memorandum and order inviting the Attorney General's *amicus* brief, if the Commissioner was without authority to convey the parcels pursuant to Public Lands Law § 50, he may have derived authority from another provision of New York law, such as Public Lands Law § 33.  However, because I find that the transfer was valid under § 50, I need not determine whether it was authorized by another provision of New York law.  In any event, § 50 is the only provision relied on by the Attorney General and GIP in arguing that the conveyance was valid.

[11]     The New York state canal corporation (called the "canal corporation") is a subsidiary of the New York state thruway authority.  N.Y. Canal Law § 2(21); N.Y. Pub. Auth. Law § 382(1).  The canal corporation is empowered to "operate, maintain, construct, reconstruct, improve, develop, finance, and promote the New York State canal system."  N.Y. Pub. Auth. Law § 382(1).

Commissioner *said* the parcels were abandoned, and that is a determination within his jurisdiction and is therefore not a proper subject of inquiry in this context.[12]

Public Lands Law § 50 authorizes the Commissioner of General Services to sell all title and interest of the state in "any real property, acquired for canal purposes, [1] which the [canal corporation][13] may determine to have been abandoned for such purposes, or [2] as to which a determination of abandonment shall have been heretofore made pursuant to law." There is no dispute that the parcels were acquired for canal purposes, and specifically for a barge canal terminal. Section 50 of the New York Canal Law governs the abandonment of canal lands. It confers authority upon the canal corporation to abandon any portion of canal lands "which have or may become no longer necessary or useful as a part of the barge canal system, as an aid to navigation thereon, or for barge canal terminal purposes." N.Y. Canal Law § 50(1). The Canal Law prescribes a method for abandonment, including requirements of notice and an opportunity for all interested parties to comment. *Id.* § 51. In addition to these procedural requirements, the Canal Law contains a significant limitation on the canal corporation's authority to abandon barge canal terminals: "This authority . . . shall not include the abandonment of a barge canal terminal unless such terminal has been by a special act of the legislature previously determined to have become no longer necessary or useful as a part of the barge canal system, as an aid to navigation thereon, or for barge canal terminal purposes." *Id.* § 50(1). There is no indication in the record that the canal corporation abandoned the parcels pursuant to Canal Law §§ 50 and 51.

The Attorney General, in his *amicus* submission, apparently concedes that the parcels have not been abandoned by the canal corporation, but he contends that they fall into the

---

[12]     The December 15, 2004 findings of fact, which are referenced in the letters patent, contain an explicit finding by the Commissioner of General Services that that the parcels had been abandoned. Dec.15 Findings at 1.

[13]     As discussed below, the statute refers to the commissioner of transportation rather than the canal corporation. However, I conclude that this is due to an oversight by the 1992 New York legislature.

second category of abandoned canal lands identified in Public Lands Law § 50, *i.e.*, those "as to which a determination of abandonment shall have been heretofore made pursuant to law." The Attorney General argues that the 1944 Act was sufficient to satisfy this second prong. I disagree. The Attorney General reads the word "heretofore," which was present in § 50 long before 1944, out of the statue.[14] "Heretofore" has one of two possible meanings: prior to the date the statute took effect, or prior to its application. I find the second reading implausible, as it would render the word "heretofore" superfluous. N.Y. Stat. Law § 231 ("In the construction of a statute, meaning and effect should be given to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning."); *see also id.* § 93 ("Generally, a statute speaks . . . as of the time it took effect.") The 1944 Act clearly cannot have determined the parcels abandoned prior to 1928. Accordingly, the 1944 Act does not satisfy the second avenue to abandonment identified in Public Lands Law § 50. Based on the record before me, the parcels were not abandoned canal lands at the time of their transfer to GIP.

However, that does not mean that I may conclude that the Commissioner acted *ultra vires* when he executed the letters patent. Assuming an actual determination of abandonment is required by Public Lands Law § 50, I conclude that it was within the Commissioner's jurisdiction to decide whether such a determination had been made. Accordingly, I may not look behind the patent's facial recitation, or behind the General Commissioner's explicit fact finding that the patent was issued in compliance with Public Lands Law § 50, to extrinsic evidence that the parcels were not in fact abandoned.

---

[14]     The relevant language was inserted into Public Lands Law § 50 in 1928. *Compare* 1921 N.Y. Laws Ch. 431 *with* 1928 N.Y. Laws Ch. 578, § 3.

In contending otherwise, Hess argues, in effect, that statutory authority to convey canal lands does not vest in the Commission until the canal corporation has in fact abandoned those lands. The question is close. It has not been clearly addressed by the New York courts, but I am guided by opinions by the United States Supreme Court in cases presenting analogous facts.

For example, in 1881, in *St. Louis Smelting & Refining Co.*, the Supreme Court endorsed and relied on a holding in one of its prior cases, *Minter v. Crommelin*, 59 U.S. 87 (1856), which concerned a statute providing that no land reserved to members of a particular tribe should be sold by the Land Department unless specifically directed by the Secretary of the Treasury. *St. Louis Smelting*, 104 U.S. at 646 (citing *Minter*, 59 U.S. at 88-89). When the plaintiff in the case produced a patent issued by the Land Department for land reserved to the tribe, the Court held that the patent itself was *prima facie* proof that the Secretary of the Treasury had made the requisite order: "The rule being that the patent is evidence that all previous steps had been regularly taken to justify making of the patent; and one of the necessary previous steps here being an order from the secretary to the register to offer the land for sale, . . . we are bound to presume that the order was given." *Minter*, 59 U.S. at 89; *see also St. Louis Smelting*, 104 U.S. at 646. In *Wright v. Roseberry*, 121 U.S. 488 (1887), the Supreme Court considered the validity of a conveyance of certain swamp lands from California to an individual. The state had received title to the swamp lands from the United States pursuant to federal statute, but the commissioner of the land office had failed to certify the grant to the state as required by the statute. California's effort to convey title to the lands was called into question on the theory that California had not itself received title from the United States. The Court rejected the argument that the commissioner's failure rendered the grant void, as the investiture of title depended upon

the act of Congress, not of the commissioner, and the commissioner's certification was only an official recognition of the lands' character.  *Id.* at 519-21.

I find the Supreme Court's reasoning persuasive and in keeping with New York precedent.  With the passage of Public Lands Law § 50 and Canal Law § 50, the New York legislature authorized the sale of all canal lands with the exception of barge canal terminals that had not been legislatively declared "no longer useful" as part of the barge canal system.  It then established certain procedural requirements that had to be satisfied by the canal corporation and the Commissioner.  *See* N.Y. Canal Law §§ 50, 51; N.Y. Pub. Lands Law §§ 50, 33.  Sale of any canal lands, other than those legislatively exempted, was therefore within the Commissioner's statutory authority and was not prohibited by statute.  *See Jackson*, 10 Johns. at 26.  In these circumstances, where the Commissioner has issued letters patent indicating that he has complied with all procedural requirements, Hess cannot void the conveyance on the basis of extrinsic evidence to the contrary.[15]

ii.   *Hess's Claim that GIP Was Not an Occupant of the Parcels or an Adjacent Land Owner*

Section 50 of the Public Lands Law provides that the Commissioner "may" sell abandoned canal lands

> in the same manner and with the same discretion as he may sell
> and convey unappropriated state land . . . .  The commissioner may

---

[15]     *Whitehill*, 139 P. 184, at first seems to present authority to the contrary, but I find it distinguishable from the present case.  In *Whitehill*, the New Mexico Supreme Court found that an executive official's reservation of lands from entry by homesteaders deprived land officials of Congressionally granted jurisdiction to recognize such entries and voided the commission's grant of a homestead application.  *Id.* at 187. The court found that, under the statutory scheme at issue, the president was authorized to set lands apart so that they were no longer subject to disposition under the public land laws.  *Id.* at 186-87.  The statutory scheme at issue in the present case is different; it does not authorize the canal corporation, or any other executive body, to insulate canal properties from sale.  It instead sets up procedures for the disposition of certain canal properties.  The canal corporation and Commissioner for General Services are required to follow those procedures and make certain findings before selling any such properties, but all such properties are ultimately subject to disposition and are thus within the Commissioner's statutory jurisdiction to sell.

> sell such abandoned canal lands for not less than the appraised
> value thereof to occupants of such abandoned canal lands or
> owners of adjacent land who have used or improved such
> abandoned canal lands either under a permit issued pursuant to
> section one hundred of the canal law or in good faith without
> knowledge that such canal lands were owned by the state . . . .

Public Lands Law § 33 governs the sale of unappropriated state lands and authorizes the

Commissioner to convey such lands "at public auction or by sealed bids."  Section 33 establishes

certain parameters for the sale of unappropriated state land, including notice requirements, and it

requires the Commissioner to set a minimum price for the sale, based on an appraisal, whether

the lands are sold at auction or following solicitation of offers.

       In my April 8, 2011 order inviting the Attorney General to submit an *amicus*

brief, I read § 50 of the Public Lands Law to offer the Commissioner an option: either to sell

abandoned canal land to the highest bidder, according to the procedures set out in Public Lands

Law § 33, or to sell the land to an occupant or owner of adjacent land for not less than its

appraised value.  Hess, by contrast, reads the two prongs in the conjunctive.  It assumes that the

Commissioner can sell abandoned canal lands to no one but their occupants or adjacent

landowners and must do so through the bidding and auction mechanisms laid out in § 33.  This

combination of requirements would be illogical.  Hess's interpretation also overlooks the

statute's use of the word "may" and the absence of any constraining language indicating, for

instance, that the Commissioner can sell abandoned canal lands *only* to their occupants.

       Hess complains that GIP, at the time of the conveyance, was not an occupant of

the parcels or an owner of adjacent land who had used or improved the parcels.  Under my initial

reading of the statute, that would not necessarily disqualify GIP from receiving title.  However,

even if Hess's interpretation is correct, its allegations regarding GIP's occupancy status do not

present a facial challenge to the letters patent.  The New York Court of Appeals has made clear

that this type of alleged shortcoming relies on external evidence and cannot sustain a claim of facial invalidity.  In *New York Cent. & Hudson River R.R. v. Aldridge*, 135 N.Y. 83 (1892), the plaintiff railroad sought to recover possession of a strip of underwater land from the defendant. *Id.* at 85-86.  The state had vested the parties with overlapping interests in the disputed properties, but the letters patent vesting title in the defendant predated those vesting title in the plaintiff.  *Id.* at 91.  To defeat the defendant's apparently superior claim, the plaintiff cited the statute pursuant to which the grants had been made, which provided for grants of underwater lands to the owners of the adjacent uplands.  *Id.*  The plaintiff argued that the defendant was not the owner of the upland adjoining the disputed property and therefore could not legally obtain a grant of the lands under water.  *Id.*  The court refused to consider the plaintiff's argument, because it did not present a facial challenge to the patent, which was not obviously void.  *Id.*  It wrote, "The simple claim that the patent of the defendant is void because he was not the upland proprietor (even if well founded in fact), could not be urged in this action."  *Id.*; *see also E.G. Blakslee Mfg. Co.*, 129 N.Y. at 160 ("The patent of 1889 is valid on its face and affirmatively purports to have been executed to the owner of the upland.  Whether this was, in fact, true cannot be litigated in this action.").

Hess's challenge does not go to the Commissioner's statutory authority to convey title under Public Lands Law § 50, and it does not highlight an invalidity apparent on the face of the patent "when read in the light of existing law, or by reason of what the court must take judicial notice of."  *St. Louis Smelting*, 104 U.S. at 644.  Rather, it challenges the performance of the Commission in exercising its duty to ascertain certain facts before conveying the parcels. The letters patent themselves "establish[], *prima facie*, the existence of the jurisdictional facts authorizing a sale of the lands."  *De Lancey*, 138 N.Y. at 41-42; *see also St. Louis Smelting*, 104

U.S. at 645 ("[W]hen the authority [of the commission] depends upon the existence of particular facts . . . and it is the duty of the [commissioner] to ascertain whether the facts exist . . . its determination is as conclusive of the existence of the authority against any collateral attack, as is its determination upon any other matter properly admitted to its decision.").

      iii.    *Hess's Claim that the Parcels Were Conveyed for Less than Their Appraised Value*

Finally, Hess objects that GIP tendered insufficient consideration for the parcels, and that the procedural requirements of Public Lands Law § 33 were disregarded.  The letters patent state that they were conveyed pursuant to §50 of the Public Lands Law and "in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by [GIP]."  The patent, "being regular and valid upon its face," is "presumptive evidence of itself that the previous proceedings have been regular, and that all the prescribed preliminary steps have been taken."  *De Lancey*, 138 N.Y. at 42; *see also Saunders*, 144 N.Y. at 84 ("[T]he recitals in [the grant] are *prima facie* evidence of its regularity and of compliance with the preliminary requisites of the statute.").  Hess cannot rebut this evidence with extrinsic evidence to show that the proceedings were irregular.  As execution and recording of letters patent "can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned, and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public lands, under the law, is intrusted [sic], that all the requirements preliminary to its issue have been complied with.  The presumptions thus attending it are not open to rebuttal in an action at law."  *St. Louis Smelting*, 104 U.S. at 640-41; *see also Moffat*, 112 U.S. at 30 ("The presumption as to the regularity of the proceedings which precede the issue of a patent of the United States for land, is founded upon the theory that every officer charged with supervising any part of them, and acting under the

obligation of his oath, will do his duty, and is indulged as a protection against collateral attacks

of third parties.").

> b.     *Hess's Claim of Ownership*

Hess seeks a declaration that it owns title to the portion of the parcels lying

beneath and to the east of the bulkhead.  It relies on the doctrines of adverse possession and

practical location.  In the alternative, Hess claims that it is entitled to exclusive use of that area

by virtue of the doctrine of easement by prescription.

> Under New York law,
>
> [a] person or entity is an "adverse possessor" of real property when
> the person or entity occupies real property of another person or
> entity with or without knowledge of the other's superior ownership
> rights, in a manner that would give the owner a cause of action for
> ejectment. . . . An adverse possessor gains title to the occupied real
> property upon the expiration of the statute of limitations for an
> action to recover real property . . . , provided that the occupancy . .
> . has been adverse, under claim of right, open and notorious,
> continuous, exclusive, and actual.

N.Y. Real Prop. Acts. Law § 501; *see also Gallea v. Hess Realty Corp.*, 515 N.Y.S.2d 683, 684

(4th Dep't 1987) ("Over the years various rules with respect to vesting of title by adversity have

evolved.  For the most part these rules have now been codified in RPAPL article 5."), *aff'd*, 71

N.Y.2d 999 (1988).  The referenced  statute of limitations is ten years.  N.Y. Real Prop. Acts.

Law § 501; N.Y. C.P.L.R. § 212(a).  A claim for an easement by prescription is similar to a

claim of adverse possession.  "The enjoyment of easements lies in use rather than in possession,"

but like the occupancy necessary to establish adverse possession, the use necessary to establish

an easement must be "adverse, open and notorious, continuous and uninterrupted for the

prescriptive period."  *Di Leo v. Pecksto Holding Corp.*, 304 N.Y. 505, 603 (1952); *see also City

of Tonawanda v. Ellicott Creek Homeowners Ass'n, Inc.*, 449 N.Y.S.2d 116, (4th Dep't 1982)

25

("The elements of an easement by prescription are similar [to those for adverse possession] although demonstration of exclusivity is not essential[.]"), *appeal dismissed*, 58 N.Y.2d 824 (1983).

The element of adverse use or occupancy demands that Hess's incursion "be inconsistent with the rights of the record owner" before it can succeed on its adverse possession or prescription claims. *Rusy-Bohm Post No. 411, American Legion, Inc. v. Islip Enterprises, Inc.*, 170 N.Y.S.2d 23, 24 (2d Dep't 1958), *aff'd*, 5 N.Y.2d 856 (1958). As discussed below, Hess's use of the area to which it now claims title is a valid exercise of its riparian rights. GIP holds title to the underwater lands, as did the Port Authority before it, subject to Hess's rights as an owner of uplands bordering on the Henry Street Basin. Because GIP and its predecessors could not complain of Hess's use, it lacks the hostile character necessary to give rise to a claim of adverse possession or prescriptive easement. *See Brand v. Prince*, 35 N.Y.2d 634, 636 (1974) ("[T]here must be possession in fact of a type that would give the owner a cause of action in ejectment against the occupier throughout the prescriptive period."); *Merriam v. 352 West 42nd St. Corp.*, 221 N.Y.S.2d 82, 85 (1st Dep't 1961) (to create an easement, a use "must be wrongful in the sense of being actionable at law for a wrong done").

Moreover, land that cannot be alienated by its titleholder cannot be adversely possessed. *City of New York v. Wilson & Co.*, 278 N.Y. 86, 97 (1938) ("When property of the State or city is inalienable, title cannot be obtained by adverse possession. . . . '[T]he whole theory of prescription depends upon a supposed grant. No such grant can be presumed where a grant would be unlawful or contrary to law.'" (quoting *Burbank v. Fay*, 65 N.Y. 57, 66 (1875))). Between 1911 and passage of the 1944 Act, an act of the legislature forbade alienation of the

26

parcels.[16]  1911 N.Y. Laws Ch. 746, § 14.  After passage of the 1944 Act, and as long as the Port

Authority held title to the parcels, they could not be conveyed to a private party.  1944 N.Y.

Laws Ch. 410, § 2(c); *see also GIP I*, 2003 WL 22076651 (finding transfer to private party in

violation of 1944 Act void).  At least until the Port Authority deeded the property back to the

state in 2004, title to the parcels could not be granted by their title holder to a private party such

as Hess, and accordingly, Hess could not acquire such possession adversely.  The ten-year

statutory period could not have begun to run prior to 2004, *see Hinkley v. State*, 234 N.Y. 309,

315-16 (1922) ("No time, for instance, can run against the state as to property which it could not

grant to private individuals, such as . . . canal property . . . ." (citing *Donahue v. State*, 112 N.Y.

145 (1889))), and thus cannot be satisfied fewer than ten years after 2004.

      Hess's claim of practical location is defeated for the same reason.  Under the

doctrine of practical location, "a practical location of a boundary line and an acquiescence

therein for more than the statutory period is conclusive of the location of the boundary although

such line may not in fact be the true line according to the calls of the deeds of the adjoining

owners."  *Hazen v. Hazen*, 809 N.Y.S.2d 659, 661 (3d Dep't 2006) (quoting *Fisher v. MacVean*,

226 N.Y.S.2d 951, 952 (3d Dep't 1966)) (brackets and ellipses omitted).  Hess argues that the

Port Authority's decades-long tolerance of the bulkhead constituted acquiescence in adjusting

the boundary lines between its property and Hess's to conform with the practical barrier created

by the bulkhead.  Under the 1944 Act, however, the Port Authority could not cede any portion of

the parcels to Hess, and it was therefore without power to acquiesce in Hess's apparent claim of

ownership to all lands lying between the 1875 bulkhead line and the western edge of Hess's

bulkhead.

---

[16]     Hess does not allege that it or its predecessors used the area to which it now claims title prior to
1911.

In any event, Hess's claim of practical location was raised before Judge Glasser in *GIP I* and was rejected.  *GIP I*, 2003 WL 22076651, at *8-9.  Judge Glasser held that "[i]n order for the practical boundary to be adopted . . . there must be some action by both landowners," *id.* at *8 (citing *Hadix v. Schelzer*, 588 N.Y.S.2d 337 (2d Dep't 1992); *Wentworth v. Braun*, 79 N.Y.S. 489, 491 (1st Dep't 1903), *aff'd* 175 N.Y. 515 (1903); *Van Dusen v. Lomonaco*, 204 N.Y.S.2d 778, 782-83 (N.Y. Sup. Ct. 1959)), and Hess failed to show any activity taken by the Port Authority, "other than remaining silent," that demonstrated adoption of the boundary line as demarcated by the bulkhead, *id.* at *9.  Hess's claim of practical location is therefore barred by res judicata,[17] and, in any event, I agree with Judge Glasser's reasoning.  *See also Hazen*, 809 N.Y.S.2d at 698 (finding case a "textbook example" of practical location, where neighboring property owners jointly erected and maintained fence); *Robert v. Shaul*, 879 N.Y.S.2d 240, 241 (3d Dep't 2009) ("[T]o be effectual, the acquiescence must be an act of the parties, either express or implied; and it must be mutual, so that both parties are equally affected by it and it must be definitely and equally known, understood and settled." (internal quotation marks and alterations omitted)).  Accordingly, Hess's claim of practical location, like its claims of adverse possession and prescriptive easement, fail as a matter of law.

2.   *Hess's Riparian Rights*

Hess argues that as an owner of uplands bordering on the Henry Street Basin, it has riparian rights that vest in it certain rights of use and access with respect to the basin and its floor.  Hess asserts that maintenance of the bulkhead, fence and piping are within its riparian rights.  GIP disagrees.  It contends that Hess does not own land directly adjacent to the water,

---

[17]   GIP has not argued that res judicata applies to Hess's claim of practical location, but "res judicata is a waivable defense that a court is nonetheless free to raise *sua sponte*."  *Walters v. Indus.& Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011).  Hess itself, in its memorandum in support of its motion, drew the court's attention to Judge Glasser's prior disposition of its claim.  Def.'s Mem. Supp. Mot. Summ. J. at 22 (citing *GIP I*, 2003 WL 22076651, at *9).

and that it therefore possesses no riparian rights with respect to the basin.  GIP argues that it

owns a five-foot strip of land, including the bulkhead, between the basin and the edge of Hess's

property.  At oral argument, GIP argued that Hess itself filled in this land to build the bulkhead

and, by doing so, landlocked its own property and stripped itself of all riparian rights to treat the

five-foot strip as foreshore.

   GIP's theory is defeated by the holding of the New York Court of Appeals in

*Tiffany v. Town of Oyster Bay*, 234 N.Y.15 (1922).  In *Tiffany*, the owner of uplands filled in the

foreshore bordering his property.  *Id.* at 19.  The Town of Oyster Bay was subsequently

determined to be the foreshore's owner.  *Id.* at 18-19.  The Court of Appeals held that "the filled-

in land retains its character as land under water and the plaintiff, as owner of the adjacent upland,

has the same rights and no greater rights in and across the same as if no filling had been done, or

as if the filling had been done lawfully by the town; and that plaintiff's rights as a riparian owner

continue and he has not become an inland owner to the extent of the fill."  *Id*. at 21-22; *see also*

*City of New York v. Third Ave. Ry. Co.*, 294 N.Y. 238, 241 (1945) ("[T]he railway company, as

riparian owner, possesses, as incident to its fee title to the lands above high water mark, rights to

the use of the filled-in lands to which the City has title."); *City of New York v. Wilson & Co.*, 278

N.Y. at 97 ("Land originally under water is treated as land under water even after it is filled.")

   Second, GIP argues that even if Hess is a riparian owner, maintenance of the

bulkhead, piping and fence do not constitute a reasonable exercise of riparian rights, which have

been defined as "the right of access to navigable water, and the right to make this access a

practical reality by building a pier, or wharfing out."  *Town of Oyster Bay v. Commander Oil*

*Corp.*, 96 N.Y.2d 566, 571 (2001) (internal quotation marks omitted).  GIP argues that the

bulkhead precludes Hess from accessing the water because it acts as a barrier between Hess's

29

property and the basin.  In addition, GIP argues that the fence and piping constitute a per se unauthorized encroachment into the basin because they prevent GIP from accessing certain portions of the parcels.  GIP's arguments are incompatible with New York's common law of riparian rights.

GIP reads the term "access" too narrowly, construing it to mean only physical passage directly between the uplands and the water.  The right of access guaranteed to uplands owners is significantly broader, "comprehend[ing] the reasonable, safe and convenient use of the foreshore for navigation, fishing and such other purposes as commonly belong to the riparian owner, exercised in a reasonable manner."  *Town of Hempstead v. Oceanside Yacht Harbor, Inc.*, 328 N.Y.S.2d 894, 896 (2d Dep't 1972), *aff'd*, 32 N.Y.2d 859 (1973).  Two paramount purposes belonging to riparian owners are navigation and commerce.  This right of access has been read to exclude use of the foreshore for commercial purposes entirely divorced from navigation, *see, e.g.*, *In re Neptune Ave., City of New York*, 3 N.Y.S.2d 825, 826 (2d Dep't 1938) (maintenance and operation of a restaurant not within upland owner's riparian rights), *aff'd*, 280 N.Y. 604 (1939) (per curiam); *People v. Steeplechase Park Co.*, 218 N.Y. 459 (1916) (maintenance of fences, pavilions and other amusement park structures does not constitute a reasonable exercise of riparian rights), but where commerce is intertwined with navigation, "[t]he policy of the State . . . has been directed toward encouraging the private development of waterfronts, subject only to the condition that the use be reasonable and not obstructive of navigation," *Oceanside Yacht*, at 898.

Hess's commercial use of the Brooklyn Terminal depends on access to the neighboring waterway.  Uncontroverted evidence establishes that three oil tanks sit on Hess's waterfront property where they can accept deliveries of oil from vessels that dock nearby and

transfer the oil into trucks for overland delivery.  It is also undisputed that the bulkhead, fence

and piping were constructed to facilitate Hess's commercial use of its waterfront property.  The

bulkhead was built to prevent erosion of the uplands along the eastern bank of the basin and to

ensure that the oil tanks do not collapse into the water.  The piping is used to transport oil from

the finger pier to the tanks, and the fence was built to secure the facility with the approval of the

Department of Homeland Security.  In light of these uncontested facts, GIP's position that the

structures do not enhance Hess's access to navigation cannot be sustained as a matter of law.

Hess has, in other words,

> made [its] right of access practical.  It is a general rule that when
> the use of a thing is granted, everything is granted by which the
> grantee may enjoy such use. . . .  [T]he riparian owner's right of
> access to the navigable waters in front of his upland comprehends,
> necessarily and justly, whatever is needed for the complete and
> innocent enjoyment of that right.

*Town of Brookhaven v. Smith*, 188 N.Y. 74, 87 (1907).  Hess is acting on its rights to use the

foreshore both to construct a pier and to pass and transport goods to and from the pier "with

reasonable safety and convenience."  *Saunders*, 144 N.Y. at 88; *see also City of New York v.

Third Ave. Ry. Co.*, 294 N.Y. at 243 (recognizing riparian owner's "right to transport

merchandise to and fro between the navigable water and their lands").

However, Hess, as a riparian owner, does not have an unlimited right to make use

of the foreshore to improve its access.  A riparian owner cannot expand its access "in a manner

that would seriously impair the underwater land owner's rights."  *Commander Oil Corp.*, 96

N.Y. 2d at 573; *see also Hedges v. West Shore R.R.*, 150 N.Y. 150, 157 (1896) ("The owner of

the uplands cannot exercise his easement or right of access to the channel in such a way as to

prevent other parties, to whom the sovereign has granted the bed of the river or some portion of

it, from using their own property in a reasonable way.").  If Hess's use of the foreshore

31

threatened to impair or destroy GIP's ability to use its underwater lands, the court would be called upon to balance the parties' interests and ensure that neither had "an unfettered veto over reasonable land uses necessary to the other's acknowledged rights." *Commander Oil Corp.*, 96 N.Y.2d at 572. But GIP has made no showing that Hess has impaired its ability to use its land in a reasonable way. GIP argues that it is "loathe to exercise its rights to rent its property" because of the presence of the fence and piping on top of the bulkhead, Pl.'s Reply Mem. Supp. Mot. Summ. J. at 9-10, Sept. 12, 2011, ECF No. 42, but it has not identified a single concrete use it wishes to make of the parcels which is thwarted by the presence of Hess's bulkhead. In a basin approximately 200 feet wide, the bulkhead lies between one inch and six feet west of the eastern boundary. It is undisputed that GIP has unfettered access to the east side of the finger pier and to the western foreshore of the Henry Street Basin. It is also undisputed that GIP has not made extensive use of these piers. There is no evidence in the record that would allow a reasonable factfinder to conclude that the bulkhead, fence and piping hinder GIP from making reasonable use of its underwater property.

The only concrete injury GIP complains of is its inability to physically access those portions of its property that lie behind Hess's fence. GIP does not allege that it has any reasonable need of access, but merely asserts that the fence "blocks GIP from its property and therefore, is unreasonable in character."[18] Pl.'s Mem. Supp. Mot. Summ. J. at 4, July 14, 2011, ECF No. 37-1. This argument fails to acknowledge that GIP does not have an absolute right to the underwater lands it received from the state. It holds its title subject to the rights of riparian owners, including Hess. *See Steeplechase Park Co.*, 218 N.Y. at 479-80 ("Where the state has conveyed lands without restriction intending to grant a fee therein for beneficial enjoyment, the

---

[18] At oral argument, GIP's counsel stated that GIP's principal simply does not like "stuff" on his property and seeks the satisfaction of looking at unencumbered property and knowing that it is his.

title of the grantee except as against the rights of riparian or littoral owners, is absolute . . . .").

GIP's objection to the bulkhead, fence and piping amount to an attempt to exercise "an

unfettered veto over reasonable land uses necessary to [Hess's] acknowledged rights."

*Commander Oil Corp.*, 96 N.Y.2d at 572.

C.      *The Parties' Claims for Declaratory Relief*

Both parties have moved for summary judgment on their own and on each other's

claims for declaratory relief.  GIP seeks declarations that the bulkhead lies within the parcels,

that GIP holds title to the parcels, that GIP "is entitled to sole, exclusive and unfettered use of

and access to the Bulkhead," that GIP may construct a series of pile clusters alongside the

bulkhead and construct catwalks attaching the pile clusters to the bulkhead, and that Hess has no

claims to ownership or use of the bulkhead.  Hess seeks declarations that GIP lacks title to the

parcels, that GIP is not entitled to use of or access to the bulkhead, that Hess owns title to those

portions of the parcels lying beneath and to the east of the bulkhead, and that Hess is entitled to

exclusive use and maintenance of those portions of the parcels and of the bulkhead.

1.      *The Legal Standard for Declaratory Judgment*

The Declaratory Judgment Act authorizes a federal district court, in a case of

"actual controversy," to "declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

A federal court has no jurisdiction over a claim for declaratory judgment in the absence of "an

actual controversy in the constitutional sense."  *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d

501, 504 (2d Cir. 1968).  Accordingly, the controversy with respect to which a declaration is

sought must be "definite and concrete . . . admitting of specific relief through a decree of a

conclusive character, as distinguished from an opinion advising what the law would be upon a

hypothetical set of facts." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240-41 (1937); *see also Muller*, 404 F.2d at 504 (distinguishing between "definite, concrete, and substantial controversies which are justiciable, and hypothetical, abstract, or academic ones which are not justiciable").   Where a plaintiff asks a court for a declaration bearing on a controversy that is conjectural or otherwise lacking "immediacy and reality," the court is without jurisdiction to grant it. *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

Even where jurisdiction exists, "[a] district court has broad discretion to decide whether to render a declaratory judgment." *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1100 (2d Cir. 1993); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995) (discussing the "unique and substantial discretion" bestowed on district courts by the Declaratory Judgment Act).   "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.   In general, the propriety of granting declaratory relief depends upon "a circumspect set of fitness informed by the teachings and experience concerning the functions and extent of judicial power." *Id*. at 287 (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 243 (1952)).   The Second Circuit has provided guidance as to how a district court should exercise its discretion. According to the Second Circuit, a district court should render a declaratory judgment if either "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, [or] . . . will terminate and afford relief from the uncertainty, insecurity, and controversy giving

34

rise to the proceeding." *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1970) (quotation omitted), *cert. denied*, 397 U.S. 1064 (1970).

2.   *Location of the Bulkhead*

GIP seeks a declaration that the offending bulkhead lies within the parcels.  GIP sought the same declaration in *GIP I*.  Judge Glasser issued the requested declaration after finding that GIP was entitled to it as a matter of law.  *See GIP I*, 2003 WL 22076651, at *7 ("[T]he Bulkhead is . . . declared to be within the property.").  GIP's second claim for an identical declaration is barred by the doctrine of res judicata.

> The general rule of res judicata applies to repetitious suits involving the same cause of action.  It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations.  The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action . . . [t]he judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment.

*Comm'r v. Sunnen*, 333 U.S. 591, 597 (1948).  While res judicata typically applies to bar relitigation of a claim asserted by the non-prevailing party, I see no reason why GIP should be permitted to waste judicial resources in an effort to obtain the same relief twice.  In addition, because the issue of the bulkhead's location has already been settled, a declaration would not serve to clarify the parties' relations or provide relief from any uncertainty.  Accordingly, Hess's motion for summary judgment is granted with respect to GIP's claim for a declaration that the bulkhead lies within the parcels.

3.   *Ownership of the Parcels*

The parties' dispute over ownership of the parcels presents a justiciable question. All events bearing on GIP's claim of title and Hess's claim of adverse possession have taken

place and have given rise to a real controversy between the parties.  Furthermore, as is made

clear by the discussion of GIP's trespass and nuisance claims above, determining the parcel's

ownership serves a useful purpose in clarifying the legal relations between GIP and Hess with

respect to the bulkhead and will terminate certain aspects of the uncertainty that gave rise to

GIP's claims.  Accordingly, and for the reasons set out above in section B.1 of this memorandum

and order, GIP's motion for summary judgment is granted insofar as it seeks a declaration that it

holds title to the parcels as a matter of law.[19]  Hess's motion for summary judgment to dismiss

that claim is denied.  GIP's motion for summary judgment to dismiss Hess's claim for a

declaration that GIP lacks title to the parcels is granted.  Hess's motion for summary judgment is

denied with respect to its request for a declaration of its own claim of ownership, and GIP's

motion for summary judgment dismissing that claim is granted.

    4.    *Use of the Bulkhead*

GIP seeks a declaration that it may construct a series of pile clusters alongside the

bulkhead and construct catwalks attaching the pile clusters to the bulkhead.  GIP has presented

no evidence that it has concrete plans to engage in any such construction, and its counsel

conceded at oral argument that it did not.  GIP therefore asks the court to determine what the

legal rights and obligations of the parties would be in the face of contingencies that, given the

evidence, are not likely to occur.  The court is without jurisdiction to issue a declaration touching

upon this hypothetical situation.  *See Associated Indem. v. Fairchild Indus.*, 961 F.2d 32, 35 (2d

---

[19]    GIP asks for a declaration that it owns the parcels "including the Bulkhead."  GIP is entitled to the declaration that it owns the parcels as well as the underwater and filled-in lands on which the bulkhead sits.  GIP has presented no evidence that it owns the structures that Hess has constructed on that land, including the fence and piping.  Accordingly, GIP's claim for a declaration that it owns the entirety of the bulkhead itself is denied.  Correspondingly, Hess's counterclaims are granted insofar as they seek a declaration that Hess owns the structures it built and maintains on the foreshore and filled-in lands bordering the western side of the Brooklyn Terminal.

36

Cir. 1992) (when parties ask the court to resolve a hypothetical conflict, the court "should focus

on the practical likelihood that the contingencies will occur").

Even if I did have jurisdiction to issue the declaration GIP seeks regarding pile

clusters and catwalks, I would not.  As discussed above, weighing the rights of an underwater

lands owner like GIP against those of an uplands owner like Hess requires a fact-intensive

inquiry into the conflicting uses each party wishes to make of the foreshore, as well as

reasonable alternatives each party might adopt.  *See Commander Oil Corp.*, 96 N.Y.2d 566

(calling for a balancing of riparian and underwater lands owners' interests and remanding in part

because alternatives to riparian owners' disputed uses were not considered).  Accordingly, GIP's

reasons for wanting to construct pile clusters and catwalks would be relevant.  If, for instance,

GIP wanted to dock boats alongside the bulkhead, the reasonableness of GIP's plans would

depend on such factors as the availability of space at its other docks along the basin and the

feasibility of constructing a dock in another location.  The analysis would be different if GIP

argued that the bulkhead was not structurally sound and it wished to build pilings as additional

insurance that the oil tanks would not tumble into the basin.  Similarly, the reasonableness of

GIP's plans would depend on the design of the pilings and catwalks and the degree to which

such structures would interfere with Hess's commercial operations at the Brooklyn Terminal.  In

light of so many variables, any declaration in the abstract regarding GIP's right to build pilings

and catwalks could not settle the legal relations between the parties or terminate any uncertainty.

Therefore, with respect to GIP's claim for a declaration that it may build pile clusters and

catwalks, GIP's motion for summary judgment is denied and Hess's motion for summary

judgment is granted.  The claim is accordingly dismissed.

GIP also asks for a declaration that it is entitled to sole, exclusive and unfettered use of and access to the bulkhead, and that Hess has no claim to ownership or use of the bulkhead.  Insofar as GIP seeks this declaration with respect to the parties' current uses and plans regarding the basin, I have jurisdiction to decide the claim on its merits, and, as discussed above, Hess's use and maintenance of the bulkhead is within its riparian rights as a matter of law. Accordingly, no reasonable factfinder could find GIP entitled to the declaration it seeks pertaining to current conditions in the basin.  Of course, conditions in the basin may change. Hess may cease to use the bulkhead, fence and piping in connection with commerce dependent on navigation, in which case its maintenance of the bulkhead might exceed its riparian rights. However, these are matters of conjecture about which I can only speculate.  To the extent that GIP's clam for a declaration regarding Hess's use of the bulkhead turns on events that may never come to pass, I am without jurisdiction to grant it.  GIP's claim for declaratory judgment regarding its and Hess's rights to use the bulkhead is accordingly dismissed.

I also dismiss Hess's claim for a declaration that GIP is not entitled to use of or access to the bulkhead, and that Hess is entitled to exclusive use and maintenance of the bulkhead and the area of the parcels lying under and to the east of the bulkhead.  Given current conditions, Hess's maintenance of the bulkhead is reasonable, and GIP may not interfere with the bulkhead, fence or piping.  However, this does not mean that Hess's right to access the bulkhead is exclusive.  Hess's proposed declaration that GIP simply cannot use a portion of the foreshore would controvert the principles of New York riparian rights law, which hold that no party may exercise "an unfettered veto over reasonable land uses necessary to the other's acknowledged rights."  *Commander Oil Corp.*, 96 N.Y.2d at 572.   In the future, should Hess's exclusive use of the bulkhead unreasonably interfere with a use that GIP actually plans to make of its underwater

property, GIP may be entitled to access the bulkhead as well. Once again, this issue is purely

hypothetical and is not one with which I can engage on the current record.

D.       *Hess's Claim for Injunctive Relief*

Hess also seeks a permanent injunction preventing GIP from (a) attempting to

eject Hess from the bulkhead; (b) interfering or attempting to interfere with Hess's possession

and occupancy of the bulkhead; or (c) using the bulkhead for any purpose whatsoever without

Hess's prior permission. I dismiss Hess's claim for a permanent injunction for many of the same

reasons for which I dismissed its claim for declaratory relief. Under New York riparian rights

law, Hess is not entitled to a perpetual guarantee that GIP may never interfere with its use of the

bulkhead and the foreshore on which it sits. In addition, as Hess has emphasized throughout

these proceedings, there is no evidence in the record that GIP plans to use the bulkhead or

interfere with Hess's use. Accordingly, no reasonable factfinder could conclude that Hess will

suffer irreparable harm if the injunction is not granted. *See Roach v. Morse*, 440 F.3d 53, 56

("To obtain a permanent injunction, a plaintiff must succeed on the merits and 'show the absence

of an adequate remedy at law and irreparable harm if the relief is not granted.'" (quoting *N.Y.*

*State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)).

CONCLUSION

For the reasons stated above, both parties' motions for summary judgment are

granted in part and denied in part. Specifically, GIP's claims for trespass and private nuisance

are dismissed, as are its claims for declarations that the bulkhead lies within the parcels, that GIP

is entitled to "sole, exclusive and unfettered use of and access to the Bulkhead," that GIP is

entitled to construct a catwalk and related pile clusters on the bulkhead, and that Hess has no

claim to the ownership or use of the bulkhead. GIP's claim for a declaration that it owns the

parcels is granted.  Hess's counterclaims are dismissed, except to the extent that it seeks a declaration that it owns the structures that it built and maintains, excluding the land on which those structures sit.  Finally, Hess's motion for partial summary judgment on the proper measure of damages is denied as moot in light of the dismissal of GIP's trespass and nuisance claims.  As no claims or counterclaims remain pending, the Clerk is respectfully directed to close the case.


So ordered.


John Gleeson, U.S.D.J.

Dated: October 19, 2011
       Brooklyn, New York